# EXHIBIT A

# (PAGES 1-25)

This Order Is Not Precedential
And Is Not To Be Cited

No. 2--99--0924

**FILED**

AUG 2 1 2001

LOREN J. STROTZ, CLERK
APPELLATE COURT 2nd DISTRICT

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

**RECEIVED**

AUG 2 2 2001

OFFICE OF THE STATE
APPELLATE DEFENDER
ELGIN, ILLINOIS

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Du Page County |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) ) | No. 98--CF--741 |
| DAVID P. BOURKE, | ) ) ) | Honorable George J. Bakalis, |
| Defendant-Appellee. | ) ) | Judge, Presiding. |

### RULE 23 ORDER

Following a jury trial, defendant, David Bourke, was convicted
of first degree murder (720 ILCS 5/9--1(a)(2) & (3) (West 1998)) in
connection with the shooting death of Roger Johnson on April 16,
1998.  He was sentenced to a term of 25 years' imprisonment.  The
jury had been instructed on the affirmative defenses of use of
force in defense of person (720 ILCS 5/7--1 (West 1998)) and use of
force in defense of dwelling (720 ILCS 5/7--2 (West 1998)).
Defendant argues on appeal that: (1) the State did not disprove his
affirmative defenses and prove the elements of first degree murder
beyond a reasonable doubt; (2) this court should reduce his
conviction to second degree murder pursuant to Supreme Court Rule
615(b)(3) (134 Ill. 2d R. 615(b)(3)); and (3) his trial counsel
provided ineffective assistance of counsel in failing to: (a)
strike two prospective jurors, (b) bring a motion in limine to
exclude certain photographs, a videotape of defendant's room, and

No. 2--99--0924

recordings of conversations between a 911 operator and defendant's father, and (c) object to certain of the State's remarks during its closing argument.  We reverse because we conclude that the State did not prove defendant guilty of first degree murder.

## BACKGROUND

### I.   The State's Case-in-Chief.

The defendant did not dispute at trial, and does not dispute on appeal, that he shot and killed Roger Johnson on April 16, 1998, but instead claims that the shooting was justified.  In its case-in-chief, the State established several uncontested facts about Johnson's mode of death and the condition of the scene of his death.  At about midnight on April 16, 1998, officers of the Downers Grove Police Department were dispatched to the Somerset Motel in Downers Grove in response to a 911 call from James Bourke, who had reported that his son, defendant, had shot a man at the motel.  Arriving at the scene, the officers found Johnson's body outside room 15.  Johnson had no vital signs and was pronounced dead about an hour later.  An autopsy revealed that he died of a single gunshot wound to the face.  The bullet had entered his left nostril at an upward angle and became embedded in his brain above the eyes.  Johnson's face was marked by stippling (red marks caused by specks of gunpowder lodged under the skin), which indicated that the gun could have been fired anywhere from one inch to two feet away from Johnson's nose, but probably was fired much less than two feet away given the density of the stippling pattern.  While Johnson's hands were splattered with blood, there were no injuries to them.  Aside from the gunshot wound, Johnson's body bore no

-2-

No. 2--99--0924

signs of any recent injury. At the time of the autopsy, Johnson
was five feet and seven inches tall and weighed 233 pounds. His
blood-alcohol level was .187. Found on his person were two key
rings, two packs of cigarettes, and some United States currency.

After discovering Johnson's body, police obtained a key from
the manager to unlock room 15. Before disturbing the body or the
interior of the room, the police photographed and videotaped the
body and its immediate vicinity and photographed the interior of
the room. The photographs and videotape were offered and admitted
into evidence without objection. The State played the videotape
for the jury. Through the videotape, photographs, and
corresponding testimony, the State established that Johnson was
found lying on his back just outside room 15 with his feet resting
on a doormat located mere inches outside the threshold of the
doorway. A tire track bearing Johnson's blood led away from his
body through the motel parking lot to Florence Avenue and then out
to Ogden Avenue. Johnson's clothing was not disheveled, ripped, or
missing any buttons. He still wore his glasses although they were
pushed up to his forehead. Johnson's left arm was at about a 45-
degree angle to his body and his right arm was resting across his
chest with his right hand near his shoulder. There were drops of
blood around his feet and on the frame of the door to room 15.
There were no signs of forced entry on the door or its frame.

With photographs and two diagrams of the interior of room 15,
the State established that the room was rectangular in shape. The
shorter walls faced south and north and the longer walls east and
west. The room's only outside door opened on the east wall near

-3-

No. 2--99--0924

the southeast corner of the room.   The door opened inward and to
the north.  On the southeast corner of the south wall, immediately
to the south of, and at a right angle to, the outside door was the
bathroom door.   To the immediate north of the outside door, and
running against the east wall, was a dresser on which stood a lamp
and piles of miscellaneous items.   Standing upright at the corner
of the dresser and the east wall immediately to the north of the
doorway were fishing rods.  Piled in front of the wall between the
dresser and the doorway were some miscellaneous items including a
full plastic garbage bag.   A small plastic garbage can stood
upright in the same area.  Running lengthwise against the west wall
was a twin bed, its headboard running against the south wall
immediately to the west of the bathroom door.  Atop the east end of
the headboard were a champagne glass and a coffee pot.  An open gun
case was lying near the head end of the bed.

     Between the dresser and the bed was a space of about two to
three feet, which allowed passage from the north end of the
apartment to the south end.  An armchair was at the foot of the
bed, its back facing it.  Adjacent to the chair and against the
west wall of the room was an end table on which had a lamp and
miscellaneous items.   Immediately to the north of the table was
another arm chair, its back to the west wall.  Immediately to the
north of this chair, in the northwest corner of the room, was a
desk on which was a pile of clothes and other items.  East of the
desk, on the north wall of the room near the northwest corner, was
a closet, in front of which was another pile of miscellaneous
items.   Suspended from a bracket in the northeast corner was a

-4-

No. 2--99--0924

television set, its screen facing into the room.  Both armchairs faced the screen of the television set.

A live .38 caliber shell was lying between the dresser and the bed.  The middle drawer of the middle column of drawers in the dresser was open partially.  Inside, among other items, was a vinyl case containing a box of .38 caliber shells.  Lying near each other just inside the threshold of the room were a spent .38 caliber casing and a bloodstained and partially smoked cigarette.

Officer Dan Ferraro of the Downers Grove Police Department testified that Johnson's clothing bore no signs of a struggle such as rips, tears, missing buttons or dishevelment.  However, Ferraro conceded on cross-examination that the absence of tears on a person's clothing does not necessarily mean that the person had not been involved in a struggle.

Officer Timothy Dutton testified that, although room 15 was "a mess," there were no signs of struggle such as overturned lamps, tables or chairs.  Dutton testified that the placement of Johnson's feet and the absence of blood on the bottom of Johnson's shoes indicated that Johnson fell backward immediately upon being shot.  Dutton testified that Johnson's clothing did not bear signs of a struggle such as tears, rips, missing buttons, or dishevelment.  Dutton also testified that if Johnson had exchanged blows with his assailant, his glasses likely would have been knocked off or moved to one side, which they were not.

On cross-examination, Dutton testified that Johnson might reflexively have raised his hands to his face upon being shot, which would explain the blood on his hands.  Dutton conceded that

-5-

No. 2--99--0924

he did not know how long Johnson lived after receiving the gunshot.
He also testified that he would not expect to see signs of forced
entry into room 15 if the door was ajar when an intruder approached
the room.   Dutton also acknowledged that Johnson's shirt was a
cotton T-shirt and thus had no buttons that could be ripped off.
Dutton also asserted that indicia of a struggle might vary
depending on the nature of the struggle.

On redirect, Dutton testified that he saw no evidence at the
scene that Johnson had crossed the threshold into room 15.  He also
testified that, had two "rather substantial-sized grown men" fought
for their lives from one end of room 15 to the nother, he would
expect to have seen furniture overturned, which he did not.   On
recross, Dutton testified that he could not point to any evidence
that Johnson was <u>not</u> in room 15 that night.  He also conceded that
he did not look for fingerprints in room 15.

Officers Robert Jacobs, Robert Sommerville, and Andrew
Blaylock testified that they were dispatched to the residence of
James Bourke at 4248 Saratoga Street in Downers Grove shortly after
12 a.m. on April 17, 1998.  Officer Jacobs testified that when he
entered Mr. Bourke's condominium, he saw defendant and Mr. Bourke
sitting at a table, on which there were an open carton of Marlboro
cigarettes, a cooler, and two cans of beer.  Defendant was drinking
from one of the cans.  When defendant saw Officer Jacobs he stood
up, placed his hands behind his back, and said, "Here I am.  Take
me."  Jacobs told the defendant to sit down and asked for the
location of the weapon that dispatch had told him was inside Mr.
Bourke's residence.   Mr. Bourke said that the gun was in the

No. 2--99--0924

bedroom.  Jacobs ordered Sommerville and Blaylock to go with Mr.
Bourke to retrieve the weapon.  After learning defendant's name and
date of birth, Jacobs asked defendant what had happened.  Defendant
replied, "Someone came into my room and I shot them, they startled
me and I shot them."  When Jacobs asked for the identity of the
person who came into defendant's room, defendant said, "Take me and
do what you have to do."  On cross-examination, Jacobs testified
that defendant's speech was slurred and his breath smelled of
alcohol, but he was not emotional.

Officer Sommerville testified that when he followed Mr. Bourke
into the bedroom of the condominium, Mr. Bourke retrieved a
semiautomatic handgun from underneath a dresser.  Officer Dutton
testified that the handgun was a .38 caliber semiautomatic.  Dutton
explained that, because it was a single action handgun, the user
had to prepare the gun for firing once a clip is loaded by pulling
back the slide and releasing it, which would cause a round to enter
the chamber.  Dutton testified that if the slide were pulled back
and released while a live round was already in the chamber, the
live round would be ejected.

Officer James Nehls testified that he recovered a cooler from
the dining room table of the Bourke residence on Saratoga.  The
cooler contained three cans of Miller Lite beer and a plastic bag
filled with ice.  Nehls also recovered from the table a half-full
can of Miller Lite beer and a carton of Marlboro cigarettes.  Nehls
recovered an empty can of Miller Lite beer from a garbage can in
the residence.

No. 2--99--0924

Officer Edward Harrison testified that he took photographs of defendant at the Downers Grove Police Station at about 8 a.m. on April 17, 1998. Defendant was directed to strip to his underwear for these photographs, which were offered and admitted into evidence without objection. Harrison testified that the only visible sign of injury he observed on defendant was what resembled a scab of a blister on defendant's left palm.

The parties then stipulated that the bloody tire track found at the Somerset Motel was made by defendant's car, which the police had found at Mr. Bourke's residence. The parties also stipulated that the bullet retrieved from Johnson's body was fired by defendant's handgun, which also was found in Mr. Bourke's residence.

Barbara Russell, who was Johnson's girlfriend on April 16, 1998, testified that she was living with Johnson at the Somerset Motel on that date. Their room was on the west side of the building opposite defendant's room. Russell testified that defendant came to their room between 1 p.m. and 1:30 p.m. on April 16 and asked Johnson if he wanted to go to the DuPage Inn later that day. Johnson declined because he did not have enough money. Russell left for work about 2:30 p.m., which was the last time she saw Johnson alive, and returned home about 11:20 p.m. Russell testified that Johnson was smoking Marlboro Lights on that date.

Gloria Johnson, Roger Johnson's mother, testified that Johnson called her at about 7:30 p.m. on April 16, 1998, and she spoke with him for about 30 minutes. Ms. Johnson testified that Johnson

-8-

No. 2--99--0924

seemed to be in good spirits at the time and he did not indicate that anything unusual had occurred that evening.

Patricia McKenna testified that on April 16, 1998, she lived in room four of the Somerset Motel and Johnson lived in room five next door to her. McKenna had been friends with defendant for about two years. On April 16, McKenna arrived home from work at about 7:40 p.m. She walked to the office area to pay her rent and there saw Johnson on the motel's pay phone. McKenna then went to buy cigarettes at a nearby gas station. Upon returning to the motel, she saw defendant knocking on Johnson's door with a beer in his hand. McKenna informed defendant that Johnson was on the pay phone. Defendant invited McKenna to go out for drinks with him and Johnson down the street, but she declined. After using the pay phone, McKenna listened to a game on her walkman before going to bed at about 1 a.m.

McKenna testified that defendant accompanied her when she bought a cellular phone in 1997 and that she still owned it on April 16, 1998. McKenna testified that she believed defendant owned a cellular phone on that date, but admitted during cross-examination that she seemed to recall that the phone was not working on that date. McKenna testified on cross-examination that she did not see any arguments or any other signs of tension between defendant and Johnson on April 16. McKenna also testified that defendant remarked to her on a couple of occasions that he had heard someone turning his doorknob from the outside at night. Defendant told her that this made him concerned about the possessions in his room.

-9-

No. 2--99--0924

William Yackley testified that on April 16, 1998, he was employed at the Valvoline service center located across the street from the Somerset Motel. Defendant, who then was Yackley's friend of about a year and a half, arrived at Valvoline at about 7 p.m. to get the oil in his car changed. Roger Johnson was with defendant. Yackley testified that defendant and Johnson each drank two or three beers and appeared to be under the influence of alcohol to the extent of a "medium buzz." Yackley testified on cross-examination that defendant and Johnson did not argue with each while they were with him but appeared friendly to each other.

Dawn Mossman testified that she arrived at Suburbanite Bowl in Westmont between 5 p.m. and 5:30 p.m. on April 16, 1998. She met two friends at the bowling alley lounge. She saw defendant enter the lounge with Johnson between 5 p.m. and 5:45 p.m. Mossman heard defendant tell the bartender, Kathy Herdzina, that he and Johnson were looking for a person named Chuck Riha. When Herdzina informed them that Riha would be in later, they had a drink and left about 45 minutes after they arrived. Mossman testified that she noticed no signs of alcohol impairment in either defendant or Johnson at that time.

Mossman testified that she was still in the lounge when defendant and Johnson returned between 7:30 p.m. and 8:45 p.m. that night. Defendant and Johnson took seats at the bar, one on Mossman's immediate right, the other on her immediate left. They remained there with Mossman until about 10:30 p.m. Mossman testified that defendant drank five or six beers during this time. Mossman testified that she engaged in small talk with defendant and

-10-

No. 2--99--0924

Johnson. At one point in the evening, Chuck Riha joined defendant and Johnson. Several times during the night defendant commented to Mossman that she was a "real nice darlin" for putting up with their jokes. At one point, defendant asked Mossman if she was married. Mossman said that she was happily married with two children. Defendant then told Mossman that he had been married and that the marriage failed after his and his wife's child died of sudden infant death syndrome (SIDS). Twice during the evening defendant said to Mossman, "I can be a real son of a bitch." Mossman testified that Johnson and defendant seemed "cordial" and "friendly" to each other while she saw them.

Mossman testified that, at about 9:30 p.m. or 10 p.m., while she was conversing with someone else, she heard raised voices coming from Johnson, Riha, and defendant's party. All three were engaged in this "debate," as she called it. However, by the time she turned to see what was occurring, the disagreement was over. She did not hear what was said during the disagreement. She did not see any pushing, shoving, or punching, nor anyone with a face that seemed flushed from anger. Mossman testified that Johnson and defendant were walking normally when they left the bowling alley. Each was "buzzed" and of "questionable" fitness for driving but neither was "falling down drunk." Mossman arrived home about 11 p.m. She did not see anything unusual occur in the bowling alley parking lot as she departed.

On cross-examination Mossman testified that she remembered someone saying "Oh, cool it," during the disagreement but did not

-11-

No. 2--99--0924

remember anything else. Mossman also testified that she consumed about five "rum and cokes" during the evening.

Kathleen Herdzina testified that she was working as a bartender in the lounge at Suburbanite Bowl on the evening of April 16, 1998. At about 5:30 p.m., defendant and Johnson came into the lounge and ordered a tap beer and a mixed drink. They asked for Chuck Riha. Herdzina told them that Riha was no longer employed at the bowling alley but would be bowling for a league there in about an hour. Defendant and Johnson left about 45 minutes after they arrived.

Herdzina testified that defendant and Johnson returned to the lounge at about 8 p.m. Defendant came in with a cheeseburger, french fries, and a beer while Johnson came in with just a mixed drink. Defendant and Johnson left between 11:15 p.m. and 11:30 p.m while Herdzina was in the stockroom. While in the bar, defendant drank about three or four beers and two or three shots of tequila. Herzdina observed that defendant and Johnson were "very pleasant" to each other during the time she observed them. The one exception was a disagreement that arose when Chuck Riha joined them after he finished bowling. Herdzina did not hear the subject of the dispute but only heard someone say words to the effect of "I'm sorry" or "no problem, you must have misunderstood." Herdzina testified that defendant was intoxicated but not extremely so when he left the bar and that he probably was capable of driving.

Herdzina testified on cross-examination that Johnson was intoxicated, but not overly so, when he left the bar. She thought that defendant probably was less intoxicated than Johnson because

-12-

No. 2--99--0924

he had eaten a cheeseburger and french fries.  Herdzina testified that, with the exception of the brief argument, she did not hear defendant or Johnson say anything in an angry tone towards anyone while in the bar.  Herdzina did not hear Johnson speak to Mossman about a former marriage or a child who died of SIDS.  She noted, however, that she was listening only sporadically to the conversation that was occurring between the three.

Richard Racine, manager of the Suburbanite Bowl on the night of April 16, 1998, testified that he remembered seeing on that night two male individuals whom he had never seen before.  Shown a picture of Johnson by the State, Racine identified Johnson as one of the individuals that he saw that night.  Racine, however, did not recognize defendant as one of those individuals.  Racine testified that he saw the individuals together twice that night; once, while he was working the main bowling counter, and again when he came to the lounge between 11 p.m. and 11:15 p.m. to bartend for Herdzina while she used the restroom.  The individuals left the bowling alley a couple of minutes after Racine arrived in the lounge to help Herdzina.

James Bourke, defendant's father, testified that, just before midnight on April 16, 1998, defendant rang the doorbell of the complex on Saratoga Street in Downers Grove that housed Mr. Bourke's condominium.  After remotely unlocking the outer door for defendant, Mr. Bourke met him in an interior hallway.  Defendant was carrying a cooler containing ice and beer and fell down in the hallway on the way to the condominium.  When defendant entered Mr. Bourke's condominium, he sat at the dining room table where he

-13-

No. 2--99--0924

drank one or two cans of beer and smoked cigarettes. Although Mr. Bourke testified that he believed defendant normally smoked Marlboro cigarettes, he conceded that he did not remember what brand defendant smoked that night or whether defendant had brought a whole carton of cigarettes or just a pack.

On cross-examination, Mr. Bourke testified that when he first saw defendant in the hallway, defendant appeared to be very intoxicated and very upset. Mr. Bourke testified that defendant brought a handgun with him in addition to the cooler. When defendant placed the gun on the kitchen table, Mr. Bourke picked it up, wrapped it in a paper towel, and hid it in his bedroom under a dresser.

## II. Defendant's Case-in-Chief.

Gloria Johnson testified for the defense that Johnson had been married twice but that he was not married on April 16, 1998. Mrs. Johnson testified that Johnson's baby from his first marriage died of SIDS, and that the marriage ended after the death.

Defendant testified that he had been living at the Somerset Motel since May of 1993. Defendant purchased a handgun from his brother less than one week before April 16, 1998, out of concern for his safety. Defendant testified that some "seedy characters" lived at the motel. Defendant had observed people sleeping in the common areas of the motel such as the laundry room and the pay phone area. There had been thefts from the vending machines. On several occasions while he was in his room at night, defendant heard someone jiggling his door knob from the outside. This occurred as recently as two weeks before April 16, 1998. Several

-14-

No. 2--99--0924

times defendant returned home to find marks on the door indicating that someone had tried to enter forcibly. Defendant told the management about these incidents and persuaded them to install a dead bolt on his door. Defendant had a valid firearms license on April 16, 1998.

Defendant testified that he arose at about 1 p.m. on April 16. He went to Johnson's room, which was on the other side of the motel from his. Defendant and Johnson were just acquaintances at the time and were "just starting to get to know each other." They drank beer together outside their rooms and discussed going out for beers. Defendant asked Johnson if he wanted to go out for a couple of beers with defendant that day. Johnson declined because he did not have enough money. Defendant went back to his room and watched television for a couple of hours. At about 4:30 p.m., Johnson came to defendant's room and said that he now had some money and wanted to go to Suburbanite Bowl. Defendant agreed to go. Defendant had consumed two beers by this time.

Defendant testified that he and Johnson arrived at the bowling alley, which was about a half-mile from the motel, shortly after 5 p.m. Johnson asked the bartender for Chuck Riha and was informed that Riha no longer worked there but would be bowling there in a league later that evening. Defendant and Johnson remained at the bowling alley for another hour, during which time defendant ate a double cheeseburger and french fries and drank two or three Miller Lite beers. Johnson had two or three mixed drinks consisting of Canadian Club and Seven-Up. Defendant offered Johnson money for food but Johnson declined.

-15-

No. 2--99--0924

Defendant testified that, when he and Johnson returned to the
motel, defendant went across the street to the Valvoline service
center to speak with his friend, Bill Yackley, about getting his
oil changed.   Yackley told defendant to return about 7 p.m.
Defendant and Johnson agreed to meet there at that time.   Defendant
testified that he drove to Valvoline about 7 p.m. with a cooler
packed with seven or eight beers and some ice.   Johnson walked over
shortly thereafter with his own can of beer.   Defendant, Johnson,
and Yackley each drank about two beers at Valvoline.

Defendant testified that he and Johnson left for the motel
about 30 minutes later.   Defendant returned to his room and drank
another beer.   He then went to Patricia McKenna's room and asked
her if she wanted to accompany him and Johnson to the bowling
alley.   She declined.   Defendant then met up with Johnson, and they
drove in defendant's car to the bowling alley.   Defendant testified
that there had been no tension between him and Johnson up to this
point.

Defendant and Johnson arrived at the bowling alley's lounge at
about 8 p.m. and met with Chuck Riha.   Before they left the bowling
alley at about 11:15 p.m., defendant had five beers and two shots
of tequila.   Johnson continued to drink Canadian Club mixed with
Seven-Up and also shots of a liquor called "Rumpleman's [sic]."
Defendant did not count the number of drinks Johnson consumed, but
he knew that Johnson drank the entire time they were at the bar.
Defendant testified that he conversed with Dawn Mossman.   He
denied, however, that he had ever been married or that he ever had

-16-

No. 2--99--0924

a baby who died of SIDS. Defendant described his conversation with Johnson that night as consisting of small talk and jokes.

Defendant testified that Johnson "started becoming little bit boisterous" and a "little smart with the mouth" at one point in the evening. When Johnson's language became offensive, Riha told him to "cool it." This incident aside, defendant characterized his interaction with Johnson at the bowling alley as "cordial." Up to this point in the evening, Johnson had made no threats to defendant.

Defendant testified that he told Johnson at about 10:30 p.m. that he wanted to leave the bowling alley. Johnson responded by ordering a fresh drink. Defendant waited for Johnson to finish the drink, which took about 20 minutes. After speaking with the bartender for about five more minutes, defendant and Johnson walked toward the exit. On the way, Johnson said he wanted to use the restroom. Defendant testified that he was tired and anxious to get home at this point and that he told Johnson to wait to use the restroom at the motel, which was only a short ride away. Johnson said, "Fuck you," and walked to the restroom. Defendant waited in his car in the parking lot for 10 minutes before deciding to drive away. As defendant left the parking lot, Johnson ran out of the bowling alley towards the car, hurling expletives and screaming for defendant to stop. Defendant continued driving, telling Johnson through the open driver's window that he had had enough of Johnson's "shenanigans" for that night and that Johnson could walk home.

-17-

No. 2--99--0924

Defendant testified that he parked his car in front of his room when he arrived at the motel. Defendant got ready for bed and began watching television. Leaving his door open about an inch for ventilation because his window was broken and would not open, defendant smoked cigarettes and drank a beer. Because he sat in the chair that was situated with its back to the end of the bed, defendant's back was to the door. Between 15 and 30 minutes later, defendant heard his door crash open. He heard the fishing rods break that were standing up behind the door. Defendant's first reaction was to reach with his right arm for his handgun, which he kept in an open case in the bottom middle drawer of the dresser. As defendant reached for the gun, someone grabbed the hair on the left side of his head. Someone's foot also closed the dresser drawer against his hand. At this point, defendant did not look at the intruder or otherwise know who it was. Defendant grasped the gun and managed to pull his arm out of the drawer, inadvertently pulling the case out in the same motion. Defendant then felt a hand grasp his right hand. As he felt himself pulled out of his chair backward and to his right, he placed his left hand on the dresser to maintain his balance. He heard someone scream, "If you are going to shoot me, I am going to kill you, you mother fucker." At this point, defendant turned to face the intruder and saw that it was Johnson. Defendant testified that Johnson's eyes were "extremely bloodshot" and "very dark, very angry." Johnson yelled, "You make me walk home, you mother fucker." Defendant told Johnson to leave his house. Johnson responded, "I am going to fucking kill you."

-18-

No. 2--99--0924

Defendant testified that he pushed Johnson backward toward the bathroom. Johnson's back struck the bathroom door forcefully, causing it to swing inward violently and rebound against the bathroom wall. Defendant and Johnson struggled over the gun. During the course of the struggle, Johnson raised his arm, knocking defendant's glasses off.

Defendant testified that he managed to manipulate Johnson to the front door. Johnson had both hands on defendant's right hand and was twisting defendant's right arm. Defendant continued to yell for Johnson to leave the house. Defendant and Johnson were now a foot from the threshold of the door with Johnson's back facing the threshold. As defendant pushed Johnson further backward he felt the gun slipping from his hand. Defendant twisted his arm in response and managed to point the muzzle toward Johnson. He then pulled the trigger. Defendant testified that he vividly remembered the sound of the discharge and the smell and taste of burnt gunpowder. Johnson fell backward onto the ground and defendant heard the breath come out of him. Defendant testified that he had no doubt that Johnson would have killed him with his own gun had Johnson seized control of it.

Defendant testified that he was in shock after Johnson died. Although he confessed that he was in a "trance" afterward, defendant believed that he walked back into his room and picked up the coffee pot that had been knocked off the headboard onto the bed during the struggle near the bathroom. He also righted the chair he had been sitting on, which had been knocked over when Johnson pulled him backward, and also picked the gun case off the floor and

-19-

No. 2--99--0924

placed it on the bed. Because his room had no phone and his
cellular phone was inoperative, defendant decided to drive to his
parents' home, which was about a mile away from the motel. Before
leaving, defendant took his wallet and keys from the dresser and
placed the gun in the pocket of his jacket. Defendant kicked
Johnson's leg out of the threshold so that he could close the door.

Defendant testified that he parked his car at his parents'
residence and brought his gun and cooler, which contained beer and
cigarettes, inside. Defendant testified that he told his father
that he "had just shot somebody" and asked his father to call the
police for him. The police arrived and arrested defendant.

On cross-examination, defendant admitted that, despite the
quarrel he had with Johnson and despite his concerns about the
security of his room, he left his door ajar when he returned to his
room from the bowling alley. Defendant testified that he did not
hear the garbage can behind the door move when the door burst open,
although he did hear fishing rods snap. The State then showed a
photograph of the front door in defense exhibit number one to the
defendant, and defendant acknowledged that the photograph showed
that the garbage can and garbage bag were closer to the door than
the fishing rods. Defendant testified that the door probably could
open only a little more than 90 degrees due to the objects behind
it.

Defendant testified that he did not look at the intruder as he
reached for his gun in the drawer. Defendant did not feel someone
grab his hair until he reached into the dresser drawer. At that
point, defendant could only see the gun out of the corner of his

-20-

No. 2--99--0924

right eye because his head was pulled back by the hair. Defendant stated that, at one point while he was reaching for the gun, Johnson's left hand was clutching defendant's hair, his right hand was clutching defendant's lower right arm, and his right foot was pushing the dresser drawer closed.

Defendant testified that the gun case on which the gun was sitting was lying "almost flat" in the drawer because the other side of the case was weighed down with some loose shells. Defendant acknowledged that the box of .38 caliber shells was in another drawer at the time. Defendant testified that, when Johnson had his foot against the drawer, it was open only two or three inches because it was closed against his wrist. Defendant testified that eventually he was able to free his hand from the dresser drawer. Defendant conceded that the combined thickness of his hand, the gun, and the case was greater than two or three inches.

Defendant further testified on cross-examination that the chair he was sitting on when Johnson entered fell over as Johnson pulled him backward and to his right. Defendant was pulled out of the chair and fell onto his right knee. As defendant turned to face Johnson, the latter's left hand lost its grip on defendant's hair and then grabbed defendant's right hand, which still held the gun.

Defendant testified that he then stood up. His left hand was free but he did not use it to strike Johnson or try to free his right hand from Johnson's grip. Instead, he used it to push against Johnson's neck and chin. Defendant testified that he did

-21-

No. 2--99--0924

not attempt to squeeze Johnson's neck because he was more concerned about the gun. Defendant managed to push Johnson back past the dresser and into the bathroom door. In the process, defendant's shoulder struck the front door, closing it partially so that it was about 90 degrees open. Johnson then pushed defendant backward. Defendant was rotated several degrees. His back and lift hip in turn struck the headboard of the bed, dislodging the coffee pot.

At this point, the State again showed defense exhibit one to the defendant. Defendant acknowledged that a photograph attached to the exhibit showed a champagne glass sitting next to the coffee pot on the headboard. Defendant testified that the glass was plastic and that he believed it also was knocked over during the struggle. Defendant, however, did not remember placing it back on the headboard.

Defendant further testified on cross-examination that he and Johnson then struggled toward the front door. Defendant continued to push with his left hand against Johnson's neck and chin. Defendant tried to push Johnson, whose back was to the doorway, out of the room but could not because Johnson had one foot on the door jamb and one foot inside the room. Defendant then placed his left hand on one of Johnson's hands and twisted. Johnson lost his grip with that hand, enabling defendant to twist the gun upward until the muzzle was pointed at Johnson's face. Defendant testified that he then deliberately pulled the trigger. Johnson was in the doorway when he was shot. He fell backward and lay with one of his feet in the doorway. Johnson lay partly in the space were

-22-

No. 2--99--0924

defendant's car was parked. Defendant testified that, on April 16, 1998, he was 5 feet 11 inches tall and weighed 200 pounds.

Defendant testified that he remembered picking up the coffee pot, chair, and gun case after Johnson was shot. Asked if he picked up the coffee pot and champagne glass from the floor, defendant replied that he thought they had fallen on the bed rather than the floor. Asked if, in contrast to his previous testimony, he now remembered picking up the champagne glass, defendant said, "Not really." Shown a photograph of the dresser in defense exhibit number one, defendant admitted that the only objects on his dresser that appeared upset were a lamp shade that was off-center toward the east wall and an envelope that was lying on the floor in front of the dresser.

Defendant testified that he did not remember driving to his parents' house after shooting Johnson or, once there, whether he used the elevator or the stairs. Neither could he recall whether he had taken the cooler from his room nor whether it was already in the car when he drove to his parents. Defendant testified that the ice that was in the cooler was there from earlier that evening. Defendant said that he "believed" but did not "know" that he brought a carton of Marlboro cigarettes into his parents' residence. Defendant could not remember drinking a beer or smoking a cigarette at his parents' house, but he conceded that he could have.

Defendant testified that he drank 12 beers and two shots between 3:30 p.m. and 11 p.m. and that his feeling of intoxication was highest when he was at his parents. Defendant testified that

-23-

No. 2--99--0924

he was "falling down drunk" at his parents' but not when he left
the bowling alley.   Defendant defined "falling down drunk" as a
state of intoxication in which one loses his balance.   The State
then impeached defendant with his testimony at the hearing on his
motion to suppress that he was "falling down drunk" at the bowling
alley.   Defendant then conceded that he was "falling down drunk"
when he returned to the motel from the bowling alley.   Defendant
testified that, despite this level of intoxication, he remembered
the foregoing details about his struggle with Johnson.

Defendant testified that he remembered falling down only once
at his parents' but acknowledged that others had told him he fell
down twice.   Defendant testified that he told his father that he
had killed a man in self-defense.   Defendant also remembered
telling his father that someone had broken into his room, and that
he had shot and killed the man during a fight.   Defendant, however,
did not remember the exact words he used.   Asked if he remembered
telling his father that he had shot a man who came over to his
room, defendant said he did not recall.   Asked if he told his
father that he had a violent discussion with this man and that the
man had threatened him, defendant said he did not recall.
Defendant also could not recall whether he told his father that the
man had tried to enter his room and that defendant would not let
him inside and shot him.   Asked whether he remembered telling his
father that this man started an argument and tried to push his way
into defendant's room, defendant said that he did not recall.
Defendant testified that he could not remember any statements he
made to his father while the latter spoke with the 911 operator.

-24-

No. 2--99--0924

Defendant said that he did not recall many events after the
shooting because he was in shock.  Defendant testified that he did
not believe he mentioned at the hearing on his motion to suppress
that he picked up the coffee pot, champagne glass, or gun case,
after shooting Johnson.

Defendant testified on redirect that Johnson came into his
room uninvited and attacked him without provocation.  Defendant
also reiterated his belief that Johnson would have killed him with
his own gun had Johnson seized the gun from him.

### III. State's Rebuttal.

The State called James Bourke in rebuttal and asked several
questions concerning what defendant told him about the shooting of
Johnson after defendant arrived at his home on April 16, 1998.  Mr.
Bourke recalled that defendant told him that Johnson had come to
defendant's room and made violent threats as he pushed his way into
the room.  Mr. Bourke did not recall that defendant told him that
Johnson had physically attacked defendant.  Mr. Bourke could not
remember defendant telling him that Johnson attempted to enter his
room but defendant would not let him inside.  Nor could Mr. Bourke
recall that defendant had a violent argument with Johnson before
Johnson entered the room.  Confronted with his grand jury testimony
that defendant had told him that Johnson "was trying to get in the
door" but defendant "wouldn't let him in the door" and shot him,
Mr. Bourke testified that he did not recall giving that testimony.
Mr. Bourke also did not recall telling the 911 operator that
defendant had been attacked by a man at his front door, and that

-25-