# EXHIBIT A

# (PAGES 26-46)

No. 2--99--0924

the man had tried to come into the room and defendant shot him after a scuffle.

Mr. Bourke testified that he remembered telling Sergeant Bob Porter and Officer Jim Nehls of the Downers Grove Police Department in the early morning hours of April 17, 1998, that someone had pushed his way into defendant's room. Mr. Bourke did not remember telling them that defendant had said that this individual attempted to get into the room and defendant pushed him out.

On cross-examination, Mr Bourke testified that he was 76 years old in April 1998 and has had memory problems due to his age. He could not remember in detail his conversations with police detectives at his condominium and the police station or his testimony in front of the grand jury. He did, however, recall defendant telling the detectives that Johnson had pushed his way into defendant's room. Mr. Bourke vaguely remembered turning to defendant while on the phone with the 911 operator and asking defendant if Johnson had come into the room. Mr. Bourke remembered then telling the 911 operator, based on defendant's reply, that Johnson had come into defendant's room and threatened defendant and that defendant tried to push him out of the room. Mr. Bourke testified that defendant was not clear at that time as to whether a struggle occurred between him and Johnson.

The State also called Officer James Nehls, who testified that Mr. Bourke said during an interview on April 17, 1998, at the Downers Grove Police Station that defendant told him that a man had tried to force his way into his room, which caused a violent argument, and that defendant then shot the man.

-26-

No. 2--99--0924

The parties then stipulated to the admissibility of a recording of two conversations between Mr. Bourke and a 911 operator that occurred on April 17, 1998. The recording was played, but not transcribed, for the jury. The material parts of the conversations are as follows. In the first conversation, Mr. Bourke informed the operator that defendant "was attacked by a gentleman at his [defendant's] front door and he [defendant] shot him." Asked by the operator where his son was presently, Mr. Bourke replied that defendant was standing nearby explaining to him what happened. After dispatching officers, the operator phoned Mr. Bourke. The operator asked how defendant was doing, and Mr. Bourke replied that defendant was "very upset." The operator asked if the man had attacked defendant, and Mr. Bourke answered in the affirmative. The operator then asked if the man had been trying to get money from defendant. Mr. Bourke then asked defendant if the man had tried to get money or had threatened defendant. The tape then went blank for a short time. When it resumed, Mr. Bourke then told the operator that the "man came to the door, then they got into an argument, then this fellow threatened him, and he [defendant] shot him." When the operator asked if the man had come up behind defendant, Mr. Bourke said, "no," and that the man had come in through the front door. Mr. Bourke then asked defendant if the man had come into defendant's room. Receiving an answer from defendant which was inaudible on the recording, Mr. Bourke said that the man "tried to" come into the room and that they then "got into a tussle" and defendant "shot him." Mr. Bourke told the

-27-

No. 2--99--0924

operator that he hid defendant's gun in the apartment. Downers Grove police officers then arrived and the phone call ended.

The parties stipulated that the jury could consider, as both impeachment and substantive evidence, those portions of defendant's testimony at the hearing on his motion to suppress and Mr. Bourke's testimony before the grand jury that the State had read into the record during its cross-examination of defendant and Mr. Bourke. The parties also stipulated that the jury could consider the recording of the 911 calls as substantive evidence.

In its closing argument, the State argued that "what the evidence here has shown is an individual who had an argument with a neighbor *** appears to have deliberately maneuvered that argument to his door stoop so he could kill him." Defendant "taunt[ed]" Johnson by abandoning him in the parking lot of the bowling alley. Upon returning to the room, defendant took out his gun, placed the case on the bed, and prepared the gun for firing by pulling back the slide on the gun, which caused a live round to be ejected from the chamber onto the floor between the dresser and the bed. The State submitted that defendant left the door to his room open so that Johnson "would come in and get hit." Defendant, the State argued, "was loaded up and ready, and he stood behind the door and he waited." "That door swung open and [Johnson] was a goner," the State asserted. Johnson "never knew what hit him."

The State attacked several aspects of defendant's account of his confrontation with Johnson. The State argued that neither defendant's nor Johnson's bodies nor defendant's motel room showed signs "of this absolutely, monumental, powerful physical struggle

-28-

No. 2--99--0924

between two grown men ***."  The State also disputed defendant's
claim that he had to move one of Johnson's legs in order to shut
the front door of the motel room.  The State submitted that the
photographs of Johnson's body showed that neither of his legs, when
fully extended, would block the door.  The State also argued that
defendant, who on his own admission was "falling down drunk" when
he left the bowling alley, was in no condition to engage in such a
powerful struggle with Johnson.

The State further argued that defendant's claim that he heard
the door strike the fishing rods was inconsistent with the fact
that a garbage bag and other items were between the door and the
fishing rods.  The State also argued that the cigarette lying
inside the door bore the markings of a Marlboro Light rather than
a regular Marlboro.  As a pack of Marlboro Lights was recovered
from Johnson's body, and a carton of Marlboro cigarettes was
recovered from the kitchen table in Mr. Bourke's residence at which
defendant was seated when police arrived, the State argued that the
cigarette in the doorway was Johnson's, not defendant's.  The State
then suggested that Johnson would not have initiated a physical
struggle with defendant while smoking a cigarette.  The State also
urged that the fact that the cigarette did not appear trampled was
evidence that defendant and Johnson did not struggle near the
doorway.

The State also disputed defendant's claim that he
inadvertently pulled the gun case out of the drawer along with the
gun.  The State asserted that, because the case was weighed down on
one side only by a few loose shells, it could not have lain flat in

-29-

No. 2--99--0924

the drawer. Thus, the State urged, the drawer, which was closed tightly on defendant's hand, was not open wide enough for the combined thickness of the case, the gun, and defendant's hand. The State also claimed that defendant could not explain the presence of the live shell on the floor between the dresser and the bed. The State argued that the shell was there because defendant had ejected it from the gun as he drew back the slide in anticipation of Johnson's arrival at defendant's room. The State further argued that defendant's vivid memory of the details of his struggle with Johnson was inconsistent with his admission that he was "falling down drunk" when he returned home from the bowling alley.

Lastly, the State argued that the true statement of what occurred between defendant and Johnson was contained in the 911 recordings, in which Mr. Bourke stated that Johnson had tried to come in the room but defendant shot him.

The jury found Bourke guilty of first degree murder. Judgment was entered on the verdict on April 27, 1999.

ANALYSIS

In a criminal case, the State has the burden to establish beyond a reasonable doubt the essential elements of the offense. People v. Sanford, 24 Ill.2d 365, 368 (1962). A court reviewing the sufficiency of the evidence underlying a criminal conviction must not retry the defendant but, viewing the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found the essential elements of the crime satisfied beyond a reasonable doubt. People v. Smith, 185 Ill. 2d 532, 541 (1998). A reviewing court must give due

-30-

No. 2--99--0924

consideration to the fact that the court and jury saw and heard the witnesses. <u>Smith</u>, 185 Ill. 2d at 541 (1998). While assessing the credibility of a witness is within the province of the trier of fact, and the findings of a jury on such matters are of great weight, the jury's determination is not conclusive. <u>Smith</u>, 185 Ill. 2d at 542. Rather, a reviewing court must reverse a conviction where the evidence of guilt is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. <u>Smith</u>, 185 Ill. 2d at 542. "[A] judgment of conviction can be sustained only upon credible evidence that removes all reasonable doubt of guilt, and where the evidence of the prosecution is improbable, unconvincing or contrary to human experience, [a reviewing court] will not hesitate to reverse" that conviction. <u>People v. Stevenson</u>, 25 Ill.2d 361, 365 (1962).

Section 9--1(a) of the Criminal Code of 1961 (Code) (720 ILCS 5/9--1(a) (West 1998)) states:

"(a) a person who kills an individual without lawful justification commits first degree murder if, in performing the acts that cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible

-31-

No. 2--99--0924

felony other than second degree murder.   720 ILCS 5/9--1(a)(1), (2), (3) (West 1998).

The two justifications that defendant posited for his use of deadly force in killing Johnson are set forth in section 7--1 (use of force in defense of person) and section 7--2 (use of force in defense of dwelling) of the Code.   720 ILCS 5/7--1, 7--2 (West 1998).   Section 7--1 of the Code provides as follows:

> "Use of Force in Defense of Person.   A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force.   However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."   720 ILCS 5/7--1 (West 1998).

Thus, the elements of defense of person are:   (1) force is threatened against a person; (2) that person is not the aggressor; (3) the danger of harm is imminent; (4) the force threatened is unlawful;   (5) the person threatened actually believes that (a) danger exists, (b) the use of force is necessary to avert the danger and (c) the kind and amount of the force that he uses are necessary; and (6) these beliefs are reasonable.   People v. Denny, 221 Ill. App. 3d 298, 301 (1991).

Section 7--2 of the Code reads in relevant part as follows:

> "Use of Force in Defense of Dwelling.   A person is

-32-

No. 2--99--0924

justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling.  However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

> (a)  The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling ***."  720 ILCS 5/7--2 (West 1998).

Defense of person and defense of dwelling are both affirmative defenses.  See People v. Ellis, 107 Ill. App. 3d 603, 610 (1982); People v. Williams, 96 Ill. App. 3d 8, 16-17 (1981).  Once an affirmative defense is raised, the State must, with proof not susceptible to reasonable doubt, disprove that defense as well as prove all elements of the offense.  See People v. Shields, 143 Ill. 2d 435, 444 (1991); 720 ILCS 5/3--2(b) (West 1998).  The State carries its burden of disproving an affirmative defense when it negates even one of its elements.  See People v. De Oca, 238 Ill. App. 3d 362, 368 (1992).  To raise an affirmative defense, the defendant must present "some evidence" toward establishing the defense.  720 ILCS 5/3--2(a) (West 1998)).  The quantum of evidence necessary to raise an affirmative defense is evidence sufficient to raise a reasonable doubt as to the defendant's guilt.  People v. Kite, 153 Ill. 2d 40, 44 (1992).

-33-

No. 2--99--0924

    We hold that defendant succeeded in raising the affirmative
defenses of defense of person and defense of dwelling.  Defendant
testified that Johnson entered defendant's room without his
consent, throwing the door open with such force that objects behind
it were dislodged or broken.  Already concerned for his safety in
the motel based on past experiences, defendant's protective
instincts led him to reach for the dresser drawer in which his
loaded gun was kept.  As he reached, Johnson assaulted him by
grabbing both his arm and the hair on his head and by closing the
dresser drawer on his arm.  When defendant managed to withdraw the
gun from the drawer, Johnson tried to seize it, screaming that he
would kill defendant.  Defendant testified that Johnson appeared
very angry, his eyes dark and bloodshot.  They struggled for a
brief period in a particular section of the apartment and defendant
eventually manipulated Johnson to the threshold.  Defendant
testified that when he felt his grip on the gun slip, he renewed
his grasp and managed to point the gun at Johnson's face and pull
the trigger.  Defendant testified that he had no doubt that Johnson
would have shot him had Johnson seized control of the gun.  Thus,
although Johnson was not yet armed when defendant shot him,
Johnson's explosive entry into defendant's premises, coupled with
his screamed promises to kill defendant and his attempts to wrest
the gun from defendant's grasp, could lead defendant to the
reasonable inference that he faced the imminent infliction of great
bodily harm on himself that could be avoided only by the use of
deadly force.

No. 2--99--0924

The evidence indicates that defendant was not the initial aggressor. Defendant's abandoning Johnson in the bowling alley parking lot was not of such physical hostility, nor did not it present such potential danger to Johnson, as those acts that Illinois courts have held to make a person the aggressor. See, e.g., People v. Stokes, 185 Ill. App. 3d 643, 657 (1989)(defendant became aggressor by punching and throwing coffee cup at victim); Gedye v. People, 170 Ill. 284, 287 (1987)(defendant landlord became aggressor by removing tenant's windows and blocking tenant's chimney in attempt to "smoke out" tenant's family). Rather, the act was more along the lines of a discourtesy or slight that Johnson's interest in self-preservation would not have compelled him to address with immediate physical violence. See, e.g., People v. Grosenheider, 266 Ill. 324, 328-29 (1914)(victim's blockading disputed right-of-way did not make him aggressor because "there was a way in which [defendant's] [property] claim could be asserted and established by law"). Moreover, although "[i]t has been held that mere words may be enough to qualify one as an initial aggressor" (People v. Barnard, 208 Ill. App. 3d 342, 350 (1991)), defendant's remark as he drove away that he had had enough of Johnson's shenanigans for that evening was not like the threats, taunts, and personal affronts that courts have held to qualify a person as an aggressor. See, e.g., People v. Dunlap, 315 Ill. App. 3d 1017, 1025-26 (defendant threatened to kill victim); People v. Tucker, 176 Ill. App. 3d 209, 217 (defendant invited victim to try to "whip his ass").

No. 2--99--0924

Even if defendant could be seen as the initial aggressor, his
aggression ended with his driving away, and Johnson had no right to
pursue him in retaliation. See People v. Huddleston, 176 Ill. App.
3d 18, 34 (1988). According to defendant's testimony, Johnson
later violently entered defendant's dwelling and physically
assaulted him, apparently intending physical retaliation for having
to walk home from the bowling alley. "If one responds to a
confrontation with such excessive force that one is no longer
acting in self-defense but in retaliation, the excessive use of
force renders one the protagonist; a nonaggressor has a duty not to
become the aggressor." People v. Nunn, 184 Ill. App. 3d 253, 269
(1989).

Thus, according to defendant, Johnson clearly was the
aggressor when the struggle in the motel room commenced.
Therefore, we hold that, based on defendant's account of Johnson's
unwanted and violent entry into defendant's motel room and their
subsequent struggle over the handgun that defendant brandished to
ward off his aggressor, defendant raised the affirmative defenses
of defense of person and defense of dwelling.

We further hold that the State did not disprove those
affirmative defenses and prove defendant guilty of first degree
murder. There was uncontroverted evidence that Johnson was both
heavily intoxicated and quite angry when defendant left him in the
parking lot of Suburbanite Bowl. Also, it is manifestly apparent
from defendant's undisputed account of his verbal exchange with,
and abandonment of, Johnson in the parking lot that Johnson was the
individual who had a motive for retaliation. Also unchallenged was

-36-

No. 2--99--0924

defendant's testimony that Johnson became angry earlier in the
evening. No witness could testify to any other friction between
defendant and Johnson indicating that defendant harbored ill-will
toward Johnson rather than vice-versa. There simply is no
appreciable support in the record for the State's theory that
defendant taunted Johnson in the parking lot with the design of
luring him to his motel room, left the door to his room ajar so
that Johnson would have easy entry, readied his gun, waited by the
door, and then slew Johnson on the doorstep immediately when the
latter swung open the door. This was a highly fanciful reading of
the evidence. The trial court appeared to have a similar
sentiment when it remarked at sentencing that there was "no
indication" that defendant lured Johnson to his death outside
defendant's motel room.

Contrary to the State's contention, defendant's account of
what occurred after he returned to his motel room is reasonably
consistent with the condition of the room when police arrived. The
State has not shown that the struggle did not occur as defendant
described. In its brief, as it did during trial, the State puts a
colorful gloss on defendant's account of his altercation with
Johnson, characterizing the struggle as a "monumental" and
"powerful" one during which the combatants "blast[ed]" through
areas of the apartment. The State claimed at closing argument that
defendant would have had to spend a hour and a half reorganizing
the room had the struggle occurred as he described it. However,
the struggle, described by defendant as brief in duration and
confined to a particular section of the room, that is, between the

-37-

No. 2--99--0924

dresser and the bathroom, need not have caused typhoon-style
damage.

    At any rate, the photographs in evidence do show an extremely
cluttered and disordered room, and it certainly is not clear from
the photographs themselves that some of the disorder was not
caused by the struggle defendant described. Although it presented
absolutely no evidence concerning the general condition of the room
before Johnson was said to have entered that night, the State makes
many assumptions regarding that original condition, the thrust of
its argument being that far too many objects were left standing in
the room for such a struggle to have occurred as defendant
described. The State claims that the plastic garbage bag and waste
basket behind the outside door showed no signs of having been
displaced by a violent inward swinging of the door, as defendant
described Johnson's entry, or by defendant and Johnson's struggle
from the dresser to the bathroom and back to the front door. The
State makes the same claim of the clutter of objects on top of the
dresser. These claims are difficult to assess because there is no
evidence as to how these objects were positioned prior to the time
Johnson entered the room according to defendant's testimony. We
can see no indication in the photographs themselves that some of
these objects could not have been moved into the positions depicted
in the photographs by the entry and struggle that defendant
described. This is especially true of the mass of objects behind
the door, whose positioning lacks any semblance of order.

-38-

No. 2--99--0924

In particular, the State places far too much emphasis on
defendant's testimony that he heard fishing rods "snapping and
breaking" when Johnson threw open the door but that he did not hear
the garbage can and garbage bag behind the door move despite the
fact that they appeared in the photographs to stand between the
fishing rods and the door. The State unreasonably expects
defendant to have remembered with precision the sounds he heard
during what he described as a shocking and violent entry by an
intruder. Also, assuming that the interior photographs of the
doorway depict the objects behind the door as they were situated
when Johnson entered, then the State is correct that the door
probably would have struck the garbage bag, but not the fishing
rods, directly. But the State does not justify the assumption that
the fishing rods were not moved during Johnson's entry into the
positions seen in the photographs. What is more, even if there
were objects between the fishing rods and the door when Johnson
entered, the objects are depicted as contiguous to the fishing rods
such that the force of the door would have propelled them into the
fishing rods, causing the "snapping" and "breaking" sound defendant
heard.

Nor is there any basis in the record for the State's assertion
that the dresser drawer, once open, would have barred defendant's
path toward the bathroom. It cannot be ascertained from the record
how far defendant opened the drawer in retrieving the gun nor
whether the drawer would have blocked his path had he opened it all
the way. There was no testimony on this fact nor do the
photographs shed any light since the open dresser drawer they

-39-

No. 2--99--0924

depict is not the middle bottom dresser drawer (where defendant says he kept the gun) but the one immediately above it. We also reject the related suggestion that the armchair, once fallen, would have blocked defendant's path. Defendant testified that he was pulled out of the chair as Johnson pulled him to the south and east, that is, to defendant's back and right. Thus, as defendant described the struggle, the chair remained to the north of defendant as he was pulled south toward the bathroom, and would not have blocked his path. The State has not pointed to anything intrinsically implausible in defendant's description of this movement.

The State argues that "[d]efendant's explanation that he was acting in self-defense by grabbing the gun from the middle drawer was further undermined by the position of the gun case on the bed." The position of the gun case was entirely consistent with defendant's testimony that he unintentionally pulled the gun case out of the drawer as he retrieved the gun, and that he retrieved the case from the floor and set it on the bed just before leaving for his parents' home. We are puzzled by the State's emphasis on the fact that the dresser drawer, when closed on defendant's wrist, was not open wide enough for the gun case to slip through. Neither was the drawer then open wide enough for defendant's hand, gripping the gun, to slip through. Unless defendant's assertion that he reached into the drawer for the gun was itself unreasonable, and the State has not persuaded us so, then defendant's assertion that the gun case slipped out when he finally managed to open the

-40-

No. 2--99--0924

dresser drawer wide enough to remove his hand, which gripped the gun, was reasonable.

We likewise find unfounded the State's attempt to infer, from the fact that the coffee pot, champagne glass, and light are shown upright on the headboard in the photographs, that defendant never impacted with the headboard. Defendant testified that he repositioned the fallen coffee pot after he shot Johnson. The sketchiness of his memory with respect to the champagne glass is understandable given his intoxicated state at the time and the sudden, violent entry into his dwelling that had just occurred. Neither party elicited testimony as to defendant's recollection of the position of the lamp in the aftermath of his struggle with Johnson. To prove the absence of a struggle from the lamp's position on the headboard in the photographs, the State would have had to prove that the lamp likely would have fallen over had the struggle occurred as defendant described and that defendant did not reposition the lamp after the struggle. The State established neither.

Contrary to the State's suggestion, the presence of the live shell on the floor of defendant's room between the dresser and the bed is wholly consistent with defendant's account of his struggle with Johnson. Specifically, it is consistent with defendant's assertion that there were live shells in the gun case when he inadvertently pulled it out of the drawer during the struggle. We also disagree with the State that "the only reasonable inference" from the position of the bloodstained, partially smoked cigarette just inside the threshold is that Johnson was ambushed in the

-41-

No. 2--99--0924

doorway immediately upon arriving at defendant's room.  Johnson
would not have initiated a fight while smoking a cigarette, the
State suggests.  However, there was no testimony in the record that
the cigarette was of the brand Johnson was smoking that night or
that this particular cigarette was in fact smoked by Johnson that
night.  In its closing argument the State noted the similarity
between the markings on the cigarette found in defendant's room and
the markings on the cigarettes found in Johnson's possession, but
there was no testimony on this point.  Although Johnson's
cigarettes and the bloody cigarette were admitted into evidence,
the State's arguments concerning the similarity of these cigarettes
were not evidence.  Johnson v. Lynch, 66 Ill.2d 242, 246 (1977).
Second, even if there was evidence in the record to support the
inferences the State urged during its closing argument, one could
just as reasonably guess that Johnson threw the cigarette down as
he entered the room, or even that, in his inebriated condition, he
did not think to smother his cigarette before initiating a fight.
However, we find all of these possibilities to be mere conjecture
rather than reasonable inferences to be drawn from such limited
evidence.  We add that the State also accords too much weight to
the fact that the cigarette, an object at most two or three inches
in length, was not trampled during the struggle defendant
described.

    We also find it reasonable to believe that the struggle
between defendant and Johnson only yielded the injuries they
received.  During nearly the entire struggle, Johnson
understandably had both hands locked on defendant's right hand,

-42-

No. 2--99--0924

which was grasping the gun. As for defendant, he testified that,
because his mind was fixed on keeping control of the gun, he did
not think to squeeze Johnson's throat with his free hand. The
State notes that the minor injury found on defendant was not on the
hand that defendant claims was stuck in the dresser drawer, but the
State ignores the fact that the injury was to defendant's left
palm, which is consistent with defendant's testimony that he
pressed that palm against Johnson's neck and chin. Even when
viewed in the light most favorable to the State, defendant's
account of the struggle was reasonable and consistent with the
condition of his body and Johnson's.

     The State also argues that defendant's testimony that Johnson
was inside the room when he was shot is implausible because the
position of Johnson's body indicates he "was well outside of the
defendant's room at the time he was shot." Defendant's actual
testimony, however, was that Johnson was in the doorway when he was
shot, not that Johnson was inside the room. Moreover, the
testimony of the police officers was that Johnson fell backward
immediately after he was shot, not that he collapsed on the very
spot over which he stood. Thus, the reasonable inference from the
evidence is that Johnson's feet would be positioned further toward
the parking lot after he was shot than before he was shot.
Therefore, that the photographs show Johnson's feet as resting
outside the door do not render unreasonable the conclusion that
defendant was shot while he was in the doorway rather than while he
was outside the room. We further disagree with the State that
defendant's claim that he had to move one of Johnson's legs in

-43-

No. 2--99--0924

order to shut the door is implausible. It is not clear from the position of Johnson's legs in the photographs that neither of them would have blocked the door if fully extended. The State offered no testimony on this fact but only its own interpretation of the photographs at its closing argument.

The State suggests that defendant cannot claim defense of dwelling because he could have avoided killing Johnson by closing the door once he had pushed him to the doorway. Once Johnson was pushed to the door, the State argues, defendant succeeded in defending his dwelling. We find this claim quite puzzling. Defendant testified that he had succeeded only in pushing Johnson to the doorway when he shot Johnson. Thus, according to his testimony, defendant shot Johnson while still attempting to expel him from the room. Even assuming defendant could have shut the door on an inebriated and raging man weighing over 220 pounds, the State's argument fails. The theory of using deadly force to protect one's dwelling is not for the protection of the physical dwelling itself; rather, it is for the protection of the individuals therein. People v. Morris, 162 Ill. App. 3d 1046, 1055 (1987). Defendant testified that, while they struggled in the doorway, Johnson still had two hands on defendant's right hand, which was losing its grip on the gun. The State cites no authority for the proposition that defendant deprived himself of a defense of dwelling defense by electing not to relax his right hand and permit Johnson to seize the gun as defendant hurriedly attempted to close the door in Johnson's face. At any rate, the State's contention is irrelevant to defendant's claim of defense of person, which has

-44-

No. 2--99--0924

nothing to do with whether Johnson was inside or outside defendant's room when he was shot.

We acknowledge Mr. Bourke's statement on the 911 recording that Johnson "tried to come in" defendant's room. The import of this evidence is questionable given that defendant himself is not heard saying this on the recording but that his statements are being relayed by Mr. Bourke. Moreover, earlier in the recording Mr. Bourke is heard stating that Johnson "came in" the apartment. Thus, the recording is not significant evidence that Johnson did not enter defendant's motel room and struggle with him over the gun, as described by defendant.

Lastly, we briefly address a couple minor points raised by the State at trial. First, we acknowledge Mossman's testimony that defendant told her in the bowling alley bar that he could be "a real son of a bitch." As the context in which it was uttered raises a serious question as to whether the comment was a sober declaration of character or instead proceeded from mere alcohol-induced bravado, little weight can be attached to it. Second, as to the State's suggestion that defendant, who admitted to having been "falling down drunk" when he returned to his motel room, was in no condition to push an enraged 220 pound male intruder out of his motel room, we find this contention difficult to reconcile with the State's assumption that defendant was not too intoxicated to orchestrate Johnson's assassination with such care. The State has not demonstrated to us, with requisite proof, which of these feats defendant was less capable of achieving in his condition.

-45-

No. 2--99--0924

In conclusion, we hold that the State did not disprove beyond a reasonable doubt defendant's claim that he killed Johnson in defense of his person and his dwelling. The State did not prove as unreasonable defendant's account of his struggle with Johnson inside the motel room. Rather, that account was reasonably consistent with the condition of the room when police arrived and with the condition of Johnson's and defendant's bodies. Ruling as we do on this issue, we do not reach defendant's remaining arguments that his conviction should be reduced to second degree murder and that his trial counsel was ineffective.

The judgment of the circuit court of Du Page County is reversed.

Reversed.

O'MALLEY, J., with GEIGER and BYRNE, JJ., concurring.