# EXHIBIT D

# (1 of 2)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID BOURKE,              )
      Plaintiff,           )
   -vs-                    ) No. 03 C 7749
VILLAGE OF DOWNERS GROVE,  )
      Defendant.           )

The deposition of David Thomas, taken in the above-entitled cause before Susan Maul, CSR No. 84-2501, a notary public within and for the County of Will and State of Illinois, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts, 222 North LaSalle Street, Chicago, Illinois, on the 26th of January, A.D., 2009, at the hour of 1:09 o'clock p.m.

1

---

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| David Thomas | |
| By Mr. Mc Garry | 4 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| Thomas Deposition Exhibit | |
| No. 1 | 11 |
| No. 2 | 37 |
| No. 3 | 40 |
| Nos. 3A and 3B | 42 |
| No. 4 | 44 |
| No. 5 | 62 |

3

---

APPEARANCES:

MR. KENNETH N. FLAXMAN
200 South Michigan Avenue
Suite 1240
Chicago, IL 60604-2430
(312) 427-3200
     On behalf of the Plaintiff;
HINSHAW & CULBERTSON, LLP
222 North LaSalle Street
Suite 300
Chicago, IL 60601
(312) 704-3000
BY: MR. THOMAS P. MC GARRY
    MR. DANIEL R. DEGEN
    On behalf of the Defendants, N. Scott Conger and Wayne Brucar;
DE ANO & SCARRY
53 West Jackson Boulevard
Suite 1062
Chicago, IL 60604
(312) 564-4125
BY: MR. SCOTT B. DOLEZAL
    On behalf of all other Defendants.

2

---

(Witness sworn.)

DAVID THOMAS, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MC GARRY:

Q. Please state your name for the record.

A. David Carl with a C, C-A-R-L, Thomas.

MR. MC GARRY: This is discovery deposition of Mr. Thomas which is taken pursuant to the Federal Rules of Civil Procedure and upon agreement as to today's date, and in compliance I think with the Court's scheduling order, expert disclosures, and so forth.

BY MR. MC GARRY:

Q. You've been retained as an expert witness in this case, is that correct, sir?

A. Yes.

Q. What is your occupation?

A. I'm an attorney and formerly a law professor.

Q. Are you now just a practicing attorney?

A. Yes, correct.

Q. Not teaching?

4

1 (Pages 1 to 4)

1   A. Not teaching anymore.
2   Q. Okay. Where is your practice?
3   A. My office is located at 651 West
4   Washington Boulevard, Suite 205. But, I mean, I
5   have cases in various locations.
6   Q. Okay. In different jurisdictions?
7   A. Yes. Different jurisdictions, different
8   countries actually.
9   Q. You were retained -- I take it you do not
10  know Mr. David Bourke, B-O-U-R-K-E?
11  A. That's correct.
12  Q. And you've never spoken to him?
13  A. Never spoken to him.
14  Q. How were you retained in this case?
15  A. I was contacted by -- either by
16  Mr. Flaxman or by Cecile Singer, another attorney.
17  Q. Okay. And do you have -- do you know any
18  of the plaintiffs -- any of the lawyers in this
19  case?
20  A. No, not -- well, I mean Mr. Flaxman.
21  Q. How do you know Mr. Flaxman?
22  A. I've known Mr. Flaxman from my legal
23  practice. You know, I've run into him in court. I
24  don't know if we've ever been co-counsel, but

5

1   basically from being a lawyer.
2   Q. I guess -- is it your testimony that you
3   were not contacted directly by Mr. Flaxman in this
4   case?
5   A. I can't remember. I might have been
6   contacted by Mr. Flaxman, but the initial call
7   might have come from Cecile Singer who's another
8   lawyer who I believe is in his office.
9   Q. Could you describe your relationship with
10  Cecile and Mr. Flaxman?
11  A. Well, they're both basically the same. I
12  know both of them through the practice of law. I
13  met them in court. I've done some civil rights
14  work myself. That's the nature of the
15  relationship.
16  Q. Do either of those lawyers refer business
17  to you?
18  A. I don't believe so. I don't think any one
19  of them -- either one of them have ever referred a
20  case to me.
21  Q. Do you refer cases to them?
22  A. No.
23  Q. Do you belong to any, you know, boards or
24  any law societies that -- where they're members

6

1   that you have regular contacts with them?
2   A. No.
3   Q. Do you know how it was that they decided
4   to retain you as an expert?
5   A. No, I don't.
6   Q. Do you have any specialized -- strike
7   that. Are you an expert on jury selection?
8   A. I'm an -- yes. I'm an expert on jury
9   selection in the context of my criminal defense
10  work and my teaching, yes.
11  Q. Do you hold yourself out in any public way
12  as an expert on jury selection?
13  A. I don't advertise that if that's what you
14  mean, no.
15  Q. Have you ever been retained before as an
16  expert on jury selection?
17  A. No.
18  Q. Your expertise on jury selection comes
19  from exactly what?
20  A. It comes from my practice of some 35 years
21  plus and from approximately 23 years of teaching.
22  Q. When you were teaching, what was the focus
23  of your teaching?
24  A. Criminal procedure.

7

1   Q. What is your experience, familiarity with
2   civil cases involving legal malpractice?
3   A. I'm sorry, I don't understand your
4   question.
5   Q. What is your experience of either teaching
6   or handling legal malpractice cases?
7   A. I have not taught legal malpractice. I
8   don't believe that I have ever handled a legal
9   malpractice case, although I'm not -- I'm not
10  100 percent sure about that.
11      I'm sorry, I didn't -- you asked me about
12  teaching, I should also mention clinical education
13  in that context because that's -- that was part of
14  my teaching experience.
15  Q. What was your role in clinical education?
16  A. I was an instructor who supervised law
17  students who worked on my cases.
18  Q. Did you ever teach any courses in
19  professional responsibility of the legal
20  profession?
21  A. No.
22  Q. Is there a specialized or focus course in
23  the law school -- this is at IIT?
24  A. It was at Chicago Kent, yes.

8

2 (Pages 5 to 8)

1    Q.  Is there any focus course that you have
2  taught that deals strictly with jury selection?
3    A.  Strictly?
4    Q.  Yes.
5    A.  No.
6    Q.  Have you ever written an article on jury
7  selection?
8    A.  I don't think so.
9    Q.  Have you ever given a lecture on jury
10  selection?
11    A.  Not that I can remember.
12    Q.  It probably is worth just focusing a bit
13  here then, your opinion here relates to jury
14  selection, correct?
15    A.  Correct.
16    Q.  Okay.  And that is the sole focus of your
17  opinion, correct?
18    A.  It's the -- what's in my report is the
19  focus of my opinion.
20    Q.  Have you ever acted as an expert witness
21  or the lawyers standard of care?
22    A.  I don't believe so, not prior to this
23  case -- well, let me qualify that.  The last case
24  in which I was retained as an expert dealt with a

9

1    Q.  Sure.  In fact, we'll mark it.  I took the
2  CV out, and we'll call it Thomas Deposition Exhibit
3  No. 1 for identification.
4             (Whereupon, Thomas Deposition
5             Exhibit No. 1 was marked for
6             identification.)
7  BY MR. MC GARRY:
8    Q.  Now, you can look at that to finish your
9  answer and then we'll go into your CV.
10    A.  Okay.  Yes.  It's the -- it was the --
11  Smieszkal versus Akers case, it's listed at the top
12  under expert witness.
13      I remember that the -- the attorneys who
14  retained me in that case, I believe, represented
15  Will County, and Will County was being sued by a
16  former criminal defendant in the Circuit Court
17  there, and I guess -- there's what it was.
18      The plaintiff -- the plaintiff was
19  claiming the attorneys fees as part of his damages,
20  and I was an expert for the -- for the defendants
21  regarding the reasonableness of the amount of fees
22  that were charged.
23    Q.  Is Exhibit No. 1 a current and complete
24  list of your curriculum vitae?

11

1  lawyer and the amount of the fee that the lawyer
2  charged in a misdemeanor case.  I don't know if you
3  regard that as part of the standard of care or not,
4  but I wanted to make sure my answer was complete.
5    Q.  Were you there as an expert in the case?
6    A.  Yes.
7    Q.  What was -- was it an expert for the
8  lawyer or against the lawyer?
9    A.  I was an expert retained on behalf of the
10  client, so I guess you would say it was against the
11  lawyer.
12    Q.  So in that case the client was challenging
13  the reasonableness of the fees?
14    A.  That was part of it.  It was a -- it was
15  a -- well, strike that.
16      It was -- it was a civil rights case
17  against -- it's listed in my -- in my CV there.  It
18  was a civil rights case against the village, and I
19  was retained by the village as an expert regarding
20  the -- it was part of their damages, that's what it
21  was.
22    Q.  The recoupment of fees by the -- well,
23  back up.  The village was a defendant?
24    A.  Yeah.  Can I look at my CV just to --

10

1    A.  Well, my exhibit actually has a
2  certificate of service attached to it.
3    Q.  That shouldn't have been part of that.
4    A.  But the three pages that are left is, yes,
5  a current and accurate CV.
6    Q.  I think I asked you this, but you weren't
7  certain how it was that the defense counsel came to
8  contact you to be an expert in this case?
9    A.  I know I got a phone call, I just -- I
10  can't remember precisely who the phone call was
11  from.
12    Q.  Do you advertise at all as being available
13  to be an expert?
14    A.  No.
15    Q.  You don't belong to any sort of expert
16  league or something?
17    A.  No.  No.  No, I don't.
18    Q.  All right.  Have you ever been the
19  defendant in a legal malpractice case -- well,
20  let's start with that one.
21    A.  Yes, I have.
22    Q.  What was the name of the case?
23    A.  The plaintiff's name was Sharon
24  Kryzcinski, and I hope you don't ask me to spell

12

3 (Pages 9 to 12)

1    that --
2        Q.  Take a shot.
3        A.  It's K-R-Y I think Z-C-I-N-S-K-I,
4    something like that.  And it was against myself,
5    against a bank, Corus Bank at the time, and it was
6    one other party defendant, I can't remember.
7        Q.  Where was that case pending?
8        A.  That was in the Circuit Court of Cook
9    County.
10       Q.  Is that concluded?
11       A.  Well, it was -- it was -- it started out
12   in DuPage County and then was transferred down to
13   Cook County.  Is it concluded?  Yes, it is
14   concluded.
15       Q.  Okay.  Did you -- were you a defendant in
16   that case?
17       A.  Yes.  I was a defendant.
18       Q.  Who were your counsel?
19       A.  You mean, was I defendant in the
20   underlying case?
21       Q.  Yes, in the malpractice case.
22       A.  I was a defendant in the malpractice case,
23   yes.
24       Q.  Who were your counsel in that case?

13

1        A.  It was some insurance carrier, I can't
2    remember off the top of my head.  They're over on
3    Dearborn and Adams, they were, I think, in the
4    Marquette Building.  I could -- you know, I could
5    find out, I just can't remember.
6        Q.  Do you remember who the plaintiff's
7    counsel were?
8        A.  Plaintiff's counsel was a lawyer from
9    DuPage whose name escapes me at the moment.
10       Q.  All right.  And this -- and the case --
11   when was the case filed, what year?
12       A.  I would estimate that it was filed in
13   maybe -- somewhere between 2000 and 2005.
14       Q.  Okay.  And concluded somewhere between
15   2000 and now?
16       A.  You know, it's hard, it's just -- I would
17   say it was concluded about three years ago, perhaps
18   three or four years ago.
19       Q.  Okay.  And just on the -- just on a
20   tangentially related subject, I looked you up in
21   the ARDC registration, and it states that you did
22   not have malpractice coverage now; is that correct?
23       A.  That's correct.
24       Q.  You did at one time?

14

1        A.  I did up until the time that I left the
2    law school.  The law school carried malpractice
3    insurance coverage.
4        Q.  Was this suit something that
5    Ms. Kryzcinski brought against you for work that
6    was done through the auspices of the clinic?
7        A.  Yes.
8        Q.  Okay.  And what was the nature of the --
9    of the underlying representation?
10       A.  Ms. Kryzcinski had a host of criminal
11   cases, drug cases, all kinds of -- a lot of
12   criminal cases, I think some domestic abuse cases,
13   and I was actually approached by the bank who
14   administered her trust fund to see if I would
15   represent Ms. Kryzcinski on her various and sundry
16   criminal cases, I agreed to do so.
17       I did represent her and -- but what
18   happened, she -- the bank was not willing to use
19   any of the money from her trust fund to post her
20   bail because they regarded her behavior as self
21   destructive and just not a good risk for bail.
22       I was sued on the basis that I had, first
23   of all, refused to post bail for her which is
24   prohibited under the code of criminal procedure or

15

1    the rules of whatever, there's something -- I know
2    there's some provision that prohibits attorneys
3    from posting bail, and I was also alleged to I
4    guess not have tried hard enough or not have, you
5    know, exercised my influence on the bank to get
6    them to post bail.
7        Q.  Do you know how that case was concluded?
8        A.  It was dismissed.  I was dismissed on a
9    motion for summary judgment.
10       Q.  So I take it you don't believe all legal
11   malpractice cases are valid?
12       A.  I don't believe all of any kind of case is
13   valid.
14       Q.  Do you have any recollection of what the
15   grounds were for summary judgment in your favor?
16       A.  I think it was just failure to state --
17   well, no, that would be a motion to dismiss.
18       I know my deposition was taken, but -- you
19   know, I really don't remember the specific grounds.
20       Q.  Were experts retained?
21       A.  I don't believe it ever -- you mean by the
22   defense?
23       Q.  Yes.
24       A.  I don't believe it ever reached that

16

4 (Pages 13 to 16)

1  stage, not to my knowledge.

2     Q.  Was the client making a claim against you

3  based on the fact that she had been incarcerated

4  and had not been released because of the failure to

5  get bail?

6     A.  That was -- yeah.  That's a fair -- I

7  think a fair description of the claim.

8        MR. MC GARRY:  Off the record.

9           (Discussion had off the record.)

10 BY MR. MC GARRY:

11    Q.  That ended in your favor, correct?

12    A.  That's correct.

13    Q.  I would be trying to find -- if this

14 proceeds, I would be looking to get your deposition

15 and the case number, name or pleadings.

16        I could probably do a search in Cook

17 County and find the case, so I may circle back and

18 see if I could get that deposition.

19    A.  All right.  I don't have a copy of it

20 myself, but I'm sure the lawyers do.

21    Q.  Now, I asked you about malpractice and

22 that's the only time that you recall that you were

23 sued for malpractice?

24    A.  No.  I recall being sued one other time,

17

1     Q.  How did that case turn out?

2     A.  It turned out in my favor or our favor.  I

3  don't remember if I was the only defendant or not.

4     Q.  Was this another criminal client?

5     A.  Yes.

6     Q.  Did they -- what was the general nature of

7  the claim?

8     A.  I knew you were going to ask me but, yeah,

9  basically -- yeah, that I didn't win.

10       I would just be speculating.  I know it

11 was legal malpractice, the specific nature of the

12 malpractice that was alleged I really don't

13 remember.

14    Q.  Was the case within a case a jury trial on

15 a criminal matter?

16    A.  The case within a case was a murder case.

17 I don't -- my vague recollection, and it is a vague

18 recollection, is that we ended up pleading him out,

19 and then he was unhappy with the plea and alleged

20 some type of malpractice associated with it -- with

21 pleading him guilty rather than taking him to

22 trial.

23       That's -- you know, as I say, it's very

24 vague to me at this point, but I do remember the

19

1  it was -- it was a criminal case, defendant's name

2  was Larry Patterson.

3     Q.  Okay.

4     A.  And this was in Federal Court here in the

5  Northern District.  I don't -- I don't recall being

6  deposed, but I did -- but I testified.

7        I believe it was before Judge Moran in the

8  District Court.

9     Q.  Were you defended by counsel in that case,

10 represented by counsel?

11    A.  Yes, I was.

12    Q.  Did that go to trial?

13    A.  Yeah, I think it did.

14    Q.  Was it a bench or jury?

15    A.  I believe it was a bench.

16    Q.  Can you tell me do you remember who the

17 plaintiff -- their counsel were or your defense

18 counsel?

19    A.  Not -- no, I don't.  I don't remember

20 either one.  I have a very -- this was about

21 twenty years ago, maybe a little longer.

22    Q.  Is this another case that arose out of the

23 practice at the clinic?

24    A.  Yes.  Yes.

18

1  case.

2     Q.  Are you familiar with -- in the

3  malpractice world the concept of proof of actual

4  innocence in criminal cases?

5     A.  Sure.

6     Q.  What is that?

7     A.  What is proof of actual innocence?

8     Q.  Yes, in a malpractice context.

9     A.  Well, maybe I'm not familiar with it.  I'm

10 familiar with proof of actual innocence in the

11 context of DNA testing, death penalty litigation,

12 that sort of thing, so maybe that's not the context

13 that you're talking about.  I'm familiar with

14 claims of actual innocence in Federal habeas

15 corpus proceedings.

16    Q.  Do you know whether Illinois has an actual

17 innocence rule for claims against -- served against

18 lawyers for legal malpractice for mishandling a

19 criminal case that resulted in a --

20    A.  I believe they do.  In Illinois you have

21 to show underlying innocence to maintain a claim

22 for legal malpractice, that's my impression.

23    Q.  Help me one more time with that Federal

24 malpractice case.  It was Larry Patterson?

20

5 (Pages 17 to 20)

1    A. Patterson, P-A-T-T-E-R-S-O-N.

2    Q. And the defendant -- you were named as a

3 defendant?

4    A. I believe so, yes.

5    Q. And it was 20 years ago, so it was in the

6 '80s or '90s?

7    A. I know the criminal case was in the -- my

8 recollection is that the criminal case was in the

9 early '80s, and so the civil case might have been

10 in the late '80s or early '90s.

11    Q. All right. In the -- in your CV, turning

12 to Page 2, your expert witness experience,

13 Smieszko, S-M-I-E-S-Z-K-O, versus Akers,

14 A-K-E-R-S --

15    A. Right.

16    Q. -- was that the civil rights fee case?

17    A. Yes.

18    Q. And then Crudup, C-R-U-D-U-P, versus

19 B-A-R-T-O-N --

20    A. Yes.

21    Q. -- what was the nature of that testimony?

22    A. Well, I didn't testify.

23    Q. All right.

24    A. I was retained as an expert. I wrote a

21

---

1 report. I don't remember -- I don't remember the

2 specific topic of the -- of the report.

3    Q. It looks like it's a criminal -- a civil

4 case in Federal Court, right?

5    A. Correct.

6    Q. But do you have any memory as to what your

7 expertise was about that?

8    A. It was about I believe something that

9 happened in the underlying criminal case, that's

10 about as -- that's about as far as I can go.

11       I have a copy of the report somewhere that

12 I could --

13    Q. Well, I did see a case where you

14 testified -- this might be the Lake County one

15 where you testified as a witness on behalf of I

16 think defense counsel regarding whether that

17 defense counsel was -- looked exhausted or

18 something, does that refresh your memory?

19    A. Oh, yeah, but it wasn't in Lake County, it

20 was in Cook County, and I was not retained as an

21 expert.

22    Q. You were just a fact witness?

23    A. Yes. I was a co-counsel. That case arose

24 out of the Pontiac murder trial which is listed on

22

---

1 my list, and Randy Stone was the co-counsel, and --

2 I mean, he was counsel for a co-defendant, and

3 there were ten defendants in the case, and then

4 after that case was over, a Judge jammed Randy to

5 trial like in three weeks on a -- on another murder

6 case, and Randy said, you know, he was just

7 physically and mentally exhausted from Pontiac.

8 And since I had been involved in Pontiac, I

9 testified that to my experience with the case as to

10 how Randy appeared to me, yes. It was a post

11 conviction proceeding in state court.

12    Q. The post conviction proceeding alleged

13 that Randy had rather ineffective assistance

14 because of his situation.

15    A. His physical and mental exhaustion from

16 Pontiac, right.

17    Q. And he agreed with that?

18    A. I'm sorry?

19    Q. He agreed with that position?

20    A. Who is he?

21    Q. The criminal -- the counsel who -- Randy,

22 whoever co-counsel.

23    A. Randy is the lawyer.

24    Q. Right.

23

---

1    A. The client was -- I see. The client was

2 saying that Randy rendered ineffective assistance,

3 and Randy was agreeing with the client, yes, based

4 upon Randy's physical and mental condition, right.

5    Q. But was Randy admitting he committed

6 malpractice?

7    A. I have no idea. I was not present when

8 Randy testified.

9       I just -- I was called as a witness by the

10 client's counsel to testify to the nature of the

11 Pontiac experience.

12    Q. Do you remember what People versus Tiedje,

13 T-I-E-D-J-E, was, it's the third one, in Lake

14 County.

15    A. Right. Again I remember vaguely. It was

16 a -- I believe it was a forgery case, and it was --

17 I think my opinion related to whether a document

18 had the capacity to defraud in the context of a

19 forgery allegation.

20    Q. Was that testimony admitted?

21    A. I did not testify. I wrote a report.

22    Q. Okay. So that did not deal with standard

23 of care of a lawyer, correct?

24    A. That's correct.

24

6 (Pages 21 to 24)

1    Q.   And the Crudup, C-R-U-D-U-P, versus
2  Barton, that did not relate to the standard of care
3  of a lawyer?
4    A.   I can't say that.  I'm not saying it did,
5  but I can't say that it didn't cause I can't
6  remember enough about it.
7    Q.   Okay.  Are you currently licensed in
8  Illinois and California?
9    A.   Yes, I am.  My California license is
10 inactive, but I am licensed.
11   Q.   It's inactive?
12   A.   Yes.
13   MR. MC GARRY:  Just off the record for a
14 second.
15        (Discussion had off the record.)
16 BY MR. MC GARRY:
17   Q.   Under professional memberships, are you
18 actively participating in any of the organizations
19 listed?
20   A.   No.
21   Q.   Are you still a member of good standing in
22 those four associations?
23   A.   No, I'm not.
24   Q.   Which ones, if any, do you still -- are

25

1  support case.  And I recently in December became
2  involved as a defense counsel in a case before the
3  United Nations Tribunal in Arusha, Tanzania, it's
4  called the International Criminal Tribunal for
5  Rwanda, and I'm representing a defendant there.
6    Q.   Where -- is the court in Tanzania?
7    A.   Yeah.  The court is in Arusha.  I don't
8  believe I have any other out of state cases at this
9  point.
10   Q.   I will look at -- okay.  So let's go back,
11 the case in hand here, that was tried in 1999?
12   A.   Right.
13   Q.   Prior to 1999 could you tell us your
14 experience in trying jury trials in DuPage County?
15   A.   I have done cases in DuPage County.  I
16 have done bench trials.  I've done jury trials.
17 That's basically been my experience.
18   Q.   And prior to 1999 --
19   A.   Yes.  I'm talking about prior to 1999.
20   Q.   How many jury trials have you had in
21 DuPage County?
22   A.   I would estimate -- well, less than five I
23 would say probably.
24   Q.   That's prior to 1999?

27

1  you still a member in good standing?
2    A.   I don't believe I'm a member in good
3  standing at this point in any of them.
4    Q.   So those are all past professional
5  memberships?
6    A.   Yes.
7    Q.   Do you know when the last time you
8  belonged to any of those organizations was?
9    A.   2005, 2006 perhaps.
10   Q.   What is your -- what is your practice
11 today?
12   A.   Criminal defense primarily.  I have a
13 small civil litigation practice, too, but it's
14 primarily criminal defense.
15   Q.   Do you happen to have a concentration area
16 in the criminal defense?
17   A.   No, not really.
18   Q.   In what counties do you practice?
19   A.   Well -- you mean at the present time?
20   Q.   Yes.
21   A.   I believe all my -- all my cases at the
22 present time in Illinois are in Cook County.
23        I have a case in Federal Court in
24 Minneapolis which is a -- what we call a material

26

1    A.   Yes.
2    Q.   How about since 1999?
3    A.   I don't think I have had any jury trials
4  in DuPage since 1999.
5    Q.   Do you live in Cook County?
6    A.   Yes, I do.
7    Q.   I have obtained copies of the three
8  publications listed on your CV.
9    A.   Okay.
10   Q.   I am going to ask do any of those
11 publications relate in any way to your opinions
12 with respect to jury selection?
13   A.   Well, certainly Criminal Constitutional
14 Law does, that covers jury selections.  The
15 Prosecutorial Vindictiveness doesn't, and -- nor
16 does the Attorney's Fees article.
17   Q.   I see.  The Criminal Constitutional Law
18 publication, it -- it deals with jury selection?
19   A.   Well, it's a treatise.  It's a three
20 volume treatise, and jury selection is one of the
21 topics.  It's covered there.
22   Q.   It's not cited in your opinion, is it
23 something that you rely on in your opinion here?
24   A.   Not specifically but it's, you know, part

28

1  of my knowledge, part of my background and
2  experience.
3      Q.  Does that article discuss the question of
4  whether or not to preemptory challenge jurors?
5      MR. FLAXMAN:  By article, you mean the three
6  volume treatise?
7      MR. MC GARRY:  The three volume treatise.
8      THE WITNESS:  It discusses the exercise of --
9  could you put -- could we get the question again?
10     (Record read as requested.)
11     THE WITNESS:  Yes, it does.  It discusses the
12  exercise of preemptory challenges as well as
13  challenges for cause.
14  BY MR. MC GARRY:
15     Q.  What is the purpose of that treatise, is
16  it used for teaching or is it a training manual?
17  What is it?
18     A.  The purpose of the treatise as I
19  understand it is as a manual for practicing
20  attorneys to guide them in their practice.
21     Q.  Does it cite case law?
22     A.  Oh, yes.
23     Q.  Does it have case law in Illinois
24  regarding ineffective assistance of counsel?

29

1  A.  Off the top of my -- it sites hundreds and
2  hundreds and hundreds of cases.  I don't -- I don't
3  know if there's a specific case in Illinois dealing
4  with that topic.  I imagine that there would be,
5  but there's so many cases.  Like I say it's three
6  volumes, it's quite an extensive --
7      Q.  In preparing for your opinion in this
8  case, did you review any case law?
9      A.  I did not review anything from Criminal
10  Constitutional Law.
11         The only -- the only legal matters that
12  I -- that I reviewed are the matters that I cited
13  in my report.
14     Q.  Okay.  Are you familiar with any cases
15  where inadequate voir dire of the jury was raised
16  or discussed on appeal?
17     A.  Off the top of my head I cannot cite you
18  any cases for that proposition.
19     Q.  Do you happen to know what the general
20  rule of thumb is or the rule of law is in cases
21  involving ineffective assistance based on
22  inadequate jury selection is?
23     A.  Are you referring to Strickland or
24  something beyond Strickland?  I guess I don't

30

1  understand the question.
2      Q.  I'm referring to not Strickland but rather
3  cases where a lawyer was accused of ineffective
4  assistance based on inadequate jury selection.
5      A.  A specific case involving that topic, no.
6      Q.  Okay.  Do you know of any cases that
7  equate ineffective assistance with legal
8  malpractice?
9      A.  I know of cases and I've read cases which
10  discuss ineffective assistance and its relationship
11  to legal malpractice, some of which -- for example,
12  we already talked about in terms of requirement of
13  showing innocence as a, you know, precondition for
14  recovering for legal malpractice.
15     Q.  Do you -- are you aware of any
16  presumptions that apply to a lawyer who exercises
17  either strategy or judgment in a trial?
18     A.  Sure.  Those would be the Strickland
19  presumptions.
20     Q.  What are they?
21     A.  Well, there's a presumption that a
22  lawyer's tactics and strategy if based upon, you
23  know, inadequate investigation and -- there's some
24  other conditions and qualifiers, but are generally

31

1  immune from review.
2      Q.  Do you know of the -- the doctrine of
3  judgmental immunity and how it applies at all to
4  criminal defense?
5      A.  I'm not familiar with the doctrine of
6  judgmental immunity, no.
7      Q.  Is jury selection a matter of strategy?
8      A.  No.  I don't think that the conduct of --
9  well, let me strike that.  I guess I would say it
10  depends on the case.
11         It can be a matter of strategy, but I
12  think that there's some cases where it's so obvious
13  that it doesn't fall within the realm of strategy.
14  So I guess my answer would be that it depends on
15  the case.
16     Q.  Do you know what the case law has said
17  about the general rule regarding jury selection as
18  to whether or not it's a matter of strategy?
19     A.  I cannot recall any specific case law
20  dealing with that question.
21     Q.  Have you ever seen a reported decision
22  where a lawyer was sued for failing to take
23  preemptory challenges in a jury selection in a
24  criminal case?

32

8 (Pages 29 to 32)

1   A. Exercise them you mean?
2   Q. Yes.
3   A. No.
4   Q. Do you know if there are any reported
5   decisions where that was the claim of malpractice?
6   A. I don't know.
7   Q. Would decisions by the Appellate Courts be
8   authoritative regarding such things as trial
9   judgment or standards of care?
10  A. Which appellate courts are you referring
11  to?
12  Q. Illinois State Appellate Court, Illinois
13  Supreme Court.
14  A. Well, they would be authoritative over the
15  lower Illinois courts, the Supreme Court over the
16  Appellate and Circuit Court, and the Appellate over
17  the Circuit Court.
18  Q. Would cases -- decisions be matters which
19  reasonable experts might rely upon in coming to
20  conclusions regarding matters of standard of care?
21  A. I imagine so. It would be some of the
22  things you could rely upon.
23  Q. The three volume treatise Criminal
24  Constitutional Law, broadly is that -- is that

33

1   dealing with -- tell me what it's about because it
2   seems to have constitutional incentive between
3   criminal and law, so what is the basis, what is the
4   focus of that?
5   A. The focus of that is Federal
6   constitutional law as it affects the practice of
7   criminal defense.
8   Q. Does the constitution say -- or
9   constitutional law say how many challenges a lawyer
10  should make on behalf of a client?
11  A. No.
12  Q. Would I be able to find some instruction
13  on that in the manual -- or the treatise?
14  A. You would be able to find in the treatise
15  instruction about the function and purposes of voir
16  dire, about the nature of challenges for cause, and
17  about the nature of preemptory challenges, and
18  about the importance of doing a thorough voir dire
19  in a jury trial in order to learn the background of
20  the jurors, in order to develop a rapport with the
21  jurors, in order to educate the jurors regarding
22  your theory of the case, and how all of those enter
23  into the exercise of both types of challenges.
24  Q. In Illinois does the state have a right to

34

1   a jury trial?
2   A. No.
3   Q. In the Bourke case, who demanded a jury
4   trial?
5   A. I don't know, but I would assume that it
6   was the -- Mr. Bourke because the state has no
7   right to a jury trial.
8       There was a statute passed that tried to
9   give the state the right but it was struck down as
10  unduly interfering with operation of the courts.
11  Q. One of the articles you cited, University
12  of Chicago Law Review, has a quotation from Oliver
13  Wendell Holmes, do you recall that quotation?
14  A. No, I don't.
15  Q. I'll read it to you. The man who wants a
16  jury has a bad case, do you agree with that?
17  A. Not necessarily.
18  Q. Is this an article you relied on, Albert
19  Alschuler, University of Chicago?
20  A. Can I see it?
21  Q. Yes.
22  A. Can I look at my report?
23  Q. Sure.
24  A. All right.

35

1   Q. Let me have it. I think I marked the page
2   that you -- hold on, let me see if I marked the
3   page. You have cited this in your report.
4   A. Yes. This looks like the -- yes. This
5   looks like the Article 1989, yes.
6   Q. I think we got this off Westlaw, but this
7   is not a copy I got from you.
8   A. Right.
9   Q. Does that look like the article?
10  A. Yes.
11  Q. Do you know who Albert Alschuler is, the
12  author?
13  A. I know of him. I don't know him
14  personally. I knew of him.
15  Q. Well, how -- how was he as a trial lawyer?
16  A. I don't know if Albert Alschuler ever was
17  a trial lawyer.
18  Q. Do you know how many jury trials he
19  picked?
20  A. I have no idea.
21  Q. Do you know how many jurors he ever
22  examined?
23  A. Have no idea. I know him as a -- or of
24  him as a professor at the University of Chicago Law

36

9 (Pages 33 to 36)

1  School.
2     Q.  There was another article you cited in
3  your opinion -- let me do this.  I'm getting ahead
4  of myself here, but can I have the letter opinion
5  out, and I'll mark that.  Would you mark that as 2?
6           (Whereupon, Thomas Deposition
7            Exhibit No. 2 was marked for
8            identification.)
9  BY MR. MC GARRY:
10    Q.  I've marked as Thomas Deposition Exhibit
11  No. 2 a copy of your letter opinion.
12    A.  Yes.
13    Q.  Is that a true and exact copy of your
14  opinion in this case?
15    A.  Appears to be so, yes.
16    Q.  You cited to an article California Law
17  Review of May 1982?
18    A.  Right.
19    Q.  Now, do you know who the author Michael
20  Glover is?
21    A.  No.
22    Q.  According to his disclosure, I guess he
23  was a third year law student.
24    A.  It's a comment, so comments are often

37

1  I think that's reflected in my report here under
2  materials reviewed.
3     Q.  Okay.  Now, do you remember how long it
4  took you -- do you have records of bills or time
5  spent?
6     A.  Yes, I do.
7     MR. FLAXMAN:  Is your next question would you
8  like to see them?
9  BY MR. MC GARRY:
10    Q.  I should probably say, did you bring your
11  file today.
12    A.  Yes, I brought my file.
13    Q.  I would like to mark that -- I'm not going
14  to keep it here, but I will just mark it as Thomas
15  Group Exhibit No. 3 for identification.
16    A.  The whole file?
17    Q.  Just the cover and everything that's in
18  it, will be 3A, B, C, if I select something.
19    A.  Okay.  Do you want me to look at a
20  specific portion of it?
21    Q.  Why don't you look for your bill, and then
22  we'll stop the record so that the reporter can
23  write a sticker.
24

39

1  written by law students, so that wouldn't surprise
2  me.
3     Q.  Do you know what his experience was in
4  selecting jurors?
5     A.  No.
6     Q.  Do you reckon that he had much firsthand
7  experience in selecting jurors when he was a third
8  year law student?
9     A.  I would reckon that he probably was not
10  licensed as an attorney, therefore, had not in his
11  capacity -- in the capacity of a lawyer selected
12  any juries.
13    Q.  Perhaps he's never seen one, except on TV?
14    A.  Anything is possible.
15    Q.  Now, just going through things kind of in
16  orderly fashion, I don't know if you have the -- do
17  you have the -- would you tell me what you reviewed
18  in preparing your opinion in this case?
19    A.  In terms of materials related to --
20  specifically to this case?
21    Q.  Yes.
22    A.  I looked at the transcript of the voir
23  dire, the transcript of the jury selection, and I
24  looked at the Rule 23 order of the Appellate Court.

38

1           (Whereupon, Thomas Group Exhibit
2            No. 3 was marked for
3            identification.)
4  BY MR. MC GARRY:
5     Q.  I have marked as Deposition Exhibit
6  No. -- Thompson Group 3 for identification.
7     A.  Thomas.
8     Q.  Thomas, thank you.  That's your entire
9  file, is that correct, sir?
10    A.  Yes, it is.
11    Q.  Okay.  Now, I had asked you to -- from
12  your file if you had copies of your time.
13    A.  I have a time sheet, and I have a bill
14  which I presented to Mr. Flaxman.
15    Q.  I'm going to leave exhibits out on the
16  table here by the court reporter and you.
17    A.  Okay.
18    MR. MC GARRY:  And if any time -- I don't mean
19  to be rude, I didn't make a lot of copies, so if
20  you need something, just tell me.
21    MR. FLAXMAN:  Okay.
22    MR. MC GARRY:  It goes for you, too.
23    MR. DOLEZAL:  Sure.
24

40

10  (Pages 37 to 40)

BY MR. MC GARRY:

1  Q.  May I please see the time record and the
2  bill?
3  A.  Yes.
4  Q.  Thank you.
5  A.  I should tell you there's a bill that
6  appears to be missing -- no, there's not.  I'm
7  sorry, there's not.  That's the only bill that I
8  sent.
9  I should also tell you I used recycled
10 paper, so there's -- on the back of that bill
11 there's some writing that has nothing to do with
12 this case.
13 Q.  Nothing confidential I take it?
14 A.  Right.  I faxed it to him, so I used
15 recycled paper.
16 Q.  So the -- I'll mark this as Thomas --
17 Thompson -- I'm sorry.  See, I'm trying to get away
18 from Clarence Thomas, trying not to mix you up.
19 A.  Yes.
20 MR. MC GARRY:  Thomas Deposition Exhibit 3A and
21 B.  A will be the time record.
22
23
24
                                    41

1  (Whereupon, Thomas Deposition
2  Exhibit Nos. 3A and 3B were
3  marked for identification.)
4  BY MR. MC GARRY:
5  Q.  For the record Thomas 3A and 3B are your
6  time sheet and bill respectively, correct?
7  A.  Correct.
8  Q.  Well, how long did it take you to read
9  the -- strike that.
10 How long did it take you to read the voir
11 dire?
12 A.  I have two entries, one on October 18 and
13 one on October 19th.  It indicates an hour and a
14 half to read the transcript, and then on the 19th
15 it indicates further work on the transcript, and
16 then legal research and beginning the draft of the
17 report.
18 So it would be somewhere -- something more
19 than an hour and a half.  I would estimate probably
20 two hours, maybe two hours and a quarter to read it
21 and take some notes on it.
22 Q.  Do you know what time of day back in -- at
23 the time of the voir dire that the voir dire
24 proceedings began, the jury selection?
                                    42

1  A.  No, I don't.
2  Q.  Do you know how long the jury --
3  A.  Wait a minute.  Wait a minute.  They make
4  reference to something -- at the very end of the
5  transcript -- can I look at it?
6  Q.  Sure.  I think I have it right here.
7  A.  Well, I've got a copy.
8  Q.  All right.  Go ahead, out of your file.
9  A.  I can look at it.  I recall that they --
10 well, they talked about being back at 10:00 o'clock
11 tomorrow -- well, they talk about it being a long
12 day, they don't mention any specific hours.
13 My impression was that it began late
14 morning or early afternoon and finished up --
15 Q.  Does the record show what time the
16 proceedings commenced?
17 A.  Oh, yes, 1:30.
18 Q.  And then do you know -- you're not able to
19 tell from the transcript what time of day it
20 concluded, are you?
21 A.  Not the exact time, no.
22 Q.  But it took you at least -- you spent an
23 hour and a half or two hours reading the
24 transcript?
                                    43

1  A.  Correct, and as I say taking some notes.
2  Q.  How long were they on the record doing
3  jury selection as far as you know?
4  A.  I can't tell because I don't know exactly
5  when they ended.
6  Q.  Now, I would like to look at your file,
7  also I want -- I'm going to mark this as Thomas
8  Exhibit No. 4 for identification.  It's the
9  subpoena that we sent to you.
10 (Whereupon, Thomas Deposition
11 Exhibit No. 4 was marked for
12 identification.)
13 THE WITNESS:  You mentioned the subpoena which
14 reminds me that I didn't cash your check since I
15 didn't appear on Friday, so I'll just return it to
16 you.
17 BY MR. MC GARRY:
18 Q.  Those checks are used to cover costs of
19 the photocopying if you had any costs.
20 A.  I didn't have any photocopying costs,
21 although my lawyer might have had some -- not my
22 lawyer, Mr. Flaxman might have had some
23 photocopying costs.
24 Q.  It's your prerogative, if you want to
                                    44

11 (Pages 41 to 44)

1    tender it back, it's okay.
2        MR. FLAXMAN:  How much is it?
3        MR. MC GARRY:  20 bucks.
4        THE WITNESS:  It's 20 bucks.
5    BY MR. MC GARRY:
6        Q.  It really was for your photocopying.
7        A.  Okay.  I just -- okay.
8        Q.  I certainly don't begrudge it to you if
9    you want --
10       A.  I don't care.  It doesn't make any
11   difference to me, but -- do you want me to look at
12   the subpoena?
13       Q.  Yes, please.  I would like you to take a
14   look at the rider.
15       A.  All right.
16       Q.  Have you made an effort to try to find the
17   matters that we've put in the rider?
18       A.  I have.
19       MR. MC GARRY:  There's a copy of the subpoena,
20   it was a subpoena duces tacum --
21       MR. DOLEZAL:  This went out Friday?
22   BY MR. MC GARRY:
23       Q.  You have provided Item No. 1, all the
24   materials you reviewed, correct?

45

1    as copies, I've got my time sheets, my fax cover
2    sheets, a confirmation page, a little bank slip
3    with Mr. Flaxman's cell phone number written on it.
4    There are actually no letters in here even though
5    it's labeled time sheets and letters.
6        I have notes that I took on the voir dire
7    transcript.  I have -- I have the rider -- excuse
8    me, the subpoena that you served upon me.
9        I have my handwritten -- started to make a
10   copy of my cases, my homicide juries, and then
11   Mr. Flaxman has some notes on here, and I have
12   another page where I tried to look at some of my
13   court calendars to refresh my recollection about
14   other homicide juries, and I have a confirmation
15   page for having faxed that second sheet to
16   Mr. Flaxman.  This was on Saturday.
17       In fact, I have to tell you, I didn't -- I
18   was out of the country, I didn't open your subpoena
19   till Saturday morning.
20       Q.  I understand.
21       A.  I'm sorry.
22       Q.  I think we're okay.
23       A.  Okay.  And then there are the materials
24   that -- the voir dire transcript and the Rule 23

47

1        A.  Correct.
2        Q.  And your complete file is now marked as
3    Thomas Exhibit No. 3 -- Group No. 3, correct?
4        A.  Correct.
5        Q.  And that would contain all the
6    communications between yourself and Mr. Bourke's
7    attorneys?
8        A.  Except for the phone calls.  I mean -- you
9    know, looking at that time sheet, it refreshes my
10   recollection about the initial contact.
11       Q.  Yes.  When was that?
12       A.  When?
13       Q.  When and what were the circumstances?
14   Feel free to look at it.
15       A.  It was on October 16th of 2008, and I
16   remember now that I got a -- the initial call was
17   from Cecile Singer asking if I would be available
18   to serve as an expert, and I told her yes, and then
19   I received a call from Mr. Flaxman, so I actually
20   talked to both of them, so that's why -- anyway,
21   that was as I say on October 16th.
22       Q.  All right.  This would be a good time just
23   to give me a quick inventory of what's in there.
24       A.  Well, I've got -- my report and CV as well

46

1    order.
2        Q.  So the date you were retained was --
3        A.  October 16th of 2008.
4        Q.  And when did you agree to be an expert?
5        A.  I -- I agreed to review the materials on
6    that day.
7        Q.  Okay.  When did you form your opinion?
8        A.  I formed my opinion on October 19th.
9        Q.  And on October 19th, what had you
10   reviewed?
11       A.  I reviewed the Rule 23 order, the jury
12   selection transcript, and I had done, you know,
13   little basic legal research that's reflected in the
14   report.
15       Q.  Did you ever ask for any additional
16   materials for your expert review?
17       A.  No, I didn't.
18       Q.  Okay.  Have you done any review since
19   then?
20       A.  Of any additional materials?
21       Q.  Yes.
22       A.  No.
23       Q.  Okay.  And when did you first publish your
24   report?

48

1    A.  My report was completed -- well, I first
2  published it on October 21st.
3    Q.  Were there any drafts or revisions?
4    A.  There was a draft on the 20th, right.  And
5  I have here proof and revise report which usually
6  means basically correcting typos or grammatical
7  stuff.
8    Q.  When you supplied it to counsel for the
9  plaintiff, was it in its complete form?
10   A.  Yes.
11   Q.  And what were you asked to do?
12   A.  I was asked to review the jury selection
13  transcript and the Rule 23 order and make a
14  determination regarding -- regarding the adequacy
15  of the voir dire that was conducted in terms of the
16  standard of care expected from defense counsel in
17  1999 and whether I had an opinion as to whether
18  the -- assuming the voir dire was not a competent
19  voir dire, whether there was a reasonable
20  likelihood that it contributed to the guilty
21  verdict.
22   Q.  Now, before you had your final opinion on
23  October 19th, 2008, if that's the proper date
24  because that's what my notes reflect?

49

1    A.  Well, yeah.  Okay.
2    Q.  You formed your opinion on the 19th, you
3  drafted it on the 20th, you made your revisions,
4  final revisions on the 21st, and you published it
5  on the 21st?
6    A.  I began drafting it on the 19th, I
7  completed the draft on the 20th and then, yes,
8  proof and revision and faxed it to Mr. Flaxman on
9  the 21st.
10   Q.  Prior to October 19th, had you ever read
11  Mr. Brucar's deposition?
12   A.  No.
13   Q.  Do you know Mr. Brucar?
14   A.  No.  I don't think I do.  I might know him
15  by face, but I don't know him by name.
16   Q.  Do you know what his experience is as a
17  lawyer?
18   A.  No.  I don't -- I don't know anything
19  about him.
20   Q.  Do you know what his experience is as a
21  lawyer practicing criminal law in DuPage County?
22   A.  No.
23   Q.  Do you know how many juries he's selected
24  in DuPage County?

50

1    A.  No.
2    Q.  How about Mr. Conger, do you know who he
3  is?
4    A.  No.  And again, other than -- other than
5  if I would know him by sight.
6    Q.  Do you know -- have you ever appeared
7  before Judge Bakalis B-A-K-A-L-I-S?
8    A.  I don't believe I have.
9    Q.  Do you know a Brian Telander, Judge
10  Telander?
11   A.  Oh, yes.
12   Q.  How do you know him?
13   A.  I have known Judge Telander again as an
14  attorney since ages, decades.
15   Q.  Do you know him to be a competent criminal
16  defense lawyer?
17   A.  I regard him as a competent criminal
18  defense lawyer, yes, I guess he was before he was a
19  judge, or -- he became a judge, and then he became
20  a lawyer again, didn't he?
21   Q.  Yes.
22   A.  Okay.  So if he's a lawyer now again, yes,
23  I regard him as a competent criminal lawyer.
24   Q.  Had you ever read the report of

51

1  proceedings of the trial?
2    A.  No.
3    Q.  Had you read the depositions taken -- in
4  the civil case have you read depositions of David
5  Bourke?
6    A.  No.
7    MR. MC GARRY:  Do I pronounce that correctly?
8    MR. FLAXMAN:  It's Bourke.
9    MR. MC GARRY:  I was thinking it might be.
10  B-O-U-R-K-E pronounced Bourke.
11   THE WITNESS:  I only read what I've listed here
12  in materials reviewed, that's it.
13  BY MR. MC GARRY:
14   Q.  Do you know if the state's attorney gave a
15  deposition in this case?
16   A.  I have no idea.
17   Q.  Do you know if a posttrial motion was
18  filed?
19   A.  No -- well, wait a minute.  There might be
20  a reference in it to the Rule 23 -- in the Rule 23
21  order.
22      I don't see a specific reference, but
23  there's also no discussion of plain error, so I
24  can't imagine that there wasn't a posttrial motion

52

13  (Pages 49 to 52)

1   filed.

2       Q.  And I take it that you -- you are not

3   familiar today with how Judge Bakalis ruled on any

4   posttrial motion?

5       A.  No, I'm not.

6       Q.  Do you know if Judge Bakalis made any

7   findings that the verdict was -- should stand?

8       A.  Well, since it was appealed, I assume that

9   he found that the verdict should stand.

10      Q.  Who took the appeal?  Who prosecuted the

11  appeal?

12      A.  It had to be -- it had to be Mr. Bourke

13  because otherwise double jeopardy would prevent the

14  state from appealing.

15      Q.  Okay.  I didn't mean it as a trick

16  question.  I guess who handled the appeal for

17  Mr. Bourke?

18      A.  Oh, I have no idea.

19      Q.  Did -- in the Rule 23 order, did the Court

20  make any statement or criticism regarding the jury

21  selection?

22      A.  They didn't address the jury selection --

23  well, wait a minute.  No -- no.  There was a claim

24  raised about trial counsel being ineffective, but

53

1   since they reversed outright it didn't reach the

2   claim, so they mentioned it but they didn't rule on

3   it at all.

4       Q.  Now, just going back to the rider of

5   things that I was trying to see if we could

6   locate --

7       A.  Okay.

8       Q.  -- we'll just keep working on this.  Have

9   you any depositions or transcripts of depositions

10  where you've testified?

11      A.  I have never been deposed as an expert.

12      Q.  Okay.  Now, do you -- do you have -- what

13  I was looking for, too, then do you have copies of

14  jury selections that you've done?

15      A.  No.

16      Q.  Transcripts?

17      A.  No.  I mean there -- the files from my --

18  my practice at -- while I was at Kent Law School

19  are archived and in storage, and there might be

20  somewhere in those files some transcripts.  I have

21  no idea.

22          If there was an appeal, you know, there

23  could be a case where there's a transcript, but I

24  don't have any specific recollection, you know.  I

54

1   have no idea.

2           I certainly don't have -- I'm sorry.  I

3   certainly don't have any in my office, I'll you

4   that.

5       Q.  I asked you if you had been a defendant in

6   a legal malpractice.  You mentioned two cases, and

7   that's the sum total of all the malpractice cases

8   where you've been a defendant?

9       A.  To the best of my recollection, yes.

10      Q.  Have you ever been in a situation where

11  your former client has alleged ineffective

12  assistance of counsel on posttrial motion or

13  appeal?

14      A.  I don't recall that, but I -- you know,

15  it's not an uncommon allegation, so I don't -- I

16  don't really want to say never, but I don't recall

17  that.

18      Q.  Okay.  You can't recall any reported

19  decisions where ineffective assistance of you or

20  the -- the students or other lawyers under your

21  care were --

22      A.  I can't recall any.

23      Q.  In the cases that you had, maybe as many

24  as five cases in DuPage County before 1999, were

55

1   you first chair on all of those?

2       A.  Yes.

3       Q.  And were you defense counsel in all of

4   those cases?

5       A.  Yes.

6       Q.  Did you win all those cases?

7       A.  I remember one case specifically where we

8   won, it was a jury trial.  I have a vague

9   recollection of another case that we won.

10          I know I've pled some cases out there.  I

11  don't have any -- wait a minute.

12      Q.  Well, let me ask you this:  Have you won

13  all of your cases?

14      A.  No, I have not.

15      Q.  And just looking at juries alone, just

16  jury cases, how many jury cases have you tried?

17      A.  I would say a hundred, 75 to a hundred.

18      Q.  Did you win some that you thought you

19  might lose?

20      A.  Yes.

21      Q.  Did you lose some that you thought you

22  might win?

23      A.  Yes.

24      Q.  And the ones you lost, did you blame the

56

14 (Pages 53 to 56)

| | |
|---|---|
| 1  jury? | 1   Q.  Is that the kind of thing a lawyer might |
| 2      A.  I don't know how to answer that question. | 2  say before consulting with his co-counsel and |
| 3  The ones that I lost, I don't know.  I guess I | 3  client regarding accepting a jury? |
| 4  don't blame -- I don't blame people because I -- | 4      A.  It's possible, yes. |
| 5  you know, I -- some of them I thought maybe the | 5      Q.  But you do confer with your clients before |
| 6  jury should have made a different decision.  If you | 6  you accept the panel of jurors, don't you? |
| 7  want to call that blaming the jury, then in those | 7      A.  Yes. |
| 8  cases I did blame the jury but, you know -- | 8      Q.  Why is that? |
| 9      Q.  And on the cases that you lost, did -- did | 9      A.  Well, because they should have input into |
| 10  the clients blame you? | 10  the -- into the situation, and because no matter |
| 11      A.  Occasionally they did, but not -- not all | 11  how well you know your case, your client always |
| 12  that often because I tried to -- I tried to | 12  knows some things about it that you don't know. |
| 13  practice in a way in which my client were involved | 13      Q.  What would a client know about jury |
| 14  in the decisions regarding what we did at trial and | 14  selection? |
| 15  so forth and so on so that they felt like they, you | 15      A.  Not about jury selection, but the -- about |
| 16  know, were a partner in the process. | 16  the case, about the facts of the case. |
| 17      Q.  Do you know in the jury selection process | 17      Sometimes -- sometimes the client knows |
| 18  in this case whether or not Mr. Bourke consulted | 18  something about the juror, something about the |
| 19  with Mr. Brucar or Mr. Conger before accepting one | 19  neighborhood that the juror lives in, or something |
| 20  of the panels? | 20  about the company where the juror works, might be |
| 21      A.  I don't see any indication on the record | 21  the same company where one of the witnesses worked, |
| 22  of the transcript that they did. | 22  you know, that you the lawyer don't know about. |
| 23      I don't see them asking a Judge for a | 23      There's a whole host of information.  It's |
| 24  couple of minutes to talk to him, but if it | 24  not, you know, so much about jury selection per se |
| **57** | **59** |
| 1  happened off the record, I would have no way of | 1  as it is about facts. |
| 2  knowing that. | 2      Q.  Do you know Hans Eisele? |
| 3      Q.  Well, if you read the deposition, you | 3      A.  I knew Hans Eisele way back when when I |
| 4  might, right? | 4  was down at the University of Chicago.  He's been |
| 5      A.  I might, yes. | 5  dead for a long time. |
| 6      Q.  So I guess what you're saying is you don't | 6      Q.  Well, he used to work as a jury |
| 7  know whether or not they consulted with their | 7  consultant, didn't he? |
| 8  client regarding the jury selection, the two | 8      A.  I think he did, yes. |
| 9  defendants here? | 9      Q.  Have you ever worked as a jury consultant? |
| 10      A.  Again I'll answer the question in the same | 10      A.  No, I have not.  I've worked with jury |
| 11  way, I don't see any indication on the record that | 11  consultants, but I've never worked as one myself. |
| 12  they did, but they could have done it off the | 12      Q.  On the rider No. 7, have you -- were you |
| 13  record. | 13  able to find any sort of materials that are used |
| 14      I'll just say, you know, my practice would | 14  specifically on -- I'm just focusing not in the |
| 15  always be to ask the Judge if -- after I got done | 15  constitutional broad stroke but basically on the |
| 16  with my voir dire if I can have a brief moment to | 16  nuts and bolts of how to pick a jury? |
| 17  consult with my client which would appear on the | 17      A.  I looked and found a syllabus from -- I |
| 18  record.  And I don't recall that appearing on this | 18  taught two courses, one was called the -- excuse |
| 19  record, if I'm wrong I'm sure you'll correct me. | 19  me, one was called the investigatory course which |
| 20      Q.  I'm looking at Page 61 of the transcript. | 20  was basically Fourth and Fifth Amendment, pretrial |
| 21  Before Mr. Brucar accepted the panel, he states at | 21  procedure, and the second one was called the |
| 22  line seven, if I can just have one moment, Judge. | 22  adjudicatory course, and a portion of that course |
| 23  The Court, yes. | 23  dealt with jury selection. |
| 24      A.  Okay. | 24      And I found a syllabus from the course, I |
| **58** | **60** |

**15 (Pages 57 to 60)**

1    found a couple of folders containing some materials
2    that we would use when we were talking about jury
3    selection. And I found some very, very old notes
4    which I didn't even use at the end --
5        Q. Have you found any written materials,
6    either handwritten notes or syllabi or treatises
7    that tell a lawyer whether to exercise preemptory
8    challenges or to exercise one or two or three, up
9    to seven, is there a handbook that tells you how
10   many you should take?
11       A. No, because that would be arbitrary. It
12   depends upon the facts of the case.
13       The books tell you, you know, what the
14   function of the voir dire is and what the purpose
15   of your preemptory challenge is -- are, and I know
16   of no book that says you should use, three, four,
17   five.
18       Different jurisdictions have different
19   numbers of preemptory challenges. Different levels
20   of cases have different numbers of preemptory
21   challenges so, no, I don't.
22       MR. MC GARRY: We'll mark this as Exhibit 5.
23
24
                                                    61

1        So that's what -- by the way, there's a
2    typo here, this David Hablace, I was thinking the
3    name of the case was David Wallace, but it turns
4    out it was Melvin Turner, so there is no such
5    person as David Hablace, but this should be
6    Hurtado, but that's what -- that's what I was able
7    to come up with in the time that I had.
8    BY MR. MC GARRY:
9        Q. Do you recall how many of those cases
10   dealt with the defense -- self defense?
11       A. McShane dealt with self defense. Robert
12   Eisenberg dealt with self defense. Hurtado dealt
13   with self defense. Jackie Wilson, I'm trying to
14   remember whether we presented a self defense case
15   in Jackie Wilson.
16       Jermaine Claire definitely involved self
17   defense, he was found guilty of second degree
18   murder in perfect self defense. So I would say
19   about half of them.
20       Q. Of the half of self defense, how many were
21   acquitted and how many were convicted?
22       A. I need to see it. Eisenberg was
23   convicted. Hurtado was convicted. Sims McShane
24   was acquitted. Jackie Wilson was convicted if we
                                                    63

1        (Whereupon, Thomas Deposition
2        Exhibit No. 5 was marked for
3        identification.)
4    BY MR. MC GARRY:
5        Q. This is an e-mail that you were not copied
6    on, but it was from Mr. Flaxman just giving me a
7    list of cases that were responsive to the question
8    on a list of your homicide juries; is that right?
9    MR. DEGEN: I believe so.
10   THE WITNESS: Yes. This -- as I indicated, I
11   opened your -- I was out of the country, and I
12   opened your subpoena on Saturday morning, and I
13   attempted to -- from my memory primarily, I
14   attempted to recall all the -- all the homicide
15   juries that I could remember. Off the top of my
16   head, this second group, three, six, seven, the
17   second group of seven cases, that was completely
18   from memory.
19       And then I started -- I tried to go
20   through some of my calendar books to refresh my
21   memory about some other cases, and I got through
22   about -- well, it looks like I got down to like
23   1996 when my time was up and I had to fax it to
24   Mr Flaxman.
                                                    62

1    did present a self defense case. That involved the
2    murders of two police officers.
3        And Jermaine Claire as I said was
4    convicted of second degree. We would have pled the
5    second degree in that case if they would have
6    offered it to us.
7        MR. MC GARRY: Do you have --
8        MR. FLAXMAN: Let's take a break so we can use
9    the washroom.
10       MR. MC GARRY: Sure. Perfect time.
11       (Short break.)
12   BY MR. MC GARRY:
13       Q. Go ahead.
14       A. Yes. I indicated off the record that I
15   misspoke when I stated that the case of Sims
16   McShane, M-C-S-H-A-N-E, that it was a self defense
17   case. It was not a self defense, it was --
18   accident was the defense in that case, so I just
19   wanted to correct that.
20       Q. Is that more recycled paper or is that
21   part of this?
22       A. I used both sides of the paper, yeah.
23   It's all my writing, but -- as opposed to the other
24   one.
                                                    64

16 (Pages 61 to 64)

1    Q.  I was referring to your handwritten notes
2    where you did a simple abstract of the transcript
3    of the voir dire.
4    A.  Yes.  That's -- that's not -- it says --
5    the one that says Bourke at the top.
6    Q.  Do you know where the physical evidence is
7    in the case?
8    A.  No, I don't.
9    Q.  Do you know what the --
10   A.  You mean the location of it?
11   Q.  Yes.
12   A.  No, I don't.
13   Q.  Do you know where the gun is?
14   A.  No.
15   Q.  Do you know if Bourke has made any motions
16   to expunge the record?
17   A.  No.
18   Q.  I'm looking at your notes, and you did it
19   looks like a jury chart?
20   A.  Very primitive one, yes.
21   Q.  Have you seen Mr. Brucar's jury chart?
22   A.  No, I have not.
23   Q.  Or his notes regarding voir dire?
24   A.  I have not.  I did that chart primarily to

65

1    try and figure out who is who because sometimes I
2    refer to them by numbers and other times I refer to
3    them by name, so I was trying to, you know,
4    basically chart which juror they were talking to.
5    Q.  What was the -- now, let's take a look at
6    your report.
7    A.  Okay.
8    Q.  I'm going to just go to Page 2 right now
9    called opinions.
10   A.  All right.
11   Q.  Actually I'm going to move past Page 2 and
12   go right to Page 3 for a second.
13   A.  Okay.
14   Q.  Because in the first full paragraph, you
15   single out two jurors, one was juror No. 9 and the
16   other was juror No. 193.
17   A.  Right.
18   Q.  Now, juror No. 193 was excused during the
19   trial for other reasons?
20   A.  That's what I was told.
21   Q.  I was wondering who you knew that from
22   just looking at the transcript?
23   A.  After I faxed my report or -- the day I
24   faxed my report, I had a telephone call with

66

1    Mr. Flaxman, and he told me during that call that
2    she was excused.
3    Q.  Okay.  Do you have any opinion or
4    knowledge as to why she was excused?
5    A.  Well, I mean, I have -- I have an opinion,
6    it's speculative.  I mean, I don't know -- no, I
7    don't know why.
8    Q.  Do you know what -- what alternate juror
9    took her place?
10   A.  No, I do not, which alternate juror took
11   her place.
12   Q.  Okay.  Do you know why the state who had
13   moved to challenge her for cause withdrew its
14   objection or did not seek to remove that juror
15   for -- on a preemptory basis?
16   A.  May I look at the transcript?
17   Q.  Yes.
18   A.  You've got it.  We're talking about juror
19   number --
20   Q.  183.
21   Q.  193 or 183?
22   Q.  193, I'm sorry.
23   A.  All right.  And who -- can you direct me
24   to the portions of the transcript where the -- I

67

1    remember the state challenging a juror for cause.
2    I thought the Judge denied it, I didn't think he
3    withdrew it.
4    Q.  The Judge denied the challenge for cause,
5    but then the state never made a preemptory
6    challenge, correct?
7    A.  Okay.  I -- what portion of the transcript
8    deals with this particular juror?  I can't -- I
9    cite 49, so it's got to be around there someplace.
10   Q.  Try Page 50.
11   MR. FLAXMAN:  That's not the jury selection
12   there.
13   MR. MC GARRY:  I just had mine.  Here it is.
14   THE WITNESS:  This is juror No. 9.  I thought
15   we were talking about 193.
16   BY MR. MC GARRY:
17   Q.  193.
18   A.  Well, Page 50 deals with the examination
19   of juror No. 9.
20   Q.  All right.  Let's look at -- I'm basically
21   going to help you here, but I'm trying to test your
22   knowledge of the record.
23   A.  Well, let me look at my -- let me look at
24   my notes.

68

17 (Pages 65 to 68)

1    Q.   The Page 45, line 22, the Court states I'm
2  not going to excuse her for cause.  Do you see
3  that?
4    A.   Yes, I do.
5    Q.   And then on the next page, Mr. McGivsy
6  (phonetic) who's the prosecutor accepts her along
7  with the whole panel, correct?
8    A.   Correct.
9    Q.   Why didn't he use a preemptory challenge
10  on her?
11    A.   You'd have to ask him that question.
12    Q.   What would be his guiding rule, how would
13  he know whether to do it or not?
14    A.   Again -- let me read his basis.  I don't
15  know why he wouldn't exercise a preemptory
16  challenge, maybe he thought that he was going to
17  need the challenges later on and didn't want to use
18  one on this particular juror.  I don't know.
19    Q.   Do you believe that he felt he had
20  reasonable grounds to request for a challenge for
21  cause?
22    A.   I would assume he didn't make a frivolous
23  motion.
24    Q.   Well, wouldn't he then -- would he have

69

1  agree that it was a matter resting in his judgment
2  as trial lawyer at the time whether to exercise a
3  preemptory challenge --
4    A.   Yeah.  I would agree that it was obviously
5  his judgment whether he use one or not.
6         The -- I think the important thing about
7  that situation, though, is that he asked this
8  lawyer questions which provided the basis for him
9  to exercise that judgment.
10         Just exercising judgment alone, it doesn't
11  immunize an attorney's actions if the attorney has
12  no reasonable basis to exercise the judgment.
13    Q.   Have you ever seen a case where a lawyer
14  who exercised judgment even in a faulty way in
15  terms of voir dire had either been accused --
16  strike that, had been found guilty of legal
17  malpractice or ineffective assistance of counsel, a
18  reported decision?
19    A.   Off the top of my head, I cannot recall
20  any reported decision where a lawyer was found
21  guilty of legal malpractice based solely upon voir
22  dire.
23    Q.   Going back to your opinion, I was looking
24  at the three recognized functions of voir dire that

71

1  committed malpractice then by not taking a juror
2  who he reasonably believes should be excused for
3  cause and not using one of his preemptory
4  challenges?
5    A.   Just on the basis of this -- those two
6  facts I don't have an opinion on that.
7    Q.   Was he entitled to exercise his judgment
8  as a trial lawyer at that moment in time?
9    A.   Yes.
10    Q.   Was he -- was that a matter of his
11  strategy, trial strategy?
12    A.   You would have to ask him.
13    Q.   Well, is it a matter of trial strategy
14  whether to take a preemptory challenge after just
15  making the challenge based on cause?
16    A.   Not necessarily -- well, probably in that
17  situation, it does -- it's hard to -- I can't say
18  because I don't know why -- I don't know why he did
19  it.
20         It doesn't make a lot of sense to me to
21  tell you the truth, and I'm -- I'm not trying to
22  defend him, I'm not trying to come down on him, it
23  doesn't make a lot of sense to me.
24    Q.   Okay.  However you evaluate it, would you

70

1  you put there, what is the source of that?
2    A.   Karnisar, Modern Criminal Procedure.
3    Q.   Was that in the version in 1999?
4    A.   I believe that it was, yes.
5    Q.   And you've given the opinion that
6  Mr. Brucar and Mr. Conger fulfilled none of those
7  functions?
8    A.   Right.  Because they didn't find out any
9  facts about the -- about the jurors, they didn't
10  find out any information.
11    Q.   Let's assume that Mr. Brucar had exercised
12  preemptory challenge in this case.
13    A.   All right.
14    Q.   And so this record shows that there were
15  two panels of six, there were some jurors excused
16  by the Judge, correct?
17    A.   Yes.
18    Q.   And then so who were the next people on
19  deck for the jury, do you know?
20    A.   From the transcript it looks like they
21  were pulling people out of the audience.
22    Q.   So they're doing it randomly?
23    A.   I'm not sure I understand your question.
24  They're supposed to do it randomly.

72

18  (Pages 69 to 72)

Q. Okay. So there were -- just to set the picture, there were twelve people who were the first group of potential jurors selected randomly, and they were put in the jury box, if you will, correct?

A. I don't believe so.

Q. Were they just in the benches in the back of the courtroom?

A. He says we're going to pick -- this is at Page 3 of the transcript. We're going to pick our jury in panels of six. I'm going to designate the first six of you as our first panel of six, the second row as our second panel of six. We're going to fill in one panel at a time.

So I believe that what happened is that if the Judge excused somebody -- well, I'm not sure whether they came from -- whether the juror to replace that juror came from the audience that was still not part of the jury box or whether it came from the second row. My impression was it came from the audience.

Q. Okay. So that's a good point. So if someone were excused from the first six, then the replacement would come from the --

73

A. The general pool. Yes, I believe so.

Q. So if -- if -- if either the state or the defense had exercised any more challenges, a preemptory challenge, that would have been granted as a matter of right, preemptory challenge?

A. Yes.

Q. And then who would have come in the jury next?

A. Whoever was selected randomly to replace that juror.

Q. Tell me about that person.

A. I can't tell you about that person because the defense exercised no preemptory challenges, so they didn't see anybody other than the jurors that the state didn't knock off or the Judge didn't excuse.

Q. I'm focusing here on the question whether or not you are able to say who that next person would be. You cannot?

A. No, I'm not. Of course I cannot.

Q. So we don't know if that person would have been a more fit juror than the one that was just excused?

A. We don't have to worry about that when we

74

have seven challenges and the defendant doesn't exercise any because if the person is worse, you could excuse that person.

Q. Until you're done with your preemptories, then you would be stuck with whoever comes next unless you have what's called a challenge for cause --

A. Right.

Q. As an expert here, you don't know who those people are, what their qualifications and life experiences are as you sit here today?

A. That's correct.

Q. So the jury that was not impaneled, we don't know who that is?

A. That's correct.

Q. Have you ever used all seven preemptory challenges?

A. I have. I don't like to.

Q. Did your client make you do it?

A. No. My client didn't make me do it. I don't like to because as I think your question implies, once you use that last preemptory, then you're -- and you're pretty vulnerable, so I prefer to openly use six, but I have used -- I have used a

75

seventh sometimes.

Q. Now, Mr. Thomas, did you see in the record that Mr. Brucar introduced -- during the voir dire he introduced the fact that there was self defense?

A. He mentioned it.

Q. The fact that his client lives in a transit hotel?

A. He mentioned it.

Q. The fact there was a gun involved?

A. He mentioned it.

Q. The fact there was a violent death and his client was the cause of that?

A. He mentioned it.

Q. Okay.

A. You know, you mentioned the gun. One thing he never -- he never told the jurors that the gun was legal. I -- and that's -- I mean, that's something I didn't -- I didn't -- you know, I didn't mention that in my report.

Q. Doesn't the constitution grant the right to bear arms?

A. Well, lately -- as of July, the constitution grants the right to bear arms, but --

Q. Didn't it in 1999?

76

19 (Pages 73 to 76)

1    A.  No.

2    Q.  Was it a legal gun?

3    A.  The -- he was not charged with a UUW, and

4  the Rule 23 order says that he had a permit for the

5  gun.

6    Q.  How long did he have the gun?

7    A.  I think he had it for a week they said --

8  or he testified that he got it a week before the

9  incident, so sure looks like it was legal.

10    And particularly the juror who expressed

11  preservations about guns, I mean, there was a

12  perfect opportunity to introduce the fact to inform

13  the jury about the fact that the gun was legal, but

14  he didn't say anything.

15    Q.  And if -- that was juror No. 9?

16    A.  I believe so, yes.

17    Q.  So in terms of your opinion, the only two

18  jurors you've identified in your written opinion

19  are 9 and 193, right?

20    A.  They are jurors which to me were the most

21  obvious examples of jurors who were -- who needed

22  to be questioned.  No. 193 -- excuse me.  Wait a

23  minute.

24    Q.  I'm looking at top of Page 3.  It's the

77

1  only place I can find reference to actual jurors by

2  number.

3    A.  Right.  I made reference to two jurors.

4    The one -- the one juror who mentioned the

5  gun which I guess is No. 9, I'm sorry, he brought

6  that up on his own.

7    And -- but as I say, they never -- they

8  never tried to find out why he had this attitude

9  about guns.  They never -- they never let him know

10  that the gun was legal.  They didn't, you know --

11  they didn't pursue it at all.

12    Q.  I thought you said that was in evidence.

13    A.  Not -- there was no evidence at that time.

14    Not of the jury selection but in voir

15  dire.

16    No.  No.  The Rule 23 order says that he

17  had a -- he had a -- they call it a permit, a valid

18  firearms license.

19    Q.  How would the Appellate Court know that if

20  it wasn't in the record?

21    A.  No.  No.  It came in the evidence at the

22  trial.

23    Q.  Who made the record for the defendant?

24    A.  I haven't read the record.

78

1    Q.  Who were his lawyers --

2    A.  The state might have introduced that fact.

3  I haven't read it.  I haven't read the record, the

4  record of the trial.

5    Q.  So anyway, my simple question was -- I

6  think simple, was it only identified two jurors,

7  right?

8    A.  Right.

9    Q.  No. 9 and 193.  And 193 didn't actually

10  sit in judgment on the case, correct?

11    A.  That's what I was told.

12    Q.  Now, you say that there's a function of

13  jury selection called indoctrinating the potential

14  jurors on the merits of the case and developing

15  rapport, right?

16    A.  Uh-huh.

17    Q.  That was a quote from California Law

18  Review written by the law student?

19    MR. FLAXMAN:  When you say uh-huh, did you mean

20  yes?

21    THE WITNESS:  I'm sorry, yes.  Yes.  That is

22  from the comment written by a law student, but

23  those comments are supervised by experienced

24  professors, and I -- you know, regardless of the

79

1  fact that he's a law student, I -- you know, I

2  think that that comment is correct, and that's why

3  I cite it.

4  BY MR. MC GARRY:

5    Q.  Okay.  And then we're citing

6  Mr. Alschuler's statement in quotations -- you are,

7  "In examining prospective jurors, lawyers and

8  judges probe their attitudes and practices asking,

9  for example, about a juror's religious beliefs,

10  drinking habits, jobs, hobbies, and prior

11  experience with lawyers."

12    Now, do you ask your jurors about their

13  drinking habits, religious beliefs?

14    A.  It depends upon the case.  In this case, I

15  sure would have asked potential jurors about their

16  drinking habits because that was a very important

17  fact in this case.

18    Q.  Do you agree religious beliefs were not

19  relevant to this case?

20    A.  Based upon what I know, I would agree that

21  religious beliefs were not.

22    Q.  You know about Rule 8.4 of misconduct, it

23  says that a lawyer shall not engage in conduct that

24  is prejudicial to the administration of justice.

80

1  In relation thereto to a lawyer shall not engage in
2  adverse discriminatory treatment of litigants,
3  jurors, witnesses, lawyers, and others based on
4  race, sex, religion, national origin, disability,
5  age, sexual orientation, socioeconomic status.
6      A.  What is that, Rule 8.4?
7      Q.  Rule 8.4, misconduct in the Rules of
8  Professional Conduct.
9      A.  Okay.  The modern rules or the Illinois
10 Code --
11     Q.  Illinois Code?
12     A.  Okay.  Right.
13     Q.  So you really can't -- you can't
14 discriminate against jurors based on sexual
15 or entation or religion, right?
16     A.  No.  You can't discriminate based upon
17 race or religion, but that doesn't mean that you
18 can't ask them about their religious beliefs in a
19 proper case where it might influence their ability
20 to serve as fair and impartial jurors.
21     Q.  Were religious beliefs relevant to this or
22 is that just part of a generation quotation --
23     A.  It's part of the general -- the point of
24 the quotation and including it in here is that

81

1  reasonable lawyers find out the background facts
2  about their potential jurors, not that every topic
3  listed here is relevant to this particular case.
4      Q.  In the -- in the -- in the next paragraph
5  I think you commented that the voir dire could not
6  have lasted much longer than ten minutes in total.
7  It took you two hours to read it, so do you
8  disagree with that opinion?
9      A.  No, not at all.  That's referring to the
10 twenty pages that were involved in the -- in the
11 limited questioning by defense counsel.
12         The transcript as a whole is 120 -- some
13 123 pages, so it took -- that's just referring to
14 the brief --
15     Q.  Okay.  And you don't know the length of
16 time that Mr. Brucar and Mr. Conger actually
17 discussed the jury selection with their client?
18     A.  If they discussed it, no, I don't know.
19     Q.  If and when.
20     A.  I don't know if or when or how long.
21     Q.  Now, you say that DuPage County is a
22 culturally and politically conservative community.
23 Do you have some expert basis to state that?
24     A.  That is based upon my having practiced in

82

1  DuPage, it is based upon my knowing people from
2  DuPage, it is based upon friends of mine who have
3  been in DuPage and have described it in exactly
4  that fashion.
5      I don't -- I don't claim to be an expert
6  in sociology if that's what you're driving at, but
7  it's based upon my experience and my knowledge.
8      Q.  Is that something that a lawyer takes into
9  consideration in voir dire?
10     A.  Yes.  I think so.
11     Q.  Do you --
12     A.  A reasonably competent lawyer would.
13     Q.  Do you know what Mr. Brucar or
14 Mr. Conger's experience is in selecting DuPage
15 County jurors or communicating with them?
16     A.  No.
17     Q.  Is it your conclusion that the jury --
18 well, you don't have a -- you don't have an opinion
19 as to whether the jury acted irrationally apart
20 from the fact that there was the -- the Appellate
21 Court reversed the conviction, in other words, you
22 didn't see the evidence in this case?
23     A.  I didn't see the evidence, right.  My
24 opinion is based upon the Appellate Court opinion

83

1  which found that it acted irrationally.
2      Q.  But they didn't use that word irrational
3  in their opinion, right?
4      A.  Well --
5      Q.  This is basically sort of inductive or
6  reasoning on your part?
7      A.  No.  No, just a minute.  If you'll let me
8  look at the -- the bottom of Page 30, under
9  analysis, it says:  A Court reviewing the
10 sufficiency of the evidence underlying the criminal
11 conviction must not retry the defendant, but
12 viewing the evidence in the light most favorable to
13 the prosecution must determine whether any rational
14 trier of fact could have found the essential
15 elements of the crime satisfied beyond a reasonable
16 doubt.
17         They found that the elements were not
18 satisfied beyond a reasonable doubt even though the
19 jury found that they were.  So they found that the
20 jury acted irrationally in evaluating the evidence.
21     Q.  Acted irrationally, does that -- do you
22 equate this to the conclusion that the jurors were
23 irrational?
24     A.  I don't believe that I -- wait a minute.

84

21 (Pages 81 to 84)

1   Let me look at my report.
2       My report does not say that the jurors
3   were irrational. It says that the Appellate Court
4   necessarily found that the jury did not function in
5   a rational manner. And that's my opinion.
6       Q. All right. But have you had cases where
7   the Court -- where your client was convicted, the
8   Appellate Court has overturned a conviction?
9       A. Outright like this, I can't recall any.
10  It's very, very, very, very rare.
11      Q. Very rare. Completely rare -- very rare?
12      A. Very rare.
13      Q. Maybe the Court was irrational.
14      A. Well --
15      Q. What do you think?
16      A. No. I really don't have an opinion as to
17  whether the Court was irrational.
18      Q. Let me put it this way: It is a very
19  unusual thing for the Court to just acquit outright
20  like this in the Appellate Court? This is, in
21  fact, what they did.
22      A. It's very unusual.
23      Q. They did what's called a cold record,
24  correct? I saw that term in some of your treatises

85

1   dwelling, and they said that the state did not
2   disprove that beyond a reasonable doubt. That
3   doesn't necessarily equate to saying that
4   Mr. Bourke is credible.
5       Q. Did they rely on his testimony?
6       A. They discussed his testimony, but they
7   relied upon the fact that as they say here on
8   Page 46, in conclusion we hold that the state did
9   not prove beyond -- excuse me, did not disprove
10  beyond a reasonable doubt defendant's claim that he
11  killed Johnson in defense of his person and his
12  dwelling.
13      Q. How did his defense get in front of the
14  Court?
15      A. I have no idea.
16      Q. Well, doesn't the opinion refer to the
17  defendant's case in chief?
18      A. It does.
19      Q. In Section 2, Page 14 and on in the
20  opinion?
21      A. It does. It refers to the state's case.
22  It refers to the defendant's case, and I think
23  it -- I believe it refers to the state's rebuttal,
24  doesn't it?

87

1   here.
2       A. They did it on the basis of the record and
3   on the basis of the arguments of the lawyers and
4   the briefs, yes.
5       Q. And they looked at the photographs of the
6   crime scene, correct?
7       A. I don't know what they looked at.
8       Q. And saw the stifling on the face of the
9   victim?
10      A. I have no idea what they looked at.
11      Q. Did -- who was in a better position to
12  judge the credibility of Mr. Bourke, the jury or
13  the Appellate Court?
14      A. Credibility of Mr. Bourke?
15      Q. Yes. I mean, the Appellate Court relied
16  on his testimony in great detail.
17      A. Yes --
18      Q. Okay.
19      A. -- they did.
20      Q. They found him credible?
21      A. I don't know. I don't think they did.
22  I -- they said -- they said that the defendant had
23  raised -- had introduced sufficient evidence to
24  raise the defense of self defense and defensive

86

1       Q. Well, let's start at Page 14, second
2   paragraph.
3       A. Okay.
4       Q. Defendant testified, correct?
5       A. Wait. Wait. Wait. I'm getting there.
6       Q. Page 14?
7       A. I see it, right.
8       Q. And look at Page 15, continuing on.
9       A. Yes.
10      Q. 16?
11      A. Right.
12      Q. 17?
13      A. Right.
14      Q. 18, 19?
15      A. Right.
16      Q. And then Page 20, they go into cross
17  examination of the defendant?
18      A. Right.
19      Q. And he testified some more?
20      A. Right.
21      Q. Page 21, 22, 23, 24, and ending on
22  Page 25?
23      A. Right.
24      Q. So Page 14 through 25 includes a summary

88

22 (Pages 85 to 88)

1   of the defendant's testimony on establishing what
2   occurred that night?
3   　　A.　It appears that the defendant's testimony
4   was the only evidence that was offered in the
5   defendant's case in chief.
6   　　They don't mention any other -- oh, Gloria
7   Johnson, one paragraph on Gloria Johnson, one short
8   paragraph on Gloria Johnson, and then the rest is
9   about Mr. Bourke's testimony, correct -- Mr. David
10  Bourke's testimony.
11  　　Q.　Right.　The state called Mr. Bourke's
12  father?
13  　　A.　Right.　In rebuttal you mean?
14  　　A.　Yes.
15  　　A.　Right, and then a police officer.
16  　　Q.　Now, my point is that who is in a better
17  position to judge Mr. Bourke's credibility, the
18  jury or the Appellate Court on the cold record?
19  　　A.　It's a hard question -- that's a hard
20  question to answer because the Appellate Court
21  looks at the evidence in the light most favorable
22  to the state, and they did that here as well.
23  　　They -- you know, they never say -- I
24  don't think in all the pages that we looked, they

89

1   never -- they never said that Mr. Bourke's
2   testimony was credible or persuasive.
3   　　They said only that it was sufficient to
4   raise the defense, and the state did not disprove
5   the defense beyond a reasonable doubt.
6   　　Look at Page 34:　We hold that defendant
7   succeeded in raising the affirmative defenses of
8   defensive person and defensive dwelling.
9   　　It's not saying he's credible, that's just
10  saying he introduced some evidence relating to
11  those affirmative defenses, and having done that
12  the burden is then on the state to disprove it
13  beyond a reasonable doubt.
14  　　Q.　Who are his lawyers making that record?
15  　　A.　Who were the lawyers who put on David
16  Bourke?
17  　　Q.　Yes.
18  　　A.　I assume one of -- Mr. Conger or
19  Mr. Brucar.　I haven't read the transcripts.
20  　　Q.　So anyway -- and then after what you just
21  quoted on Page 36, the Court continues on
22  discussing defendant's testimony.
23  　　According to defendant's testimony, I'm at
24  Page 36 at the top, Johnson later violently entered

90

1   defendant's dwelling and physically assaulted him
2   apparently intending physical retaliation for
3   having to walk home from the bowling alley.　It
4   cites People versus Nunn, correct?
5   　　A.　Right.　Keep going.
6   　　Q.　And it goes on analyzing Mr. -- strike
7   that.　It analyzes the defendant's testimony
8   whether --
9   　　A.　It says we hold that the defendant raised
10  the defense, the affirmative defenses.　It's not
11  the same thing as saying he's credible.
12  　　Q.　Who are his lawyers who raised that
13  defense?
14  　　A.　I don't think they passed upon his
15  credibility, I don't see it here.
16  　　Q.　The Appellate Court didn't?
17  　　A.　Right.
18  　　Q.　The jury did, didn't they?　Do you know
19  what -- do you know what Mr. Bourke was like at the
20  jury trial?
21  　　A.　I've never met Mr. Bourke.
22  　　Q.　Do you know -- do you know what a bad
23  witness he was in his own case in person?
24  　　A.　I don't know if he was a bad witness or

91

1   not.
2   　　Q.　Have you ever represented someone that was
3   a bad witness on their own behalf?
4   　　A.　Yes, I have.
5   　　Q.　Have you counseled them not to take the
6   stand?
7   　　A.　Yes.
8   　　Q.　How do you raise self defense without
9   calling the defendant?
10  　　A.　It's very, very difficult.　It can be
11  done.　The state's case could raise self defense.
12  　　Q.　The Appellate Court never personally
13  witnessed Mr. Bourke testifying when they entered
14  the Rule 23 order?
15  　　A.　It would be very unusual if they did.
16  　　Q.　Well, do you have any information that
17  they did?
18  　　A.　No.　No, I don't.
19  　　Q.　Okay.
20  　　A.　No, I don't.
21  　　Q.　How important is a defendant's credibility
22  to prevailing in a jury trial in self defense?
23  　　A.　It is an advantage if you have a credible
24  defendant.

92

23 (Pages 89 to 92)

1   Q.  In this case, in the very moment of the
2   shooting, there were only two participants who were
3   witnesses, it was the -- Mr. Bourke and his victim,
4   correct?
5   A.  If you say so.  I mean, I have not read
6   the transcript of the trial.
7   Q.  Do you know whether there was a struggle
8   for a gun?
9   A.  I could refresh my memory on that by
10  looking at the -- by looking at the Appellate Court
11  opinion.  I believe that there was, that's my --
12  that's my recollection.
13  Q.  Well, there's no testimony from the
14  victim, so it would only come from Mr. Bourke,
15  right?
16  A.  If they were the only two in the room at
17  the time.  They do refer to a struggle but -- no,
18  wait a minute.
19       As I recall, the police officer expressed
20  an opinion that there had -- well, probably
21  expressed the opinion that there had not been a
22  struggle, but my point being that there was other
23  testimony about whether there was a struggle or not
24  beside Mr. Bourke.

93

1   Q.  Page 19, defendant testified that he
2   managed to manipulate Johnson to the front door.
3        Johnson had both hands on defendant's
4   right hand and was twisting defendant's right arm.
5   Now at that time Mr. Bourke had a gun, right?
6   A.  I have no idea.  Let me see, defendant and
7   Johnson struggled over the gun.  During the course
8   of the struggle Johnson raised his arm, knocked
9   defendant's glasses off, managed to manipulate to
10  the front door.  It does -- yes, I believe that he
11  did have a gun at that time.
12  Q.  Do you know --
13  A.  Because it says he twisted his arm and
14  managed to point the muzzle towards Johnson.
15  Q.  Where is the gun?  Do you know where it is
16  today?
17  A.  You already asked me that question, no.
18       MR. MC GARRY:  I want to confer with my
19  co-counsel, I'm almost done.  Are you going to have
20  any follow-up questions?
21       MR. FLAXMAN:  I don't know.
22            (Short break.)
23  BY MR. MC GARRY:
24  Q.  Mr. Thomas, are your opinions that you

94

1   intend to express in the trial of this case set
2   forth in your Thomas Deposition Exhibit No. 2 for
3   identification?
4   A.  Yes, they are.
5   Q.  I just want to ask you -- I'm familiar
6   with some cases where -- ineffective assistance
7   cases, one called People versus Bowman, First
8   District appellate decision, and -- 325 Ill. App.
9   3rd 411, 758 N.E.2d 408, and that's First District,
10  September 2001.
11       I'm not showing you an opinion here, this
12  is cross examination, I'm just going to ask you if
13  you agree with a statement, and it states the
14  decision whether to exercise an unavailable --
15  strike that.
16       The decision whether to exercise an
17  available preemptory challenge is a strategic one.
18  Do you agree with that statement?
19  A.  Depends on the facts of the case.
20  Q.  Do you agree with this statement:  Our
21  Courts will not find ineffective assistance of
22  counsel where the claim arises from matters of
23  defense strategy?
24  A.  Same answer, depends on the facts of the

95

1   case.
2   Q.  Would you agree with this statement?
3   A.  If it is truly a matter of defense
4   strategy and it is based upon -- can I at least see
5   the statement?  I'm not asking to read the whole
6   case.
7   Q.  I'm reading the statement at the top of
8   Page 16 -- here, I'll direct you to the two
9   provisions I just read.
10  A.  Well, the first one I answered, depending
11  on the facts of the case.  But the second one is a
12  little -- again, it depends upon the facts of the
13  case.
14  Q.  I'm asking you now do you agree with the
15  general statement of the law, depending on the
16  facts of the case, our Courts will not find
17  ineffective assistance of counsel where the claim
18  arises from matters of defense strategy?
19  A.  There are cases where I would agree with
20  that statement, and there are cases where I would
21  disagree with it, and where the Courts do not --
22  strategy is not a talisman behind which every
23  deficiency of defense counsel disappears.  It
24  depends.

96

24 (Pages 93 to 96)

1    Q.  Have you ever seen a case, Federal
2  District case -- Federal circuit case Woodruff
3  versus Tomlin on trial judgment?
4    A.  Not to my recollection, no.
5    Q.  Do you agree -- I'm looking at a different
6  case, People versus Powell, P-O-W-E-L-L, 2004,
7  again First District, cited at 822 N.E.2d 131:
8  "The decision as to whether to question a potential
9  jurors" -- I'm reading exactly the way I read it,
10  "The decision as to whether to question a potential
11  jurors on particular subject is considered to be
12  one of trial strategy which has no bearing on
13  competency of counsel."  Do you agree or disagree
14  with that statement?
15    A.  Depends upon the facts of the case.  If
16  there's a particular subject that -- that is
17  irrelevant, for example, religious beliefs and they
18  conducted an otherwise reasonably competent voir
19  dire, then I would agree with it.
20    Q.  Those statements I just stated don't
21  qualify the way you just did.
22    A.  But they qualify it because they are
23  written in the context of cases that are based upon
24  specific facts, so I think they are qualified in

97

1  the way that I've been qualifying my answer.
2    You know, you can't just take a -- you and
3  I -- well, you can't just take a general
4  proposition of law and say, you know, this is the
5  law.  That's -- that's not the way it works as I'm
6  sure you well know.
7    Q.  Well, you respect the law, correct?
8    A.  Yes.
9    Q.  And the cases I read to you are decisions
10  by the First District Appellate Court, correct?
11    A.  Apparently.
12    Q.  And they cite other cases, a string of
13  citations you can see as to precedent, correct?
14    A.  Correct.
15    Q.  So the statements I just made to you are
16  statements of precedent, correct?
17    A.  They're abstract propositions of law which
18  for their validity depend upon the facts of the
19  case in which they are uttered or issued.
20    Q.  What could be more abstract than the
21  question of whether or not a potential juror should
22  be discharged for preemptory discharge when you
23  compare it to what -- when you don't even know who
24  the next juror is on deck?

98

1    MR. FLAXMAN:  Let me object to the form of the
2  question.
3    THE WITNESS:  I don't understand the question.
4  BY MR. MC GARRY:
5    Q.  Well, isn't there a degree of speculation
6  in your opinion here?
7    A.  What?
8    Q.  You're speculating on who the next jurors
9  would be, for example?
10    A.  No.  I'm not speculating on who the next
11  juror are going to be.
12    Q.  You don't have enough information to do
13  that, correct?
14    A.  I don't know who the next jurors would be.
15    MR. MC GARRY:  Okay.  I have nothing further.
16    MR. FLAXMAN:  I have no questions.
17    MR. DOLEZAL:  I don't have anything.
18    MR. FLAXMAN:  Reserve.  We'll reserve.
19    THE WITNESS:  You don't represent me.
20    MR. FLAXMAN:  I'm sorry.
21    THE WITNESS:  But I am going to reserve.
22    (Deposition concluded at 3:32 p.m.)
23    FURTHER DEPONENT SAITH NOT.
24

99

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4  DAVID BOURKE,            )
5    Plaintiff,      )
6  vs.                      )  No. 03 C 7749
7  VILLAGE OF DOWNERS GROVE,  )
8    Defendant.      )
9    This is to certify that I have read the
10  transcript of my deposition taken in the above-
11  entitled cause by Susan Maul, Certified Shorthand
12  Reporter, on the 26th of January, 2009, that the
13  foregoing transcript accurately states questions
14  asked and answers given by me as they now appear.
15
16
17    _ _ _ _ _ _ _ _ _ _ _ _ _
18        David Thomas
19  SUBSCRIBED AND SWORN TO
20  before me this _ _ _ _ day
21  of _ _ _ _ _ _ _ , 2009.
22    _ _ _ _ _ _ _ _ _ _ _ _ _
23    Notary Public
24

100

25  (Pages 97 to 100)

STATE OF ILLINOIS   )
                    ) SS:
COUNTY OF WILL   )

1   I, Susan Maul, a notary public within and for

the County of Will and State of Illinois, do hereby

certify that heretofore, to-wit, on the 26th of

January, A.D. 2009, David Thomas, personally

appeared before me, at 222 North LaSalle Street, in

the County of Cook and State of Illinois, a witness

in a certain cause now pending and undetermined in

the United States District Court, wherein David

Bourke is plaintiff and Village of Downers Grove is

defendant.

I further certify that the said witness was

first duly sworn to testify the truth, the whole

truth and nothing but the truth in the cause afore-

said; that the testimony then given by said witness

was reported stenographically by me, in the

presence of the said witness, and afterwards

reduced to typewriting by Computer-Aided

Transcription, and the foregoing is a true and

correct transcript of the testimony so given by

said witness as aforesaid.

I further certify that the signature of the

101

---

witness to the deposition was not waived.

I further certify that the taking of this

deposition was in pursuance of notice; and that

there were present at the taking of this deposition

the attorneys as hereinbefore noted.

I further certify that I am not counsel for nor

in any way related to the parties to this suit, nor

am I in any way interested in the outcome thereof.

In testimony whereof I have hereunto set my

hand and affixed my notarial seal this ___ day

of _____, 2009.

_____
Notary Public, Cook County, Illinois

102

---

McCorkle Court Reporters, Inc.
200 N. LaSalle Street Suite 300
Chicago, Illinois 60601-1014

DATE:   January 29, 2009
Mr. Kenneth N. Flaxman
200 South Michigan Avenue
Suite 1240
Chicago, IL  60604
IN RE:  Bourke vs. Village of Downers Grove
COURT NUMBER: 03 C 7749
DATE TAKEN: 01-26-09
DEPONENT: David Thomas

Dear Mr. Flaxman:

Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled
cause. Also enclosed are additional signature
pages, if applicable, and errata sheets.
Per your agreement to secure signature, please
submit the transcript to the deponent for review
and signature. All changes or corrections must be
made on the errata sheets, not on the transcript
itself. All errata sheets should be signed and all
signature pages need to be signed and notarized.

After the deponent has completed the above, please
return all signature pages and errata sheets to me
at the above address, and I will handle
distribution to the respective parties.
If you have any questions, please call me at the
phone number below.

Sincerely,

Margaret Setina        Court Reporter
Signature Department   Susan Maul
cc: Mr. McGarry

103

26  (Pages 101 to 103)

**A**

ability
81:19
able
34:12,11 43:18
60:13 63:6
74:18
above-entitled
1:11 103:11
abstract
65:2 98:17,20
abuse
15:12
accept
59:6
accepted
58:21
accepting
57:19 59:3
accepts
69:6
accident
64:18
accurate
12:5
accurately
100:13
accused
31:3 71 15
acquit
85:19
acquitted
63:21,24
acted
9:20 83 19
84:1,20,21
actions
71:11
actively
25:18
actual
20:3,7,'0,14
20:16 78:1
Adams
14:3
additional
48:15,20
103:11
address
53:22 103:17
adequacy
49:14
adjudicatory
60:22
administered
15:14
administration
80:24
admitted
24:20
admitting
24:5
advantage
92:23
adverse
81:2
advertise
7:13 12:12
affirmative
90:7,11 91:10
affixed
102:10
afore
101:16
aforementioned
103:11
aforesaid
101:23
afternoon
43:14
age

81:5
ages
51:14
ago
14:17,18 18:21
21:5
agree
35:16 48:4
71:1,4 80:18
80:20 95:13
95:18,20
96:2,14,19
97:5,13,19
agreed
15:16 23:17,19
48:5
agreeing
24:3
agreement
4:11 103:13
ahead
37:3 43:8
64:13
Akers
11:11 21:13
Albert
35:18 36:11,16
allegation
24:19 55:15
alleged
16:3 19:12,19
23:12 55:11
alley
91:3
Alschuler
35:19 36:11,16
Alschuler's
80:6
alternate
67:8,10
Amendment
60:20
amount
10:1 11:21
analysis
84:9
analyzes
91:7
analyzing
91:6
ANO
2:17
answer
10:4 11:9
32:14 57:2
58:10 89:20
95:24 98:1
answered
96:10
answers
100:14
anybody
74:14
anymore
5:1
anyway
46:20 79:5
90:20
apart
83:19
App
95:8
apparently
91:2 98:11
appeal
30:16 53:10,11
53:16 54:22
55:13
appealed
53:8
appealing
53:14

appear
44:15 58:17
100:14
APPEARANCES
2:1
appeared
23:10 51:6
101:8
appearing
58:18
appears
37:15 41:7
89:3
appellate
33:7,10,12,16
33:16 38:24
78:19 83:20
83:24 85:3,8
85:20 86:13
86:15 89:18
89:20 91:16
92:12 93:10
95:8 98:10
applicable
103:12
applies
32:3
apply
31:16
approached
15:13
approximately
7:21
arbitrary
61:11
archived
54:19
ARDC
14:21
area
26:15
arguments
86:3
arises
95:22 96:18
arm
94:4,8,13
arms
76:21,23
arose
18:22 22:23
article
9:6 28:16 29:3
29:5 35:18
36:5,9 37:2
37:16
articles
35:11
Arusha
27:3,7
asked
8:11 12:6
17:21 40:11
49:11,12
55:5 71:7
80:15 94:17
100:14
asking
46:17 57:23
80:8 96:5,14
assaulted
91:1
assistance
23:13 24:2
29:24 30:21
31:4,7,10
55:12,19
71:17 95:6
95:21 96:17
associated
19:20
associations

25:22
assume
35:5 53:8
69:22 72:11
90:18
assuming
49:18
attached
12:2
attempted
62:13,14
attitude
78:8
attitudes
80:8
attorney
4:20,22 5:16
38:10 51:14
52:14 71:11
attorneys
11:13,19 16:2
29:20 46:7
102:5
attorney's
28:16 71:11
audience
72:21 73:18,21
auspices
15:6
author
36:12 37:19
authoritative
33:8,14
available
12:12 46:17
95:17
Avenue
2:3 103:5
aware
31:15
A-K-E-R-S
21:14
A.D
1:16

**B**

B
2:22 3:10
39:18 41:22
back
10:23 17:17
27:10 41:11
42:22 43:10
45:1 54:4
60:3 71:23
73:7
background
29:1 34:19
82:1
bad
35:16 91:22,24
92:3
bail
15:20,21,23
16:3,6 17:5
Bakalis
51:7 53:3,6
bank
13:5,5 15:13
15:18 16:5
47:2
Barton
25:2
based
17:3 24:3
30:21 31:4
31:22 70:15
71:21 80:20
81:3,14,16
82:24 83:1,2
83:7,24 96:4

97:23
basic
48:13
basically
6:1,11 19:9
27:17 49:6
60:15,20
66:4 68:20
84:5
basis
15:22 34:3
67:15 69:14
70:5 71:8,12
82:23 86:2.3
bear
76:21,23
bearing
97:12
began
42:24 43:13
50:6
beginning
42:16
begrudge
45:8
behalf
7:5,15,23 10:9
22:15 34:10
92:3
behavior
15:20
beliefs
80:9,13,18,21
81:18,21
97:17
believe
6:8,18 8:8
9:22 11:14
16:10,12,21
16:24 18:7
18:15 20:20
21:4 22:8
24:16 26:2
26:21 27:8
51:8 62:9
69:19 72:4
73:6,15 74:1
77:16 84:24
87:23 93:11
94:10
believes
70:2
belong
6:23 12:15
belonged
26:8
bench
18:14,15 27:16
benches
73:7
best
55:9
better
86:11 89:16
beyond
30:24 84:15,18
87:2,9,10
90:5,13
bill
39:21 40:13
41:3,6,8,11
42:6
bills
39:4
bit
9:12
blame
56:24 57:4,4,8
57:10
blaming
57:7
boards

6:23
bolts
60:16
book
61:16
books
61:13 62:20
bottom
84:8
Boulevard
2:18 6:14
Bourke
1:4 5:10 35:3
35:6 52:5,8
52:10 53:12
53:17 57:18
65:5,15
86:12,14
87:4 90:16
91:19,21
92:13 93:3
93:14,24
94:5 100:4
101:12 103:7
Bourke's
46:6 89:9,10
89:11,17
90:1
bowling
91:3
Bowman
95:7
box
73:4,19
break
64:8,11 94:22
Brian
51:9
brief
58:16 82:14
briefs
86:4
bring
39:10
broad
60:15
broadly
33:22
brought
15:5 39:12
78:5
Brucar
2:16 50:13
57:19 58:21
72:6,11 76:3
82:6 83:13
90:19
Brucar's
50:11 65:21
bucks
45:3,4
Building
14:4
burden
90:12
business
6:16
B-A-K-A-L-I-S
51:7
B-A-R-T-O-N
21:19
B-O-U-R-K-E
5:10 52:10

**C**

C
1:6 4:8 39:18
100:6 103:7
calendar
62:20
calendars

47:13
California
 25:8,9 37:16
 79:17
call
 6:6 11:2 12:9
 12:10 26:24
 46:16,19
 57:7 56:24
 67:1 78:17
 103:19
called
 4:3 24:9 27:4
 60:18,19,21
 66:9 75:6
 79:13 85:23
 89:11 95:7
calling
 92:9
calls
 46:8
capacity
 24:18 38:11,11
care
 9:21 10:3
 24:23 25:2
 33:9,20
 45:10 49:16
 55:21
Carl
 4:8
carried
 15:2
carrier
 14:1
case
 4:17 5:14,19
 6:4,20 8:9
 9:23,33 10:2
 10:5,12,16
 10:18 11:11
 11:14 12:8
 12:19 22
 13:7, 6.20
 13:21 22,24
 14:10 11
 16:7, 2
 17:15 17
 18:1,9,22
 19:1,`4,14
 19:16 16,16
 20:1,`9,24
 21:7,8,9,16
 22:4,9,13,23
 23:3,4,6,9
 24:16 26:23
 27:1,2,11
 29:21 23
 30:3,8,8
 31:5 32:10
 32:15 16,19
 32:24 34:22
 35:3,`6
 37:14 38:18
 38:20 41:13
 52:4,45
 54:23 56:7,9
 57:18 59:11
 59:16,16
 61:12 63:3
 63:14 64:1,5
 64:15,17,18
 65:7 71:13
 72:12 79:10
 79:14 80:14
 80:14,17,19
 81:19 82:3
 83:22 87:17
 87:21,22
 89:5 91:23
 92:11 93:1
 95:1.19 96:1

96:6,11,13
96:16 97:1,2
97:2,6,15
93:19
cases
 5:5 6:21 8:2,6
 8:17 15:11
 15:11,12,12
 15:16 16:11
 20:4 26:21
 27:8,15 30:2
 30:5,14,18
 30:20 31:3,6
 31:9,9 32:12
 33:18 47:10
 55:6,7,23,24
 56:4,6,10,13
 56:16,16
 57:8,9 61:20
 62:7,17,21
 63:9 85:6
 95:6,7 96:19
 96:20 97:23
 98:9,12
cash
 44:14
cause
 1:11 25:5
 29:13 34:16
 67:13 68:1,4
 69:2,21 70:3
 70:15 75:7
 76:12 100:11
 101:10,16
 103:11
cc
 103:24
Cecile
 5:16 6:7,10
 46:17
cell
 47:3
certain
 12:7 101:10
certainly
 28:13 45:8
certificate
 12:2
Certified
 100:11
certify
 100:9 101:6,14
 101:24 102:2
 102:6
chair
 56:1
challenge
 29:4 61:15
 67:13 68:4,6
 69:9,16,20
 70:14,15
 71:3 72:12
 74:4,5 75:6
 95:17
challenges
 29:12,13 32:23
 34:9,16,17
 34:23 61:8
 61:19,21
 69:17 70:4
 74:3,13 75:1
 75:17
challenging
 10:12 68:1
changes
 103:14
charged
 10:2 11:22
 77:3
chart
 65:19,21,24

66:4
check
 44:14
checks
 44:18
Chicago
 1:16 2:5,11,20
 8:24 35:12
 35:19 36:24
 60:4 103:2,6
chief
 87:17 89:5
circle
 17:17
circuit
 11:16 13:8
 33:16,17
 97:2
circumstances
 46:13
citations
 98:13
cite
 29:21 30:17
 68:9 80:3
 98:12
cited
 28:22 30:12
 35:11 36:3
 37:2,16 97:7
cites
 91:4
citing
 80:5
civil
 1:14 4:11 6:13
 8:2 10:16,18
 21:9,16 22:3
 26:13 52:4
claim
 17:2,7 19:7
 20:21 33:5
 53:23 54:2
 83:5 87:10
 95:22 96:17
claiming
 11:19
claims
 20:14,17
Claire
 63:16 64:3
Clarence
 41:19
client
 10:10,12 17:2
 19:4 24:1,1
 24:3 34:10
 55:11 57:13
 58:8,17 59:3
 59:11,13,17
 75:19,20
 76:6,12
 82:17 85:7
clients
 57:10 59:5
client's
 24:10
clinic
 15:6 18:23
clinical
 8:12,15
code
 15:24 81:10,11
cold
 85:23 89:18
come
 6:7 63:7 70:22
 73:24 74:7
 93:14
comes
 7:18,20 75:5
coming

33:19
commenced
 43:16
comment
 37:24 79:22
 80:2
commented
 82:5
comments
 37:24 79:23
committed
 24:5 70:1
communicating
 83:15
communications
 46:6
community
 82:22
company
 59:20,21
compare
 98:23
competency
 97:13
competent
 49:18 51:15,17
 51:23 83:12
 97:18
complete
 10:4 11:23
 46:2 49:9
completed
 49:1 50:7
 103:16
completely
 62:17 85:11
compliance
 4:12
Computer-Aided
 101:20
concentration
 26:15
concept
 20:3
concluded
 13:10,13,14
 14:14,17
 16:7 43:20
 99:22
conclusion
 83:17 84:22
 87:8
conclusions
 33:20
condition
 24:4
conditions
 31:24
conduct
 32:8 80:23
 81:8
conducted
 49:15 97:18
confer
 59:5 94:18
confidential
 41:14
confirmation
 47:2,14
Conger
 2:16 51:2
 57:19 72:6
 82:16 90:18
Conger's
 83:14
conservative
 32,22
consideration
 83:9
considered
 97:11
constitution

34:8 76:20,23
constitutional
 28:13,17 30:10
 33:24 34:2,6
 34:9 60:15
consult
 58:17
consultant
 60:7,9
consultants
 60:11
consulted
 57:18 58:7
consulting
 59:2
contact
 12:8 46:10
contacted
 5:15 6:3,6
contacts
 7:1
contain
 46:5
containing
 61:1
context
 7:9 8:13 20:8
 20:11,12
 24:18 97:23
continues
 90:21
continuing
 88:8
contributed
 49:20
convicted
 63:21,23,23,24
 64:4 85:7
conviction
 23:11,12 83:21
 84:11 85:8
Cook
 13:8,13 17:16
 22:20 26:22
 28:5 101:9
 102:15
copied
 62:5
copies
 28:7 40:12,19
 47:1 54:13
copy
 17:19 22:11
 36:7 37:11
 37:13 43:7
 43:19 47:10
corpus
 20:15
correct
 4:17,23 5:11
 9:14,15,17
 14:22,23
 17:11,12
 22:5 24:23
 24:24 40:9
 42:6,7 44:1
 45:24 46:1,3
 46:4 58:19
 64:19 68:6
 69:7,8 72:16
 73:5 75:12
 75:15 79:10
 80:2 85:24
 86:6 88:4
 89:9 91:4
 93:4 98:7,10
 98:13,14,16
 99:13 101:22
correcting
 49:6
corrections
 103:14

correctly
 52:7
Corus
 13:5
costs
 44:18,19,20,23
counsel
 12:7 13:18,24
 14:7,8 18:9
 18:10,17,18
 22:16,17
 23:2,21
 24:10 27:2
 29:24 49:8
 49:16 53:24
 55:12 56:3
 71:17 82:11
 95:22 96:17
 96:23 97:13
 102:6
counseled
 92:5
counties
 26:18
countries
 5:8
country
 47:18 62:11
County
 1:12 11:15,15
 13:9,12,13
 17:17 22:14
 22:19,20
 24:14 26:22
 27:14,15,21
 28:5 50:21
 50:24 55:24
 82:21 83:15
 101:3,5,9
 102:15
couple
 57:24 61:1
course
 8:22 9:1 60:19
 60:22,22,24
 74:20 94:7
courses
 8:18 60:18
court
 1:1 5:23 6:13
 11:16 13:8
 18:4,8 22:4
 23:11 26:23
 27:6,7 33:12
 33:13,15,16
 33:17 38:24
 40:16 47:13
 53:19 58:23
 69:1 78:19
 83:21,24
 84:9 85:3,7
 85:8,13,17
 85:19,20
 86:13,15
 87:14 89:18
 89:20 90:21
 91:16 92:12
 93:10 98:10
 100:1 101:11
 101:1,7,22
Court's
 4:13
cover
 39:17 44:18
 47:1

coverage
14:22 15:3
covered
28:21
covers
28:14
co-counsel
5:24 22:23
23:1,22 59:2
94:19
co-defendant
23:2
credibility
86:12,14 89:17
91:15 92:21
credible
86:20 87:4
90:2,9 91:11
92:23
crime
84:15 85:6
criminal
7:9,24 11:16
15:10 12,16
15:24 18:1
19:4,5 20:4
20:19 21:7,8
22:3,9 23:21
26:12 14,16
27:4 28:13
28:17 30:9
32:4,24
33:23 34:3,7
50:21 51:15
51:17 23
72:2 84:10
criticism
53:20
cross
88:16 95:12
Crudup
21:18 25:1
CSR
1:11
CULBERTSON
2:8
culturally
82:22
current
11:23 12:5
currently
25:7
curriculum
11:24
CV
10:17,24 11:2
11:9 12:5
21:11 28:8
46:24
C-A-R-L
4:8
C-R-U-D-U-P
21:18 25:1

────── D ──────

D
3:1 101 7
damages
10:20 1:19
DANIEL
2:14
date
4:12 48 2
49:23 103:4
103:8
David
1:4,10 :.3 4:2
4:8 5:10
52:4 63:2,3
63:5 89:9
90:15 100:4

100:16 101:7
101:11 103:8
day
42:22 43:12,19
48:6 66:23
100:20
102:10
DE
2:17
dead
60:5
deal
24:22
dealing
30:3 32:20
34:1
deals
9:2 28:18 68:8
68:18
dealt
9:24 60:23
63:10,11,12
63:12
Dear
103:9
Dearborn
14:3
death
20:11 76:11
decades
51:14
December
27:1
decided
7:3
decision
32:21 57:6
77:18,20
95:8,14,16
97:8,10
decisions
33:5,7,18
55:19 57:14
98:9
deck
72:19 98:24
defend
70:22
defendant
1:8 10:23
11:16 12:19
13:6,15,17
13:19,22
19:3 21:2,3
27:5 55:5,8
75:1 78:23
84:11 86:22
88:4,17 90:6
91:9 92:9,24
94:1,6 100:8
101:13
defendants
2:15,23 11:20
23:3 58:9
defendant's
18:1 87:10,17
87:22 89:1,3
89:5 90:22
90:23 91:1,7
92:21 94:3,4
94:9
defended
18:9
defense
7:9 12:7 16:22
18:17 22:16
22:17 26:12
26:14,16
27:2 32:4
34:7 49:16
51:16,18
56:3 63:10

63:10,11,12
63:13,14,17
63:18,20
64:1,16,17
64:18 74:3
74:13 76:4
82:11 86:24
86:24 87:11
87:13 90:4,5
91:10,13
92:8,11,22
95:23 96:3
96:18,23
defenses
90:7,11 91:10
defensive
86:24 90:8,8
deficiency
96:23
definitely
63:16
defraud
24:18
DEGEN
2:14 62:9
degree
63:17 64:4,5
99:5
demanded
35:3
denied
68:2,4
Department
103:23
depend
98:18
depending
96:10,15
depends
32:10,14 61:12
80:14 95:19
95:24 96:12
96:24 97:15
deponent
99:23 103:8,11
103:13,16
deposed
18:6 54:11
deposition
1:10 3:12 4:9
11:2,4 16:18
17:14,18
37:6,10 40:5
41:21 42:1
44:10 50:11
52:15 58:3
62:1 95:2
99:22 100:10
102:1,3,4
103:10
depositions
52:3,4 54:9,9
describe
6:9
described
83:3
description
17:7
designate
73:11
destructive
15:21
detail
86:16
determination
49:14
determine
84:13
develop
34:20
developing
79:14

difference
45:11
different
5:6,7,7 57:6
61:18,18,19
61:20 97:5
difficult
92:10
dire
30:15 34:16,18
38:23 42:11
42:23,23
47:6,24
49:15,18,19
58:16 61:14
65:3,23
71:15,22,24
76:3 78:15
82:5 83:9
97:19
direct
67:23 96:8
directly
6:3
disability
81:4
disagree
82:8 96:21
97:13
disappears
96:23
discharge
98:22
discharged
98:22
disclosure
37:22
disclosures
4:13
discovery
4:9
discriminate
81:14,16
discriminatory
81:2
discuss
29:3 31:10
discussed
30:16 82:17,18
87:6
discusses
29:8,11
discussing
90:22
discussion
17:9 25:15
52:23
dismiss
16:17
dismissed
16:8,8
disprove
87:2,9 90:4,12
distribution
103:18
District
1:1,2,15 18:5
18:8 95:8,9
97:2,7 98:10
100:1,2
101:11
DIVISION
1:3 100:3
DNA
20:11
doctrine
32:2,5
document
24:17
doing
34:18 44:2
72:22

DOLEZAL
2:22 40:23
45:21 99:17
domestic
15:12
door
94:2,10
double
53:13
doubt
84:16,18 87:2
87:10 90:5
90:13
Downers
1:7 100:7
101:12 103:7
draft
42:16 49:4
50:7
drafted
50:3
drafting
50:6
drafts
49:3
drinking
80:10,13,16
driving
83:6
drug
15:11
duces
45:20
duly
4:3 101:15
DuPage
13:12 14:9
27:14,15,21
28:4 50:21
50:24 55:24
82:21 83:1,2
83:3,14
dwelling
87:1,12 90:8
91:1

────── E ──────

E
3:1,10
early
21:9,10 43:14
EASTERN
1:3 100:3
educate
34:21
education
8:12,15
effort
45:16
Eisele
60:2,3
Eisenberg
63:12,22
either
5:15 6:16,19
8:5 18:20
31:17 61:6
71:15 74:2
elements
84:15,17
enage
80:23
enclosed
103:10,11
ended
17:11 19:18
44:5
engage
81:1
enter
34:22

entered
90:24 92:13
entire
40:8
entitled
70:7 100:11
entries
42:12
equate
31:7 84:22
87:3
errata
103:12,14,15
103:17
error
52:23
escapes
14:9
essential
84:14
establishing
89:1
estimate
14:12 27:22
42:19
evaluate
70:24
evaluating
84:20
evidence
65:6 78:12,13
78:21 83:22
83:23 84:10
84:12,20
86:23 89:4
87:23 90:10
exact
37:13 43:21
exactly
7:19 44:4 83:3
97:9
examination
3:2 4:5 68:18
88:17 95:12
examined
4:4 36:22
examining
80:7
example
31:11 80:9
97:17 99:9
examples
77:21
excuse
47:7 60:18
69:2 74:16
75:3 77:22
87:9
excused
66:18 67:2,4
70:2 72:15
73:16,23
74:23
exercise
29:8,12 33:1
34:23 61:7,8
69:15 70:7
71:2,9,12
75:2 95:14
95:16
exercised
16:5 71:14
72:11 74:3
74:13
exercises
31:16
exercising
71:10
exhausted
22:17 23:7
exhaustion
23:15

exhibit
3:12 11:2,5,23
12:1 37:7,10
39:15 40:1 5
41:21 42:2
44:8,11 46:3
61:22 62:2
95:2
exhibits
40:15
expected
49:16
experience
8:1,5,14 21:12
23:9 24:11
27:14,17
29:2 38:3,7
50:16,20
80:11 83:7
83:14
experienced
79:23
experiences
75:11
expert
4:13,16 7:4,7
7:8,12,16
9:20,24 10:5
10:7,9,19
11:12,20
12:8,13,15
21:12,24
22:21 46:18
48:4,16
54:11 75:9
82:23 83:5
expertise
7:18 22:7
experts
16:20 33:19
express
95:1
expressed
77:10 93:19,21
expunge
65:16
extensive
30:6
e-mail
62:5

F

face
50:15 86:8
fact
11:1 17:3
22:22 47:17
76:4,6,9,11
77:12 13
79:2 80:1,17
83:20 84:14
85:21 87:7
facts
59:16 60:1
61:12 70:6
72:9 82:1
95:19 24
96:11 12,16
97:15 24
98:18
failing
32:22
failure
16:16 17:4
fair
17:6,7 31:20
fall
32:13
familiar
20:2,9,10,13
30:14 32:5

familiarity
8:1
far
22:10 44:3
fashion
38:16 83:4
father
89:12
faulty
71:14
favor
16:15 17:11
19:2,2
favorable
84:12 89:21
fax
47:1 62:23
faxed
41:15 47:15
50:8 66:23
66:24
Federal
1:14 4:10 18:4
20:14,23
22:4 26:23
34:5 97:1,2,8
fee
10:1 21:16
Feel
46:14
fees
10:13,22 11:19
11:21 28:16
felt
57:15 69:19
Fifth
60:20
figure
66:1
file
39:11,12,16
40:9,12 43:8
44:6 46:2
filed
14:11,12 52:18
53:1
files
54:17,20
fill
73:14
final
49:22 50:4
find
14:5 17:13,17
34:12,14
45:16 60:13
72:8,10 78:1
78:8 82:1
95:21 96:16
findings
53:7
finish
11:8
finished
43:14
firearms
78:18
first
4:3 15:22
48:23 49:1
56:1 66:14
73:3,12,12
73:23 95:7,9
96:10 97:7
98:10 101:15
firsthand
38:6
fit
74:22
five
27:22 55:24

61:17
Flaxman
2:2 5:16,20,21
5:22 6:3,6
6:10 29:5
39:7 40:14
40:21 44:22
45:2 46:19
47:11,16
50:8 52:8
62:6,24 64:8
67:1 68:11
79:19 94:21
99:1,16,18
99:20 103:4
103:9
Flaxman's
47:3
focus
7:22 8:22 9:1
9:16,19 34:4
34:5
focusing
9:12 60:14
74:17
folders
61:1
follows
4:4
follow-up
94:20
foregoing
100:13 101:21
forgery
24:16,19
form
48:7 49:9 99:1
formed
48:8 50:2
former
11:16 55:11
formerly
4:20
forth
4:14 57:15
95:2
found
53:9 60:17,24
61:1,3,5
63:17 71:16
71:20 84:1
84:14,17,19
84:19 85:4
86:20
four
14:18 25:22
61:16
Fourth
60:20
free
46:14
Friday
44:15 45:21
friends
83:2
frivolous
69:22
front
87:13 94:2,10
fulfilled
72:6
full
66:14
function
34:15 61:14
79:12 85:4
functions
71:24 72:7
fund
15:14,19
further
42:15 99:15,23

101:14,24
102:2,6

G

Garry
2:13 3:4 4:6,9
4:15 11:7
17:8,10
25:13,16
29:7,14 37:9
39:9 40:4,18
40:22 41:1
41:21 42:4
44:17 45:3,5
45:19,22
52:7,9,13
61:22 62:4
63:8 64:7,10
64:12 68:13
68:16 80:4
94:18,23
99:4,15
general
19:6 30:19
32:17 74:1
81:23 96:15
98:3
generally
31:24
generation
81:22
getting
37:3 88:5
give
35:9 46:23
given
9:9 72:5
100:14
101:17,22
giving
62:6
glasses
94:9
Gloria
89:6,7,8
Glover
37:20
go
11:9 18:12
22:10 27:10
43:8 62:19
64:13 66:8
66:12 88:16
goes
40:22 91:6
going
19:8 28:10
38:15 39:13
40:15 44:7
54:4 66:8,11
68:21 69:2
69:16 71:23
73:9,10,11
73:13 91:5
94:19 95:12
99:11,21
good
15:21 25:21
26:1,2 46:22
73:22
grammatical
49:6
grant
76:20
granted
74:4
grante
76:23
great
86:16
grounds

16:15,19 69:20
group
39:15 40:1,6
46:3 62:16
62:17 73:3
Grove
1:7 100:7
101:12 103:7
guess
6:2 10:10
1:1:17 16:4
30:24 32:9
32:14 37:22
51:18 53:16
57:3 58:6
78:5
guide
29:20
guiding
69:12
guilty
19:21 49:20
63:17 71:16
71:21
gun
65:13 76:9,15
76:17 77:2,5
77:6,13 78:5
78:10 93:8
94:5,7,11,15
guns
77:11 78:9

H

H
3:10
habeas
20:14
habits
80:10,13,16
Hablace
63:2,5
half
42:14,19 43:23
63:19,20
hand
27:11 94:4
102:10
handbook
61:9
handle
103:17
handled
8:8 53:16
handling
8:6
hands
94:3
handwritten
47:9 61:6 65:1
Hans
60:2,3
happen
26:15 30:19
happened
15:18 22:9
58:1 73:15
hard
14:16 16:4
70:17 89:19
89:19
head
14:2 30:17
62:16 71:19
help
20:23 68:21
hereinbefore
102:5
heretofore
101:6
hereunto

102:9
HINSHAW
2:8
hobbies
80:10
hold
7:11 36:2 87:8
90:6 91:9
Holmes
35:13
home
91:3
homicide
47:10,14 62:8
62:14
hope
12:24
host
15:10 59:23
hotel
76:7
hour
1:17 42:13,19
43:23
hours
42:20,20 43:12
43:23 82:7
hundred
56:17,17
hundreds
30:1,2,2
Hurtado
63:6,12,23

I

ID
3:11
idea
24:7 36:20,23
52:16 53:18
54:21 55:1
86:10 87:15
94:6
identification
11:3,6 37:8
39:15 40:3,6
42:3 44:8,12
62:3 95:3
identified
77:18 79:6
IIT
8:23
IL
2:5,11,20
103:6
Ill
95:8
Illinois
1:2,13,16
20:16,20
25:8 26:22
29:23 30:3
33:12,12,15
34:24 81:9
81:11 100:2
101:1,5,9
102:15 103:2
imagine
30:4 33:21
52:24
immune
32:1
immunity
32:3,6
immunize
71:11
impaneled
75:13
impartial
81:20
implies

75:22
importance
34:18
important
71:6 8C:16
92:21
impression
20:22 43:13
73:20
inactive
25:10,11
inadequate
30:15,22 31:4
31:23
incarcerated
17:3
incentive
34:2
incident
77:9
includes
88:24
including
81:24
indicated
62:10 64:14
indicates
42:13,15
indication
57:21 58:11
indoctrinating
79:13
inductive
84:5
ineffective
23:13 24:2
29:24 30:21
31:3,7,10
53:24 55:11
55:19 71:17
95:6,21
96:17
influence
16:5 81:19
inform
77:12
information
59:23 72:10
92:16 99:12
initial
6:6 46:10,16
innocence
20:4,7,10,14
20:17 21
31:13
input
59:9
instruction
34:12,15
instructor
8:16
insurance
14:1 15:3
intend
95:1
intending
91:2
interested
102:8
interfering
35:10
International
27:4
introduce
77:12
introduced
76:3,4 79:2
86:23 90:10
inventory
46:23
investigation
31:23

investigatory
60:19
involved
23:8 27:2
57:13 63:16
64:1 76:9
82:10
involving
8:2 30:21 31:5
irrational
84:2,23 85:3
85:13,17
irrationally
83:19 84:1,20
84:21
irrelevant
97:17
issued
98:19
Item
45:23

J

Jackie
63:13,15,24
Jackson
2:18
jammed
23:4
January
1:16 100:12
101:7 103:4
jeopardy
53:13
Jermaine
63:16 64:3
jobs
80:10
Johnson
87:11 89:7,7,8
90:24 94:2,3
94:7,8,14
judge
18:7 23:4 51:7
51:9,13,19
51:19 53:3,6
57:23 58:15
58:22 68:2,4
72:16 73:16
74:15 86:12
89:17
judges
80:8
judgment
16:9,15 31:17
33:9 70:7
71:1,5,9,10
71:12,14
79:10 97:3
judgmental
32:3,6
July
76:22
juries
38:12 47:10,14
50:23 56:15
62:8,15
jurisdictions
5:6,7 61:18
juror
59:18,19,20
66:4,15,16
66:18 67:8
67:10,14,18
68:1,8,14,19
69:18 70:1
72:17,18
74:10,22
77:10,15
78:4 98:21
98:24 99:11

jurors
29:4 34:20,21
34:21 36:21
33:4,7 59:6
66:15 72:9
72:15 73:3
74:14 76:16
77:18,20,21
78:1,3 79:6
79:14 80:7
80:12,15
81:3,14,20
82:2 83:15
84:22 85:2
97:9,11 99:8
99:14
juror's
80:9
jury
7:7,8,12,16,18
9:2,6,9,13
18:14 19:14
27:14,16,20
28:3,12,14
28:18,20
30:15,22
31:4 32:7,17
32:23 34:19
35:1,3,7,16
36:18 38:23
42:24 43:2
44:3 48:11
49:12 53:20
53:22 54:14
56:8,16,16
57:1,6,7,8
57:17 58:8
59:3,13,15
59:24 60:6,9
60:10,16,23
61:2 65:19
65:21 68:11
72:19 73:4
73:11,19
74:7 75:13
77:13 78:14
79:13 82:17
83:17,19
84:19,20
85:4 86:12
89:18 91:18
91:20 92:22
justice
80:24

K

Karnisar
72:2
keep
39:14 54:8
91:5
Kenneth
2:2 103:4
Kent
8:24 54:18
killed
87:11
kind
16:12 38:15
59:1
kinds
15:11
knew
19:8 36:14
60:3 66:21
knock
74:15
knocked
94:8
know
5:10,17,21,23

5:24 6:12,23
7:3 10:2
12:9 14:4,16
16:1,5,7,18
16:19 19:10
19:23 20:16
21:7 23:6
26:7 28:24
30:3,19 31:5
31:9,13,23
32:2,16 33:4
33:6 35:5
36:11,13,13
36:16,18,21
36:23 37:19
38:3,16
42:22 43:2
43:18 44:3,4
46:9 48:12
50:13,14,15
50:16,18,20
50:23 51:2,5
51:6,9,12,15
52:14,17
53:6 54:22
54:24 55:14
56:10 57:2,3
57:5,8,16,17
58:7,14
59:11,12,13
59:22,22,24
60:2 61:13
61:15 65:6,9
65:13,15
63:3 67:6,7
67:8,12
69:13,15,18
70:18,18
72:19 74:21
75:9,14
76:15,18
78:9,10,19
79:24 80:1
80:20,22
82:15,18,20
83:13 86:7
86:21 89:23
91:18,19,22
91:22,24
93:7 94:12
94:15,21
98:2,4,6,23
99:14
knowing
58:2 83:1
knowledge
17:1 29:1 67:4
68:22 83:7
known
5:22 51:13
knows
59:12,17
Kryzcinski
12:24 15:5,10
15:15
K-R-Y
13:3

L

L
101:3,3
labeled
47:5
Lake
22:14,19 24:13
Larry
18:2 20:24
LaSalle
1:15 2:9 101:8
103:1
lasted

82:6
late
21:10 43:13
lately
76:22
law
4:20 6:12,24
8:16,23 15:2
15:2 28:14
28:17 29:21
29:23 30:8
30:10,20
32:16,19
33:24 34:3,6
34:9 35:12
36:24 37:16
37:23 38:1,8
50:21 54:18
79:17,18,22
80:1 96:15
98:4,5,7,17
lawyer
6:1,8 10:1,1,8
10:8,11 14:8
23:23 24:23
25:3 31:3,16
32:22 34:9
36:15,17
38:11 44:21
44:22 50:17
50:21 51:16
51:18,20,22
51:23 59:1
59:22 61:7
70:8 71:2,8
71:13,20
82:23 81:1
83:8,12
lawyers
5:18 6:16 9:21
17:20 20:18
55:20 79:1
80:7,11 81:3
82:1 86:3
90:14,15
91:12
lawyer's
31:22
league
12:16
learn
34:19
leave
40:15
lecture
9:9
left
12:4 15:1
legal
5:22 8:2,6,7,8
8:19 12:19
16:10 19:11
20:18,22
30:11 31:7
31:11,14
42:16 48:13
55:6 71:16
71:21 76:17
77:2,9,13
78:10
length
82:15
letter
37:4,11
letters
47:4,5
let's
12:20 27:10
64:8 66:5
68:20 72:11
88:1
levels

61:19
license
25:9 78:18
licensed
25:7,10 38:10
life
75:11
light
84:12 89:21
likelihood
49:20
limited
82:11
line
58:22 69:1
list
11:24 23:1
62:7,8
listed
10:17 11:11
22:24 25:19
28:8 52:11
82:3
litigants
81:2
litigation
20:11 26:13
little
18:21 47:2
48:13 96:12
live
28:5
lives
59:19 76:6
LLP
2:8
locate
54:6
located
5:3
location
65:10
locations
5:5
long
39:3 42:8,10
43:2,11 44:2
60:5 77:6
82:20
longer
18:21 82:6
look
10:24 11:8
27:10 35:22
36:9 39:19
39:21 43:5,9
44:6 45:11
45:14 46:14
45:15 66:14
67:16 68:20
68:23,23
84:3 85:1
88:8 90:6
looked
14:20 22:17
38:22,24
60:17 86:5,7
86:10 89:24
looking
17:14 46:9
54:13 56:15
58:20 65:18
66:22 71:23
77:24 93:10
93:10 97:5
looks
22:3 36:4,5
62:22 65:19
72:20 77:9
89:21
lose
56:19,21

lost
56:24 57:3,9
lot
15:11 40:19
70:20 23
lower
33:15

_____

M

maintain
20:21
making
17:2 70:15
90:14
malpractice
8:2,6,7,9
12:19 13:21
13:22 14:22
15:2 '6:11
17:21,23
19:11,12,20
20:3,6,18,22
20:24 24:6
31:8,'.14
33:5 '5:6,7
70:1 71:17
71:21
man
35:15
managed
94:2,9,14
manipulate
94:2,9
manner
85:5
manual
29:16,19 34:13
Margaret
103:22
mark
11:1 37:5,5
39:13,14
41:17 44:7
61:22
marked
3:11 11 5 36:1
36:2 37:7,10
40:2,5 42:3
44:11 46:2
62:2
Marquette
14:4
material
26:24
materials
38:19 39:2
45:24 47:23
48:5,16,20
52:12 60:13
61:1,5
matter
19:15 32:7,11
32:18 59:10
70:10,13
71:1 74:5
96:3
matters
30:11,12 33:18
33:20 45:17
95:22 96:18
Maul
1:11 100:11
101:4 103:23
Mc
2:13 3:4 4:6,9
4:15 11:7
17:8,10
25:13,16
29:7,14 37:9
39:9 40:4,18
40:22 41:1

41:21 42:4
44:17 45:3,5
45:19,22
52:7,9,13
61:22 62:4
63:8 64:7,10
64:12 68:13
68:16 80:4
94:18,23
99:4,15
McCorkle
103:1
McGarry
103:24
McGivsy
69:5
McShane
63:11,23 64:16
mean
5:4,20 7:14
13:19 16:21
23:2 26:19
29:5 33:1
40:18 46:8
53:15 54:17
65:10 67:5,6
76:17 77:11
79:19 81:17
86:15 89:13
93:5
means
49:6
Melvin
63:4
member
25:21 26:1,2
members
6:24
memberships
25:17 26:5
memory
22:6,18 62:13
62:18,21
93:9
mental
23:15 24:4
mentally
23:7
mention
8:12 43:12
76:19 89:6
mentioned
44:13 54:2
55:6 76:5,8
76:10,13,15
78:4
merits
79:14
met
6:13 91:21
Michael
37:19
Michigan
2:3 103:5
mine
68:13 83:2
Minneapolis
26:24
minute
43:3,3 52:19
53:23 56:11
77:23 84:7
84:24 93:18
minutes
57:24 82:6
misconduct
80:22 81:7
misdemeanor
10:2
mishandling
20:18
missing

41:7
misspoke
64:15
mix
41:19
modern
72:2 81:9
moment
14:9 58:16,22
70:8 93:1
money
15:19
Moran
18:7
morning
43:14 47:19
62:12
motion
16:9,17 52:17
52:24 53:4
55:12 69:23
motions
65:15
move
66:11
moved
67:13
murder
19:16 22:24
23:5 63:18
murders
64:2
muzzle
94:14
M-C-S-H-A-N-E
64:16

_____

N

N
2:2,15 3:1
103:1,4
name
4:7 12:22,23
14:9 17:15
18:1 50:15
63:3 66:3
named
21:2
national
81:4
Nations
27:3
nature
6:14 15:8 19:6
19:11 21:21
24:10 34:16
34:17
necessarily
35:17 70:16
85:4 87:3
need
40:20 63:22
69:17 103:15
needed
77:21
neighborhood
59:19
never
5:12,13 38:13
33:3,3 52:19
55:16 55:16
60:11 68:5
76:16,16
78:7,8,9,9
89:23 90:1,1
91:21 92:12
night
89:2
North
1:15 2:19 101:8
Northern
1:2 18:5 100:2

Nos
3:16 42:2
notarial
102:10
notarized
103:15
notary
1:12 100:23
101:4 102:15
noted
102:5
notes
42:21 44:1
47:6,11
49:24 61:3,6
65:1,18,23
68:24
notice
102:3
number
3:11 17:15
47:3 67:19
78:2 103:7
103:19
numbers
61:19,20 66:2
Nunn
91:4
nuts
60:16
N.E.2d
95:9 97:7

_____

O

object
99:1
objection
67:14
obtained
28:7
obvious
32:12 77:21
obviously
71:4
Occasionally
57:11
occupation
4:19
occurred
89:2
October
42:12,13 46:15
46:21 48:3,8
48:9 49:2,23
50:10
offered
64:6 89:4
office
5:3 6:8 55:3
officer
89:15 93:19
officers
64:2
oh
22:19 29:22
43:17 51:11
53:18 89:6
okay
5:2,6,17 9:16
11:10 13:15
14:14,19
15:8 18:3
24:22 25:7
27:10 28:9
30:14 31:6
39:3,19
40.11,17,21
45:1,7,7
47:22,23
48:7,18,23
50:1 51:22

53:15 54:7
54:12 55:18
58:24 66:7
66:13 67:3
67:12 68:7
70:24 73:1
73:22 76:14
80:5 81:9,12
82:15 86:18
88:3 92:19
99:15
old
61:3
Oliver
35:12
once
75:22
ones
25:24 56:24
57:3
open
47:18
opened
62:11,12
openly
75:24
operation
35:10
opinion
9:13,17,19
24:17 28:22
28:23 30:7
37:3,4,11,14
38:18 48:7,8
49:17,22
50:2 67:3,5
70:6 71:23
72:5 77:17
77:18 82:8
83:18,24,24
84:3 85:5,16
87:16,20
93:11,20,21
95:11 99:6
opinions
28:11 66:9
94:24
opportunity
77:12
opposed
64:23
order
4:13 34:19,20
34:21 38:24
48:1,11
49:13 52:21
53:19 77:4
78:16 92:14
orderly
38:16
organizations
25:18 26:8
orientation
81:5,15
origin
81:4
outcome
102:8
outright
54:1 85:9,19
overturned
85:8
o'clock
1:17 43:10

_____

P

P
2:13
page
21:12 36:1,3
47:2,12,15

58:20 66:8
66:11,12
68:10,18
69:1,5 73:10
77:24 84:8
87:8,19 88:1
88:6,8,16,21
88:22,24
90:6,21,24
94:1 96:8
pages
12:4 82:10,13
89:24 103:12
103:15,17
panel
58:21 59:6
69:7 73:12
73:13,14
panels
57:20 72:15
73:11
paper
41:11,16 64:20
64:22
paragraph
66:14 82:4
88:2 89:7,8
part
8:13 10:3,14
10:20 11:19
12:3 28:24
29:1 64:21
73:19 81:22
81:23 84:6
participants
93:2
participating
25:18
particular
68:8 69:18
82:3 97:11
97:16
particularly
77:10
parties
102:7 103:18
partner
57:16
party
13:6
passed
35:8 91:14
Patterson
18:2 20:24
21:1
penalty
20:11
pending
13:7 101:10
people
24:12 57:4
72:18,21
73:2 75:10
83:1 91:4
95:7 97:6
percent
8:10
perfect
63:18 64:10
77:12
permit
77:4 78:17
person
63:5 74:11,12
74:16,21
75:2,3 87:11
90:8 91:23
personally
36:14 92:12
101:7
persuasive
90:2

phone
12:9,10 46:8
47:3  03:19
phonetic
69:6
photocopying
44:19,20,23
45:6
photographs
86:5
physical
23:15 24:4
65:6 91:2
physically
23:7 91:1
pick
60:16 73:9,10
picked
36:19
picture
73:2
place
67:9,11 78:1
plain
52:23
plaintiff
1:5 2:7 11:18
11:18 18:17
49:9 `00:5
101:12
plaintiffs
5:18
plaintiff's
12:23 14:6,8
plea
19:19
pleading
19:18,21
pleadings
17:15
please
4:7 41:2 45:13
103:13,16,19
pled
56:10 64:4
plus
7:21
point
19:24 20:3
27:9 73:22
81:23 89:16
93:22 94:14
police
64:2 89 15
93:19
politically
82:22
Pontiac
22:24 23:7,8
23:16 24:11
pool
74:1
portion
39:20 60:22
68:7
portions
67:24
position
23:19 86:11
89:17
possible
38:14 59:4
post
15:19,23 16:6
23:10,12
posting
16:3
posttrial
52:17,24 53:4
55:12
potential
73:3 79:13

80:15 82:2
97:8,10
98:21
Powell
97:6
practice
5:2,23 6:12
7:20 18:23
26:10,13,18
29:20 34:6
54:18 57:13
58:14
practiced
82:24
practices
80:8
practicing
4:22 29:19
50:21
precedent
98:13,16
precisely
12:10
precondition
31:13
preemptories
75:4
preemptory
29:4,12 32:23
34:17 61:7
61:15,19,20
67:15 68:5
69:9,15 70:3
70:14 71:3
72:12 74:4,5
74:13 75:16
75:22 95:17
98:22
prefer
75:23
prejudicial
80:24
preparing
30:7 38:18
prerogative
44:24
presence
101:19
present
24:7 26:19,22
64:1 102:4
presented
40:14 63:14
preservations
77:11
presumption
31:21
presumptions
31:16,19
pretrial
60:20
pretty
75:23
prevailing
92:22
prevent
53:13
primarily
26:12,14 62:13
65:24
primitive
65:20
prior
9:22 27:13,18
27:19,24
50:10 80:10
probably
9:12 17:16
27:23 38:9
39:10 42:19
70:16 93:20
probe

80:8
procedure
1:14 4:11 7:24
15:24 60:21
72:2
proceeding
23:11,12
proceedings
20:15 42:24
14:18 52:1
proceeds
17:14
process
57:16,17
profession
8:20
professional
8:19 25:17
24:8 81:8
professor
4:21 36:24
professors
79:24
prohibited
15:24
prohibits
16:2
pronounce
52:7
pronounced
52:10
proof
20:3,7,10 49:5
50:8
proper
49:23 81:19
proposition
30:18 98:4
propositions
98:17
prosecuted
53:10
prosecution
84:13
prosecutor
69:6
Prosecutorial
28:15
prospective
80:7
prove
87:9
provided
45:23 71:8
provision
16:2
provisions
96:9
public
1:12 7:11
100:23 101:4
102:15
publication
28:18
publications
28:8,11
publish
48:23
published
49:2 50:4
pulling
72:21
purpose
29:15,18 61:14
purposes
34:15
pursuance
102:3
pursuant
1:13 4:10
pursue
78:11

put
29:9 45:17
72:1 73:4
35:18 90:15
P-A-T-T-E-R...
21:1
P-O-W-E-L-L
97:6
p.m
1:17 99:22

---
Q
---
qualifications
75:10
qualified
97:24
qualifiers
31:24
qualify
9:23 97:21,22
qualifying
98:1
quarter
42:20
question
8:4 29:3,9
31:1 32:20
39:7 53:16
57:2 58:10
62:7 69:11
72:23 74:17
75:21 79:5
89:19,20
94:17 97:8
97:10 98:21
99:2,3
questioned
77:22
questioning
82:11
questions
71:8 94:20
99:16 100:13
103:19
quick
46:23
quite
30:6
quotation
35:12,13 81:22
81:24
quotations
80:6
quote
79:17
quoted
90:21

---
R
---
R
2:14
race
81:4,17
raise
86:24 90:4
92:8,11
raised
30:15 53:24
86:23 91:9
91:12 94:8
raising
90:7
randomly
72:22,24 73:3
74:9
Randy
23:1,4,6,10,13
23:21,23
24:2,3,5,8
Randy's
24:4

rapport
34:20 79:15
rare
85:10,11,11,11
85:12
rational
84:13 85:5
reach
54:1
reached
16:24
read
29:10 31:9
35:15 42:8
42:10,14,20
50:10 51:24
52:3,4,11
58:3 69:14
78:24 79:3,3
82:7 90:19
93:5 96:5,9
97:9 98:9
100:9
reading
43:23 96:7
97:9
really
16:19 99:12
26:17 45:6
55:16 81:13
85:16
realm
32:13
reasonable
33:19 49:19
69:20 71:12
82:1 84:15
84:18 87:2
87:10 90:5
90:13
reasonableness
10:13 11:21
reasonably
70:2 83:12
97:18
reasoning
84:6
reasons
66:19
rebuttal
87:23 89:13
recall
17:22,24 18:5
32:19 35:13
43:9 55:14
55:16,18,22
58:18 62:14
63:9 71:19
85:9 93:19
received
46:19
reckon
38:6,9
recognized
71:24
recollection
16:14 19:17,18
21:8 46:10
47:13 54:24
55:9 56:9
93:12 97:4
record
4:7 17:8,9
25:15,16
29:10 39:22
41:2,22 42:5
43:15 44:2
57:21 58:1
58:11,13,18
58:19 64:14
65:16 68:22
72:14 76:2

78:20,23,24
79:3,4 85:23
86:2 89:18
90:14
records
39:4
recoupment
10:22
recovering
31:14
recycled
41:10,16 64:20
reduced
101:20
refer
6:16,21 66:2,2
87:16 93:17
reference
43:4 52:20,22
78:1,3
referred
6:19
referring
30:23 31:2
33:10 65:1
82:9,13
refers
87:21,22,23
reflect
49:24
reflected
39:1 48:13
refresh
22:18 47:13
62:20 93:9
refreshes
46:9
refused
15:23
regard
10:3 51:17,23
regarded
15:20
regarding
10:19 11:21
22:16 29:24
32:17 33:8
33:20 34:21
49:14,14
53:20 57:14
58:8 59:3
65:23
regardless
79:24
registration
14:21
regular
7:1
relate
25:2 28:11
related
14:20 24:13
38:19 102:7
relates
9:13
relating
90:10
relation
81:1
relationship
6:9,15 31:10
released
17:4
relevant
80:19 81:21
82:3
relied
35:18 86:15
87:7
religion
81:4,15,17
religious

80:9,13,18
80:21 81:18
81:21 97:17
rely
28:23 33:19,22
87:5
remember
6:5 9:11 11:13
12:10 13:6
14:2,5,6
16:19 18:16
18:19 19:3
19:13,24
22:1,1 24:12
24:15 25:6
39:3 46:16
56:7 62:15
63:14 68:1
reminds
44:14
remove
67:14
rendered
24:2
replace
73:18 74:9
replacement
73:24
report
9:18 22:1,2,11
24:21 30:13
35:22 36:3
39:1 42:17
46:24 48:14
48:24 49:1,5
51:24 66:6
66:23 24
76:19 85:1,2
reported
32:21 33:4
55:18 71:18
71:20 101:18
reporter
39:22 43:16
100:12
103:22
Reporters
103:1
represent
15:15,17 99:19
representation
15:9
represented
11:14 13:10
92:2
representing
27:5
request
69:20
requested
29:10
requirement
31:12
research
42:16 43:13
reserve
99:18,18,21
respect
28:12 98:7
respective
103:18
respectively
42:6
responsibility
8:19
responsive
62:7
rest
89:8
resting
71:1
resultec

20:19
retain
7:4
retained
4:16 5:9,14
7:15 9:24
10:9,19
11:14 16:20
21:24 22:20
48:2
retaliation
91:2
retry
84:11
return
44:15 103:17
reversed
54:1 83:21
review
30:8,9 32:1
35:12 37:17
48:5,16,18
49:12 79:18
103:13
reviewed
30:12 38:17
39:2 45:24
48:10,11
52:12
reviewing
84:9
revise
49:5
revision
50:8
revisions
49:3 50:3,4
rider
45:14,17 47:7
54:4 60:12
right
12:18 14:10
17:19 21:11
21:15,23
22:4 23:16
23:24 24:4
24:15 27:12
34:24 35:7,9
35:24 36:8
37:18 41:15
43:6,8 45:15
46:22 49:4
58:4 62:8
66:8,10,12
66:17 67:23
68:20 72:8
72:13 74:5
75:8 76:20
76:23 77:19
78:3 79:7,8
79:15 81:12
81:15 83:23
84:3 85:6
87:7,11,13
88:15,18,20
88:23 89:11
89:13,15
91:5,17
93:15 94:4,4
94:5
rights
6:13 10:16,18
21:16
risk
15:21
Robert
63:11
role
8:15
room
93:16
row

73:13,20
rude
40:19
rule
20:17 30:20,20
32:17 38:24
47:24 48:11
49:13 52:20
52:20 53:19
54:2 69:12
77:4 78:16
80:22 81:6,7
92:14
ruled
53:3
rules
1:14 4:11 16:1
81:7,9
run
5:23
Rwanda
27:5

S
S
3:10
SAITH
99:23
satisfied
84:15,18
Saturday
47:16,19 62:12
saw
85:24 86:8
saying
24:2 25:4 58:6
87:3 90:9,10
91:11
says
61:16 65:4,5
73:9 77:4
78:16 80:23
84:9 85:3
91:9 94:13
SCARRY
2:17
scene
86:6
scheduling
4:13
school
8:23 15:2,2
37:1 54:18
Scott
2:15,22
se
59:24
seal
102:10
search
17:16
second
25:14 47:15
60:21 62:16
62:17 63:17
64:4,5 66:12
73:13,13,20
88:1 96:11
Section
87:19
secure
103:13
see
15:14 17:18
22:13 24:1
28:17 35:20
30:2 39:8
41:2,18
52:22 54:5
57:21,23
58:11 63:22

69:2 74:14
76:2 83:22
83:23 88:7
91:15 94:6
96:4 98:13
seek
67:14
seen
32:21 38:13
65:21 71:13
97:1
select
39:18
selected
38:11 50:23
73:3 74:9
selecting
38:4,7 83:14
selection
7:7,9,12,16,18
9:2,7,10,14
28:12,18,20
30:22 31:4
32:7,17,23
38:23 42:24
44:3 48:12
49:12 53:21
53:22 57:17
58:8 59:14
59:15,24
60:23 61:3
68:11 78:14
79:13 82:17
selections
28:14 54:14
self
15:20 63:10,11
63:12,13,14
63:16,18,20
64:1,16,17
76:4 86:24
92:8,11,22
sense
70:20,23
sent
41:9 44:9
September
95:10
serve
46:18 81:20
served
20:17 47:8
service
12:2
set
73:1 95:1
102:9
Setina
103:22
seven
58:22 61:9
62:16,17
75:1,16
seventh
76:1
sex
81:4
sexual
81:5,14
Sharon
12:23
sheet
40:13 42:6
46:9 47:15
sheets
47:1,2,5
103:12,14,15
103:17
shooting
93:2
short
64:11 89:7

94:22
Shorthand
100:11
shot
13:2
show
20:21 43:15
showing
31:13 95:11
shows
72:14
sides
64:22
sight
51:5
signature
101:24 103:11
103:13,14,15
103:17,23
signed
103:15,15
simple
65:2 79:5,6
Sims
63:23 64:15
Sincerely
103:21
Singer
5:16 6:7 46:17
single
66:15
sir
4:17 40:9
sit
75:11 79:10
sites
30:1
situation
23:14 53:10
59:10 70:17
71:7
six
62:16 72:15
73:11,12,12
73:13,23
75:24
ship
47:2
small
26:13
Smieszkal
11:11
Smieszko
21:13
societies
6:24
socioeconomic
81:5
sociology
83:6
sole
9:16
solely
71:21
somebody
73:16
someplace
68:9
sorry
8:3,11 23:18
41:8,18
47:21 55:2
67:22 78:5
79:21 99:20
sort
12:15 20:12
60:13 84:5
source
72:1
South
2:3 103:5
specialized

7:6 8:22
specific
16:19 19:11
22:2 30:3
31:5 32:19
39:20 43:12
52:22 54:24
97:24
specifically
28:24 38:20
56:7 60:14
speculating
19:10 99:8,10
speculation
99:5
speculative
67:6
spell
12:24
spent
39:5 43:22
spoken
5:12,13
SS
101:2
stage
17:1
stand
53:7,9 92:6
standard
9:21 10:3
24:22 25:2
33:20 49:16
standards
33:9
standing
25:21 26:1,3
start
12:20 88:1
started
13:11 47:9
62:19
state
1:13 4:7 16:16
23:11 27:8
33:12 34:24
35:6,9 53:14
67:12 68:1,5
74:2,15 79:2
82:23 87:1,8
89:11,22
90:4,12
101:1,5,9
stated
64:15 97:20
statement
53:20 80:6
95:13,18,20
96:2,5,7,15
96:20 97:14
statements
97:20 98:15,16
states
1:1,15 14:21
58:21 69:1
95:13 100:1
100:13
101:11
state's
52:14 87:21,23
92:11
status
81:5
statute
35:8
stenographi...
101:18
sticker
39:23
stifling
86:8
Stone

23:1
stop
39:22
storage
54:19
strategic
95:17
strategy
31:17,22 32:7
32:11,13,18
70:11,11,13
95:23 96:4
96:18,22
97:12
Street
1:15 2:9 101:8
103:1
Strickland
30:23,24 31:2
31:18
strictly
9:2,3
strike
7:6 10:15 32:9
42:9 71:16
91:6 95:15
string
98:12
stroke
60:15
struck
35:9
struggle
93:7,17 22,23
94:8
struggled
94:7
stuck
75:5
student
37:23 38:8
79:18,22
80:1
students
8:17 38.1
55:20
stuff
49:7
subject
14:20 97:11,16
submit
103:13
subpoena
44:9,13 45:12
45:19,20
47:8,18
62:12
SUBSCRIBED
100:19
succeeded
90:7
sued
11:15 15:22
17:23,24
32:22
sufficiency
84:10
sufficient
86:23 90:3
suit
15:4 102:7
Suite
2:4,10,19 5:4
103:1,5
sum
55:7
summary
16:9,15 88:24
sundry
15:15
supervised
8:16 79:23

supplied
49:8
support
27:1
supposed
72:24
Supreme
33:13,15
sure
8:10 10:4 11:1
17:20 20:5
31:18 35:23
40:23 43:6
58:19 64:10
72:23 73:16
77:9 80:15
98:6
surprise
38:1
Susan
1:11 100:11
101:4 103:23
sworn
4:1,4 100:19
101:15
syllabi
61:6
syllabus
60:17,24
S-M-I-E-S-Z...
21:13

_____T_____
T
3:10
table
40:16
tactics
31:22
tacum
45:20
take
5:9 13:2 16:10
32:22 41:14
42:8,10,21
45:13 53:2
61:10 64:8
66:5 70:14
92:5 98:2,3
taken
1:10,13 4:10
16:18 52:3
100:10 103:8
takes
83:8
talisman
96:22
talk
43:11 57:24
talked
31:12 43:10
46:20
talking
20:13 27:19
61:2 66:4
67:18 68:15
tangentially
14:20
Tanzania
27:3,6
taught
8:7 9:2 60:18
teach
8:18
teaching
4:24 5:1 7:10
7:21,22,23
8:5,12,14
29:16
Telander
51:9,10,13

telephone
66:24
tell
18:16 27:13
34:1 38:17
40:20 41:6
41:10 43:19
44:4 47:17
61:7,13
70:21 74:11
74:12
tells
61:9
ten
23:3 82:6
tender
45:1
term
85:24
terms
31:12 38:19
49:15 71:15
77:17
test
68:21
testified
4:4 18:6 22:14
22:15 23:9
24:8 84:10
77:8 88:4,19
94:1
testify
21:22 24:10,21
101:15
testifying
92:13
testimony
6:2 21:21
24:20 86:16
87:5,6 89:1
89:3,9,10
90:2,22,23
91:7 93:13
93:23 101:11
101:22 102:9
testing
20:11
thank
40:8 41:5
theory
34:22
thereof
102:8
thereto
81:1
thing
20:12 59:1
71:6 76:16
85:19 91:11
things
33:8,22 38:15
54:5 59:12
think
4:12 6:18 9:8
12:6 13:3
14:3 15:12
16:16 17:7
18:13 22:16
24:17 28:3
32:8,12 36:1
36:6 39:1
43:6 47:22
50:14 60:8
68:2 71:6
75:21 77:7
79:6 80:2
82:5 83:10
85:15 86:21
87:22 89:24
91:14 97:24
thinking
52:9 63:2

third
24:13 37:23
38:7
Thomas
1:10 2:13 3:3
3:12 4:2,8
4:10 11:2,4
37:6,10
39:14 40:1,7
40:8 41:17
41:19,21
42:1,5 44:7
44:10 46:3
62:1 76:2
94:24 95:2
100:18 101:7
103:8
Thompson
40:6 41:18
thorough
34:18
thought
56:18,21 57:5
68:2,14
69:16 78:12
three
12:4 14:17,18
23:5 28:7,19
29:5,7 30:5
33:23 61:8
61:16 62:16
71:24
thumb
30:20
Tiedje
24:12
till
47:19
time
13:5 14:24
15:1 17:22
17:24 20:23
26:7,19,22
39:4 40:12
40:13,18
43:15,19,21
46:9,22 47:1
47:5 60:5
62:23 63:7
64:10 70:8
71:2 73:14
78:13 82:16
93:17 94:5
94:11
times
66:2
today
26:11 39:11
53:3 75:11
94:16
today's
4:12
told
46:18 66:20
67:1 76:16
79:11
Tomlin
97:3
tomorrow
43:11
top
11:11 14:2
30:1,17
62:15 65:5
71:19 77:24
90:24 96:7
topic
22:2 30:4 31:5
82:2
topics

28:21
total
55:7 82:6
to-wit
101:6
training
29:16
transcript
38:22,23 42:14
42:15 43:5
43:19,24
47:7,24
48:12 49:13
54:23 57:22
58:20 65:2
66:7 67:16
67:24 68:7
72:20 73:10
82:12 93:6
100:10,13
100:22
103:10,13,14
Transcription
101:21
transcripts
54:9,16,20
90:19
transferred
13:12
transit
76:7
treatise
28:19,20 29:6
29:7,15,18
33:23 34:13
34:14
treatises
61:6 85:24
treatment
81:2
trial
18:12 19:14,22
22:24 23:5
31:17 33:8
34:19 35:1,4
35:7 36:15
36:17 52:1
53:24 56:8
57:14 66:19
70:8,11,13
71:2 78:22
79:4 91:20
92:22 93:6
95:1 97:3,12
trials
27:14,16,16,20
28:3 36:18
Tribunal
27:3,4
trick
53:15
tried
16:4 27:11
35:8 47:12
56:16 57:12
57:12 62:19
78:8
trier
84:14
true
37:13 101:21
truly
96:3
trust
15:14,19
truth
70:21 101:15
101:16,16
try
45:16 66:1
68:10
trying

17:13 27:14
41:18,19
54:5 63:13
66:3 68:21
70:21,22
turn
19:1
turned
19:2
Turner
63:4
turning
21:11
turns
63:3
TV
38:13
twelve
73:2
twenty
18:21 82:10
twisted
94:13
twisting
94:4
two
42:12,20,20
43:23 55:6
58:8 60:18
61:8 64:2
66:15 70:5
72:15 77:17
78:3 79:6
82:7 93:2,16
96:8
type
19:20
types
34:23
typewriting
101:20
typo
63:2
typos
49:6
T-I-E-D-J-E
24:13

_____U_____
uh-huh
79:16,19
unavailable
95:14
uncommon
55:15
underlying
13:20 15:9
20:21 22:9
84:10
understand
8:3 29:19 31:1
47:20 72:23
99:3
undetermined
101:10
unduly
35:10
unhappy
19:19
United
1:1,14 27:3
100:1 101:11
University
35:11,19 36:24
60:4
unusual
85:19,22 92:15
use
15:18 61:2,4
61:16 64:8
69:9,17 71:5

```
75:22,24              91:3                  59:21 81:3            1:09                  2008                  45
84:2                  Wallace               93:3                  1:17                  46:15 48:3            69:1
usually               63:3                  won                   1:30                  49:23                 46
49:5                  want                  56:8,9,12             43:17                 2009                  87:8
uttered               39:19 44:7,24         wondering             10:00                 1:17 100:12,21        49
98:19                 45:9,11               66:21                 43:10                 101:7 102:11          68:9
UUW                   55:16 57:7            Woodruff              100                   103:4
77:3                  69:17 94:18           97:2                  8:10                  205                   _____5_____
                      95:5                  word                  1062                  5:4
_____V_____     wanted                84:2                  2:19                  21                    5
vague                 10:4 64:19            words                 11                    88:21                 3:18 61:22
19:17,17,24           wants                 83:21                 3:13                  21st                  62:2
56:8                  35:15                 work                  120                   49:2 50:4,5,9         50
vaguely               Washington            6:14 7:10 15:5        82:12                 22                    68:10,18
24:15                 5:4                   42:15 60:6            123                   69:1 88:21            53
valid                 washroom              worked                82:13                 222                   2:18
16:11,13 78:17        64:9                  8:17 59:21            1240                  1:15 2:9 101:8        564-4125
validity              wasn't                60:9,10,11            2:4 103:5             23                    2:21
98:18                 22:19 52:24           working               131                   7:21 38:24
various               78:20                 54:8                  97:7                  47:24 48:11           _____6_____
5:5 15:15             way                   works                 14                    49:13 52:20
verdict               7:11 28:11            59:20 98:5            87:19 88:1,6          52:20 53:19           60601
49:21 53:7,9          57:13 58:1            world                 88:24                 77:4 78:16            2:11
version               58:11 60:3            20:3                  15                    88:21 92:14           60601-1014
72:3                  63:1 71:14            worry                 88:8                  24                    103:2
versus                85:18 97:9            74:24                 16                    88:21                 60604
11:11 21:13,18        97:21 98:1,5          worse                 88:10 96:8            25                    2:20 103:6
24:12 25:1            102:7,8               75:2                  16th                  88:22,24              60604-2430
91:4 95:7             Wayne                 worth                 46:15,21 48:3         26th                  2:5
97:3,6               2:16                  9:12                  17                    1:16 100:12           61
victim                week                  wouldn't              88:12                 101:6                 58:20
86:9 93:3,14          77:7,8                38:1 69:15,24         18                    29                    62
viewing               weeks                 write                 42:12 88:14           103:4                 3:18
84:12                 23:5                  39:23                 183                                         651
village               Wendell               writing               67:20,21             _____3_____     5:3
1:7 10:19,19          35:13                 41:12 64:23           19
10:23  00:7           went                  written               88:14 94:1           3                     _____7_____
101:12 103:7          45:21                 9:6 38:1 47:3         19th                  3:15 39:15
Vindictiveness        weren't               61:5 77:18            42:13,14 48:8         40:2,6 46:3           7
28:15                 12:6                  79:18,22              48:9 49:23            46:3 66:12            60:12
violent               West                  97:23                 50:2,6,10            73:10 77:24           704-3000
76:11                 2:18 5:3              wrong                 193                   3A                    2:12
violently             Westlaw               58:19                 66:16,18 67:21        3:16 39:18            75
90:24                 36:6                  wrote                 67:22 68:15          41:21 42:2,5          56:17
vitae                 we'll                 21:24 24:21           68:17 77:19          3B                    758
11:24                 11:1,2,9 39:22                              77:22 79:9,9         3:16 42:2,5           95:9
voir                  54:8 61:22            _____X_____     1982                  3rd                   7749
30:15 34:15,18        99:18                                      37:17                 95:9                  1:6 100:6
38:22 42:10           we're                 X                     1989                  3:32                  103:7
42:23,23             47:22 67:18           3:1,10                36:5                  99:22
47:6,24              73:9,10,13                                  1996                  30                    _____8_____
49:15,8,19           80:5                  _____Y_____     62:23                 84:8
58:16 61:14          we've                                       1999                  300                   8.4
65:3,23              5:24 45:17            yeah                  27:11,13,18,19        2:10 103:1            80:22 81:6,7
71:15,21,24          whereof               10:24 17:6            27:24 28:2,4          312                   80s
76:3 78:14           102:9                 18:13 19:8,9          49:17 55:24           2:6,12,21             21:6,9,10
82:5 83:9            willing               22:19 27:7            72:3 76:24            325                   822
97:18                 15:18                 50:1 64:22                                  95:8                  97:7
volume                Wilson                71:4                  _____2_____     34                    84-2501
28:20 29:6,7          63:13,15,24           year                                       90:6                  1:12
33:23                 win                   14:11 37:23           2                     35
volumes               19:9 56:6,18          38:8                  3:14 21:12           7:20                  _____9_____
30:6                  56:22                 years                 37:5,7,11            36
vs                    withdrew              7:20,21 14:17         66:8,11              90:21,24              9
1:6 100:6             67:13 68:3            14:18 18:21           87:19 95:2           37                    66:15 68:14,19
103:7                 witness               21:5                  20                    3:14                  77:15,19
vulnerable            3:2 4:1,3,16                                21:5 45:3,4                                 78:5 79:9
75:23                 20:9 11:12            _____Z_____     88:16                 _____4_____     90s
                      21:12 22:15          Z-C-I-N-S-K-I         20th                                        21:6,10
_____W_____     22:22 24:9           13:3                  49:4 50:3,7          4
                      29:8,11                                    200                   3:4,17 44:8,11
W                     44:13 45:4           _____0_____     2:3 103:1,5          40
101:3                 52:11 62:10                                2000                  3:15
wait                  68:14 79:21          01-26-09             14:13,15             408
43:3,3 52:19          91:23,24             103:8                 2001                  95:9
53:23 56:11          92:3 99:3,19          03                    95:10                 411
77:22 84:24          99:21 101:9           1:6 100:6             2004                  95:9
88:5,5,5             101:14,17,19          103:7                 97:6                  42
93:18                 101:23 102:1                               2005                  3:16
waived                witnessed            _____1_____     14:13 26:9           427-3200
102:1                 92:13                1                     2006                  2:6
walk                  witnesses            3:13 11:3,5,23        26:9                  44
                                           45:23                                       3:17
```